E-FILED
Friday, 09 January, 2026  04:28:37 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

THE UNITED STATES OF AMERICA,

        *Plaintiff*,

  v.

BERNADETTE MATTHEWS, in her Official
Capacity as Executive Director of the State Board
of Elections for the State of Illinois,

        *Defendant*.

Civil Action No. 3:25-cv-3398-CRL-DJQ

**MEMORANDUM IN SUPPORT OF COMMON CAUSE, ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, BRIAN BEALS, PABLO MENDOZA, AND ALEJANDRA L. IBANEZ'S MOTION TO INTERVENE AS DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.    DOJ's Efforts to Obtain Private Voter Information ................................. 2

    II.   Proposed Intervenors ........................................................................... 7

ARGUMENT ...................................................................................................................... 10

    I.    Movants Are Entitled to Intervene as a Matter of Right. ...................... 10

      A.   The Motion to Intervene Is Timely. ................................................. 10

      B.   Proposed Intervenors Have Concrete Interests in the Litigation. ................... 11

      C.   Disposition of this Case May Impair the Proposed Intervenors' Interests. ................... 13

      D.   The Board of Elections' Interests Differ from Those of Proposed Intervenors. ............ 14

    II.   In The Alternative, The Court Should Grant Permissive Intervention. ............................. 17

CONCLUSION ................................................................................................................... 18

CERTIFICATE OF COMPLIANCE ................................................................................. 19

CERTIFICATE OF SERVICE .......................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*American Farm Bureau Federation v. Environmental Protection Agency*,
    278 F.R.D. 98 (M.D. Pa. 2011) ............................................................................ 16

*Berger v. North Carolina State Conference of the NAACP*,
    597 U.S. 179 (2022) ............................................................................................ 16

*Bost v. Illinois State Board of Elections*,
    75 F.4th 682 (7th Cir. 2023) ....................................................................... 14, 15, 17

*City of Chicago v. Federal Emergency Management Agency*,
    660 F.3d 980 (7th Cir. 2011) ............................................................................... 14

*Donaldson v. United States*,
    400 U.S. 517 (1971) ........................................................................................... 11

*Driftless Land Area Conservancy v. Huebsch*,
    969 F.3d 742 (7th Cir. 2020) ............................................................................... 15

*Flying J, Inc. v. Van Hollen*,
    578 F.3d 569 (7th Cir. 2009) ......................................................................... 11, 14

*Judicial Watch, Inc. v. Illinois State Board of Elections*,
    No. 24-cv-1867, 2024 WL 3454706 (N.D. Ill. July 18, 2024) ................................. 14, 15, 16

*Kobach v U.S. Election Assistance Commission*,
    No. 13-cv-04095, 2013 WL 6511874 (D. Kan. Dec. 12, 2013) ............................................ 13

*Lopez-Aguilar v. Marion County Sheriff's Depatment*,
    924 F.3d 375 (7th Cir. 2019) ....................................................................... 10, 11, 12

*Meridian Homes Corp. v. Nicholas W. Prassas & Co.*,
    683 F.2d 201 (7th Cir. 1982) ............................................................................... 11

*Pennsylvania Fair Elections v. Pennsylvania Department of State*,
    337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) ............................................................. 6

*Reich v. ABC/York-Estes Corp.*,
    64 F.3d 316 (7th Cir. 1995) ........................................................................... 10, 11

*Republican National Committee v. Aguilar*,
    2024 WL 3409860 (D. Nev. July 12, 2024) ................................................................ 18

*Security Insurance Co. of Hartford v. Schipporeit, Inc.*,
    69 F.3d 1377 (7th Cir. 1995) ............................................................................... 17

*Texas v. United States*,
    798 F. 3d 1108 (D.C. Cir. 2015) ................................................................. 13

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ........................................................................................ 12

**Statutes**

5 U.S.C. § 552a .................................................................................................... 12, 15

52 U.S.C. § 20703 ..................................................................................................... 14

52 U.S.C. § 20704 ....................................................................................................... 3

5 ILCS 179/10 ............................................................................................................ 12

10 ILCS 5/1A-25 ........................................................................................................ 12

815 ILCS 530/5 .......................................................................................................... 12

**Other Authorities**

Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians
    Trying to Sway the Election and Change the Country*,
    PROPUBLICA, July 13, 2024 ....................................................................... 5

Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications
    Fizzle*, SPOTLIGHT PA, Nov. 8, 2024 ......................................................... 6

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National
    Voter Roll*,
    N.Y. TIMES, Sept. 9, 2025 ........................................................................ 4

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*,
    N.Y. TIMES MAGAZINE, Nov. 16, 2025 ..................................................... 5

Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot
    Applications Challenged*, NPR, Nov. 5, 2024 ......................................... 6

Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-
    Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*,
    PHILA. INQUIRER, Nov. 1, 2024 ................................................................. 6

Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*,
    STATELINE, Sept. 12, 2025 ........................................................................ 4

Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged
    by feds as ineligible*,
    STATELINE, Dec. 18, 2025 ......................................................................... 6

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*,
NPR, June 29, 2025 ................................................................................................. 5

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, Tracker of Justice Department Requests for Voter Information,
Brennan Center for Justice (updated Dec. 19, 2025) ............................................. 2

Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET,
June 12, 2025 ........................................................................................................... 5

Press Release, U.S. Department of Justice, *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026) ................................. 4

Press Release, U.S. Department of Justice, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025) ......................................................................................................................... 4

Press Release, U.S. Department of Justice, *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025) ...................................................... 4

Press Release, U.S. Department of Justice, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025) ........................... 4

Press Release, U.S. Department of Justice, *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025) ...................... 4

Press Release, U.S. Department of Justice, *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025) ................................... 4

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025 ................................................. 4

**Rules**

Fed. R. Civ. P. 24(b)(1)(B) ........................................................................................ 17

## INTRODUCTION

The United States seeks to force Illinois to turn over voters' sensitive personal information and data. It has been widely reported that the United States intends to use this data to build an unauthorized national voter database and to target voters for potential challenges and disenfranchisement.

Proposed Intervenors are Common Cause, a non-partisan organization dedicated to grassroots voter engagement in Illinois whose members and whose own work are at risk by the relief the federal government seeks in this case; Illinois Coalition for Immigrant and Refugee Rights ("ICIRR"), a non-partisan, statewide coalition that promotes the full civic, cultural, social, and political participation of immigrants and refugees in Illinois through advocacy, organizing, and voter engagement; and voters who are directly threatened. Proposed Intervenors have a strong interest in preventing the disclosure of Illinois' most sensitive non-public voter data. Common Cause has an interest in protecting the voting and privacy rights of its members and all Illinois voters, and ICIRR has a similar interest in protecting the voting and privacy rights of naturalized citizens whom they help register to vote. The relief the federal government seeks risks discouraging Illinois residents from registering to vote, undermining their work. And the privacy and voting-rights interests of Common Cause's members, of people that ICIRR helps register, and of the individual voter Intervenors are also directly at stake. Proposed Intervenors include members of some of those groups who are under particular threat from the United States' requested relief, including voters who are naturalized citizens and voters who have a prior felony conviction.

Proposed Intervenors are entitled to intervene as of right under Rule 24 as this motion is timely, their rights and interests are at stake, and those rights and interests are not adequately represented by Defendant, who unlike Proposed Intervenors, is a state actor, subject to broader considerations external to the legal issues presented in this case. Proposed Intervenors' unique

1

interests, perspective, and motivation to interrogate the purpose of the sweeping request for non-public voter data will ensure full development of the record and aid the Court in its resolution of this case. Indeed, in similar cases brought over other states' refusal to turn over sensitive voter information, such organizations were granted intervention. *See* Minute Order, *United States v. Amore*, No. 1:25-cv-00639-MSM-PAS (D.R.I. Jan. 6, 2026); Minute Order, *United States v. Galvin*, 1:25-CV-13816 (D. Mass Jan. 6, 2026), Dkt. No. 30; Order, *United States v. Simon*, No. 25-cv-3761 (D. Minn. Jan. 6, 2026), Dkt. No. 90; Minute Order, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Nov. 19, 2025), Dkt. No. 70; Minute Order, *United States v. Oliver*, No. 25-cv-01193 (D.N.M. Dec. 19, 2025), Dkt. No. 25.

Intervention as of right pursuant to Rule 24(a), or in the alternative permissive intervention pursuant to Rule 24(b), should be granted.

## BACKGROUND

### I.　　DOJ's Efforts to Obtain Private Voter Information

Beginning in May 2025, Plaintiff United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, Tracker of Justice Department Requests for Voter Information, Brennan Ctr. for Just. (updated Dec. 19, 2025), https://perma.cc/A4A4-737Z.

On July 28, 2025, DOJ sent a letter to the Executive Director of the Illinois State Board of Elections, Bernadette Matthews ("Director Matthews"), demanding an electronic copy of Illinois' entire statewide voter registration list, including "all fields." Pl.'s Mot. for Order to Compel, Ex. 1, Ltr. from Michael E. Gates to the Hon. Bernadette Matthews dated July 28, 2025, Dkt. No. 5-2 ("July 28 Letter"); Compl. ¶¶ 19–20. The July 28 Letter also propounded several questions

2

regarding Illinois' voter registration and list maintenance procedures and requested that Illinois provide information about purported "registered voters identified as ineligible to vote" due to being non-citizens or due to a felony conviction. July 28 Letter, Dkt. No. 5-2 at 3–4. DOJ asked Illinois to respond within 14 days. *Id.*

On August 11, 2025, Director Matthews provided a redacted version of the registration list citing privacy provisions under both state and federal law. *See* Compl. ¶ 22. The redacted version excluded social security and driver's license numbers, information of registered voters who are victims of domestic violence, human trafficking, and other similarly protected groups, and telephone numbers and addresses for judges who have requested redaction of personal information. *See* Pl.'s Mot. for Order to Compel, Ex. 3, Letter from Marni M. Malowitz to Harmeet K. Dhillon dated September 2, 2025, Dkt. No. 5-2 at 11 & n.1 ("September 2 Letter").

Three days later, DOJ sent another letter, reiterating its demand for the full electronic voter file. Compl. ¶ 23. DOJ again stated that the production "must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Pl.'s Mot. for Order to Compel, Ex. 2, Letter from Harmeet K. Dhillon to the Hon. Bernadette Matthews dated Aug. 14, 2025, Dkt. No. 5-2 at 7 ("Aug. 14 Letter"). This time, DOJ also cited the Civil Rights Act of 1960 ("CRA") as authority for its request, and noted that the "purpose of the request is to ascertain Illinois's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 8. DOJ dismissed any potential privacy issues on the ground that the CRA prohibits DOJ from sharing the sought-after information directly with the public. *See id.* (citing 52 U.S.C. § 20704).

On September 2, 2025, Director Matthews sent a letter to DOJ refusing to provide an unredacted voter registration list. *See* September 2 Letter. The United States responded by filing

3

this lawsuit, which is one of at least twenty-four similar suits seeking disclosure of sensitive voter data.[1]

Notably, according to public reporting, DOJ's requests for private, sensitive voter data from Illinois and other states do not appear to relate to list maintenance under the NVRA and HAVA. Rather, they appear to be connected with novel efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching in order to scrutinize state voter rolls. According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating these novel efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*; *see also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09. One

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/6QP2-8ZXC; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/HHJ7-JWQQ; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division describing

DOJ's aims in this case and others like it:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES

MAGAZINE, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-

justice-department-staff-attorneys.html.

According to additional public reporting, these efforts are being conducted with the

involvement of self-proclaimed "election integrity" advocates within and outside the government

who have previously sought to disenfranchise voters and overturn elections.[2] These actors and

their associates have previously sought to compel states to engage in aggressive purges of

registered voters, and have abused voter data to make mass challenges to disenfranchise voters in

other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw.

---

[2]     *See* Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters; (reporting that Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," has, among other things, promoted the use of artificial intelligence to challenge registered voters); *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://www.propublica.org/article/inside-ziklag-secret-christian-charity-2024-election ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

Ct. 2025) (determining that complaint brought by group affiliated with current DHS official Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to the federal Help America Vote Act, was meritless).[3]

Here, DOJ's actions also indicate that it may target specific groups of voters in its use of the requested data. *See also, e.g.*, Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged by feds as ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/. In its initial July 28 Letter to Director Matthews, and in letters to other states requesting the same private voter data, DOJ requested information about how election officials, among other things, identify and remove duplicate registrations; and verify that registered

---

[3] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-ballot-application-challenges-pennsylvania-fair-elections/ (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); *see also* Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://www.inquirer.com/politics/election/heather-honey-pa-fair-elections-vote-challenges-pennsylvania-20241101.html (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://www.npr.org/2024/11/04/nx-s1-5178714/pennsylvania-mail-ballot-voter-challenges-trump (same).

voters are not ineligible to vote, such as due to a felony conviction or lack of citizenship.[4] In other

states, DOJ also requested information concerning the processing of vote-by-mail applications.[5]

## II.    Proposed Intervenors

Proposed Intervenor Common Cause is a non-partisan organization committed to, *inter*

*alia*, ensuring that all eligible Illinois voters register to vote and exercise their right of vote at each

election. *See* Ex. 2, Decl. of Elizabeth J. Grossman ("Grossman Decl.") ¶¶ 3, 5, 7. Common Cause

has over 15,000 members in Illinois. *Id.* ¶ 4. Those members include Illinois voters, whose

personal data will be provided to DOJ if the United States prevails in this lawsuit. *Id.* ¶ 9. Common

Cause expends significant resources conducting voter engagement and assistance efforts,

including registering qualified people to vote, helping voters navigate the vote-by-mail process,

encouraging participation, and assisting voters who face problems trying to vote. *See id.* ¶¶ 7, 9–

11, 14. The success of these efforts, especially with respect to voter registration, depend on voters'

trust that, when they provide personal information to the State as part of the registration process,

that information will not be abused, their privacy will be respected, and their right to participate

will be honored. *See id.* ¶¶ 10, 12, 14–15.

Proposed Intervenor ICIRR is a nonprofit, non-partisan statewide coalition dedicated to

---

[4] *See, e.g.*, Br. in Supp. of Mot. to Intervene as Defs., Exhibit No. 1, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 25-cv-01481 (W.D. Pa. Oct. 9, 2025), Dkt. No. 37-1 (Pennsylvania); Mot. for Leave to File Mot. to Dismiss, Exhibit A, Letter from Michael E. Gates to Sec'y of State Jocelyn Benson (July 21, 2025), *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. Nov. 25, 2025), Dkt. No. 34-3 (Michigan); Decl. of Thomas H. Castelli in Supp. of State Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), *United States v. Oregon*, No. 25-cv-01666 (D. Or. Nov. 17, 2025), Dkt. No. 33-1 (Oregon); Decl. of Malcolm A. Brudigam in Supp. of Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Nov. 7, 2025), Dkt. No. 37-2 (California).

[5] *See id.*

promoting the full and equal civic participation of immigrants and refugees in Illinois. *See* Ex. 3, Decl. of Lawrence Benito ("Benito Decl.") ¶¶ 3, 6. Founded in 1986, ICIRR is a coalition of more than 100 member organizations across Illinois and has long been at the forefront of immigrant civic engagement, including voter registration, voter education, and non-partisan get-out-the-vote efforts, particularly among naturalized citizens. *See id.* ¶¶ 4–8. Through its Democracy Project and related initiatives, ICIRR has registered more than 300,000 eligible voters and assisted over 150,000 individuals in becoming U.S. citizens, while serving immigrant communities in dozens of languages statewide. *Id.* ¶¶ 6–8. ICIRR expends significant resources conducting voter registration, voter protection, and voter assistance efforts, all of which depend on the trust of naturalized citizen voters that their personal information will not be shared with or misused by the federal government. *See id.* ¶¶ 9–17. If Illinois voter information were disclosed to the federal government, that trust would be undermined, deterring eligible voters from registering or voting and forcing ICIRR to divert resources away from its core civic engagement and voter protection work. *Id.* ¶ 15, 17.

Proposed Intervenor Brian Beals is an Illinois resident who was wrongfully convicted and incarcerated for 35 years for a crime he did not commit. *See* Ex. 4, Decl. of Brian Beals ("Beals Decl.") ¶¶ 1, 4. After he was exonerated in 2023, he registered to vote and has voted since then. *See id.* ¶¶ 2, 4. Mr. Beals has devoted his life to civic engagement, education, and community organizing, particularly among communities impacted by incarceration and disenfranchisement. *Id.* ¶¶ 3–7. During and following his incarceration, Mr. Beals served as a Civics Peer Educator through programs administered by the Illinois Department of Corrections, training other incarcerated individuals and delivering dozens of non-partisan presentations on voting rights and civic participation, reaching hundreds of people. *Id.* ¶¶ 5–7. Voting is of profound importance to

Mr. Beals, both personally and professionally, and he works actively to combat disenfranchisement and encourage eligible voters—especially formerly incarcerated individuals—to participate in the democratic process. *Id.* ¶¶ 8–9. Mr. Beals is deeply concerned that Illinois voter data, including his own, may be shared with the federal government, particularly because formerly incarcerated voters already face fear, mistrust, and vulnerability, and such disclosure would deter civic participation and suppress voting in already marginalized communities. *Id.* ¶¶ 10–12.

Proposed Intervenor Pablo Mendoza is an Illinois resident, returning citizen, registered voter, and community organizer who works to support the civic reintegration of formerly incarcerated people. *See* Ex. 5, Decl. of Pablo Mendoza ("Mendoza Decl.") ¶¶ 1, 3–5. After spending more than two decades incarcerated, Mr. Mendoza participated in the Education Justice Project and later cofounded and now codirects Walls Turned Sideways, a Chicago-based organization that provides reentry support, political education, and voter registration assistance to returning residents. *Id.* ¶¶ 3–5. Through this work, Mr. Mendoza helps formerly incarcerated individuals restore their right to vote and understands voting as a critical means of reclaiming political voice. *Id.* ¶ 6. Mr. Mendoza is deeply concerned that the federal government may obtain access to his voter registration data and that of the communities he serves, particularly given the historical targeting of formerly incarcerated people for voter suppression. *Id.* ¶ 7. He seeks to intervene to protect his own voter data and to prevent its misuse in ways that could chill political participation and infringe on constitutional rights. *Id.* ¶¶ 7–8.

Proposed Intervenor Alejandra Ibañez has been an Illinois resident and Illinois registered voter since 1997. *See* Ex. 6, Decl. of Alejandra L. Ibañez ("Ibañez Decl."), ¶¶ 1, 5, 7. Born in Chile in 1973, Ms. Ibañez fled with her family to the United States in 1979 to escape persecution. *Id.* ¶¶ 2–3. Her family initially settled in New Jersey before relocating to Illinois in 1988. *Id.* ¶ 3. Ms.

Ibañez became a naturalized citizen in 1997. *Id.* ¶ 5. The right to vote is extremely important to Ms. Ibañez, and she has regularly voted since she became eligible. *Id.* ¶ 7. Ms. Ibañez does not believe that the federal government should have access to her private voter registration information and fears such data could be used to suppress voting rights by chilling participation among naturalized citizens—whom she believes, based on her own experience and longstanding ties to immigrant communities are especially vulnerable in this political moment. *Id.* ¶¶ 8–9.

**ARGUMENT**

**I.    Movants Are Entitled to Intervene as a Matter of Right.**

In the Seventh Circuit, a party is entitled to intervene as of right under Federal Rule of Civil Procedure 24(a) upon establishing: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action." *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) (quotation marks and citation omitted). "A motion to intervene as a matter of right . . . should not be dismissed unless it appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint." *Id.* Because Prospective Intervenors satisfy each of these requirements, intervention should be granted.

**A.  The Motion to Intervene Is Timely.**

Timeliness is determined "from all the circumstances." *Lopez-Aguilar v. Marion Cnty. Sheriff's Dept.*, 924 F.3d 375, 388 (7th Cir. 2019). Relevant factors include the "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; [and] (4) any other unusual circumstances." *Id.* (quotation marks and citation omitted). Ultimately, the test "is essentially one of reasonableness: 'potential intervenors need to be reasonably diligent in

learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly.'" *Id.* (quoting *Reich*, 64 F.3d at 321). Courts should be reluctant to dismiss a request for intervention as untimely where the proposed intervenor would be "seriously harmed" if intervention is denied. *See id.* at 388–89.

This motion is timely. The suit was filed on December 18, 2025, and, upon learning of it, Proposed Intervenors promptly prepared this motion. *Cf. Reich*, 64 F.3d at 321 (intervention motions deemed timely "because they were filed soon after the potential intervenors learned of the impairment of their respective interests"). Defendants have not yet filed their response, meaning that the case is at its earliest stages and the existing partes would not be prejudiced. In contrast, Proposed Intervenors will be substantially prejudiced absent intervention, given the serious threats that the relief sought poses to Proposed Intervenors' fundamental rights.

**B. Proposed Intervenors Have Concrete Interests in the Litigation.**

Proposed Intervenors have a "sufficient"—*i.e.*, a "significantly protectable"—interest in the litigation. *Donaldson v. United States*, 400 U.S. 517, 531 (1971). In the Seventh Circuit, the "interest must be direct, significant, and legally protectable." *Lopez-Aguilar*, 924 F.3d at 391 (quotation marks and citation omitted). While the required interest is "more than the minimum Article III interest," *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009), the Seventh Circuit has "interpreted 'statements of the Supreme Court as encouraging liberality in the definition of an interest.'" *Lopez-Aguilar*, 924 F.3d at 392 (quoting *Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 204 (7th Cir. 1982)).

Here, Proposed Intervenors offer multiple, independently sufficient interests.

*First*, Proposed Intervenors have a right to privacy in the sensitive data sought, *i.e.*, the entire unredacted voter file, "with all fields, including . . . state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier." Compl. ¶ 28(B). The

11

Supreme Court has made clear that "disclosure of private information" is an injury "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)—and so Proposed Intervenors have "a direct, significant, and legally protectable" in avoiding its disclosure. *Lopez-Aguilar*, 924 F.3d at 391. Illinois statutes recognize Social Security numbers and driver's license numbers as sensitive personal information and limit their disclosure. 5 ILCS 179/10(b)(1); 815 ILCS 530/5; 10 ILCS 5/1A-25(b); *id.* 1A-25(c). The data sought is also protected by federal law, which prohibits the creation of a national voter database of the type that the United States is reportedly assembling. *See* 5 U.S.C. § 552a(e)(7) (prohibiting the creation of any database "describing how any individual exercises rights guaranteed by the First Amendment," which includes exercising the right to vote). These privacy interests are significant and inure to each of the individual voter Proposed Intervenors, to Common Cause's members who are Illinois voters, and to ICIRR's core activity of helping naturalized citizens register to vote. *See* Mendoza Decl. ¶ 7; Beals Decl. ¶ 10; Grossman Decl. ¶ 6; Benito Decl. ¶¶ 9–10; Ibañez Decl. ¶¶ 8–9.

    *Second*, based on the United States' requests to Illinois and other States, the data sought is likely to be used to challenge the registration of certain Illinois voters, including voters with prior felony convictions, voters who are naturalized citizens (whose current citizenship status might not be reflected in databases that have out-of-date information), s*ee supra* 4–6, or impose fear of a challenge or purge thereby chilling voting, and Proposed Intervenors fall within at least some of those categories. *See* Mendoza Decl. ¶¶ 2–3 (Illinois voter with prior felony conviction); Beals Decl. ¶¶ 2, 4 (Illinois voter wrongfully convicted of a felony and since exonerated); Ibañez Decl. ¶¶ 5, 7 (naturalized citizen). And Common Cause's members, especially those most likely to be targeted using the data sought, have a concrete interest in not being disenfranchised by so-called

"election integrity measures."

*Third*, Common Cause and ICIRR as organizations have protectable interests at stake as their core missions will be harmed if the relief that the federal government seeks is granted. Their voter registration activities will be harmed as voters will be chilled from registering if they believe their sensitive personal data will be provided to the federal government and potentially misused as part of a national database. Grossman Decl. ¶¶ 10, 12; Benito Decl. ¶¶ 9–15. The threat of voter eligibility challenges (such as challengers misinterpreting or misusing voter roll information) will force Common Cause and ICIRR to redirect resources to mitigating the attempted disenfranchisement of existing voters, away from core activities of registering voters and engaging new voters in the democratic process. Grossman Decl. ¶ 13; Benito Decl. ¶ 15.

Courts routinely find that non-partisan organizations, like Common Cause, should be granted intervention in election-related cases, due to their significantly protectable interests related to voting. *See, e.g.*, *Texas v. United States*, 798 F. 3d 1108, 1111–12 (D.C. Cir. 2015); *Kobach v U.S. Election Assistance Comm'n*, No. 13-cv-04095, 2013 WL 6511874, at *1–2 (D. Kan. Dec. 12, 2013). This case is no exception. Indeed, in similar cases brought over other states' refusal to turn over sensitive voter information, such organizations were granted intervention. *See* Minute Order, *United States v. Amore*, No. 1:25-cv-00639-MSM-PAS (D.R.I. Jan. 6, 2026); Minute Order, *United States v. Galvin*, 1:25-CV-13816 (D. Mass Jan. 6, 2026), Dkt. No. 30; Order, *United States v. Simon*, No. 25-cv-3761 (D. Minn. Jan. 6, 2026), Dkt. No. 90; Minute Order, *United States v. Weber*, No. 25-cv-09149, (C.D. Cal. Nov. 19, 2025), Dkt. No. 70; Minute Order, *United States v. Oliver*, No. 25-cv-01193 (D.N.M. Dec. 19, 2025), Dkt. No. 25.

### C. Disposition of this Case May Impair the Proposed Intervenors' Interests.

Proposed Intervenors' interests would be impaired if Plaintiff succeeds in obtaining its requested relief. This third element requires a showing that "the applicant is so situated that the

13

disposition of the action may as a practical matter impair or impede the applicant's ability to protect th[e] interest." *Flying J. Inc.,* 578 F.3d at 572 (quoting Fed. R. Civ. P 24(a)(2)). "[T]he possibility that the would-be intervenor if refused intervention might have an opportunity in the future to litigate his claim" is no bar to intervention. *City of Chicago v. Fed. Emergency Mgmt. Agency*, 660 F.3d 980, 985 (7th Cir. 2011).

Here, the threat of impairment is significant. Plaintiff proposes to summarily dispose of voters' interests by obtaining an immediate order compelling the disclosure of private voter data, bypassing the normal civil litigation process and any discovery into "the basis and the purpose" of their request, 52 U.S.C. § 20703. *See* U.S. Mot. to Compel Prod. of Recs., Dkt. No. 5. This attempt to secure the irrevocable disclosure of private voter data at the very beginning of the case militates strongly in favor of allowing Proposed Intervenors into the case to represent voters' interests. Indeed, if DOJ is successful in obtaining Proposed Intervenors' private voter data, that "would as a practical matter foreclose rights of the proposed intervenors in a subsequent proceeding." *Judicial Watch, Inc. v. Ill. State Bd. of Elections*, No. 24-cv-1867, 2024 WL 3454706, at *3 (N.D. Ill. July 18, 2024).

### D. The Board of Elections' Interests Differ from Those of Proposed Intervenors.

The Seventh Circuit "appl[ies] three different standards for showing inadequacy" of representation, depending on the strength of "the relationship between the interests of the existing party and the interests of the party attempting to intervene." *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 688 (7th Cir. 2023). Where, as here, "there is no notable relationship between the existing party and the applicant for intervention," the test "is a lenient one." *Id.* "[T]he applicant for intervention need only show that representation of his interest by the existing party *may be* inadequate." *Id.* (quotation marks and citation omitted). That rule applies so long as the would-be intervenor's interests are not "genuinely identical" to the existing party. *Id.* Merely "seek[ing] the

same outcome" is not enough. *Id.*; *see also Driftless Land Area Conservancy v. Huebsch*, 969 F.3d 742, 748 (7th Cir. 2020) (requiring a "discriminating comparison of the absentee's interests and the interests of existing parties" that accounts for the possibility that "interests and objectives overlap in certain respects but are importantly different").

Proposed Intervenors meet this minimal burden here. As a government officer, Director Matthews has a generalized interest in carrying out Illinois State Board of Elections' legal obligations and in minimizing burdens on governmental employees and resources. Director Matthews also must consider broader public policy concerns, in particular the need to maintain working relationships with federal officials. In contrast, Proposed Intervenors bring a distinct, particular interest to this litigation, making the existing representation inadequate: the perspective of non-partisan civil rights and civil engagement groups whose sole commitment is to ensuring access to the ballot and individual voters whose own rights are at risk. *Compare Judicial Watch,* 2024 WL 3454706, at *5 ("The State Board has an interest in fulfilling its election obligations as required by the NVRA and Illinois law. Proposed Intervenors seek protection for their discrete set of members' voting rights and have an interest in preventing resource reallocation in doing so." (citations omitted)), *with, e.g.*, Grossman Decl. ¶¶ 5, 13 (describing Common Cause's commitment to "empower[ing] people to make their voices heard in the political process" and its interest in preventing resource reallocation from its capacity to "educate voters and mobilize communities" toward responding to DOJ's activities if it obtains the requested data).

Indeed, there may be arguments and issues that Defendant may not raise that are critical to organizations like Common Cause and ICIRR. For example, individual voters have a more direct injury than states under the Privacy Act for misuse of their personal data, especially given that the Privacy Act grants individuals an express right to bring suit. *See* 5 U.S.C. § 552a(g)(1)(D)

15

("Whenever an agency fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency"). As another example, courts have found a risk that considerations external to the issues presented by a case like this can motivate officials to pursue a settlement that could jeopardize the private information of Proposed Intervenors or of their members. *See Judicial Watch*, 2024 WL 3454706, at *5 (allowing intervention in NVRA case and observing that "potential intervenors can cite potential conflicts of interests in future settlement negotiations to establish that their interests are not identical with those of a named party"); *cf. Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 198 (2022) (reversing denial of motion to intervene where North Carolina Board of Elections was "represented by an attorney general who, though no doubt a vigorous advocate for his clients' interests, is also an elected official who may feel allegiance to the voting public or share the Board's administrative concerns").

These diverging perspectives—between the government's general need to balance various considerations and the Proposed Intervenors' personal and particular interest in the privacy of their own data—present a classic scenario supporting intervention. *See, e.g.*, *Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 110–11 (M.D. Pa. 2011) (allowing public interest groups to intervene, "[b]ecause the EPA represents the broad public interest . . . not only the interests of the public interest groups").

While Proposed Intervenors' motion rises or falls on its own merit, they bring a different set of perspectives and interests than the other proposed intervenors in this case. Proposed Intervenors here include specific Illinois voters—Mr. Mendoza, Mr. Beals, and Ms. Ibañez—who have unique experiences not reflected by the other proposed intervenors because they fall within several categories of particularly vulnerable voters identified in DOJ's requests to Illinois, such as

16

voters with felony conviction histories (including one who was exonerated), *see* Mendoza Decl. ¶¶ 2–3, 7–8; Beals Decl. ¶¶ 2, 4, 10, and naturalized citizens, *see* Ibañez Decl. ¶¶ 5, 7. These perspectives are essential to this litigation and to vindicating the rights of Proposed Intervenors.

## II.    In The Alternative, The Court Should Grant Permissive Intervention.

Should the Court decline to grant intervention as of right, the Court should use its broad discretion to grant permissive intervention. "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising its discretion, the district court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *see, e.g.*, *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995) (intervenor qualified for permissive intervention because the benefits of "efficiency and consistency that result from resolving related issues in a single proceeding" were "considerable" and outweighed prejudice to existing parties). These are the "only required considerations." *Bost*, 75 F.4th at 691.

As discussed above, this motion is timely, there will be no delay or prejudice to the adjudication of the existing parties' rights, and their interests are not adequately represented by any of the existing parties. And Proposed Intervenors' defense goes directly to the matters at issue, such as (1) whether federal law permits Plaintiff to force Illinois to give it the personal information sought; (2) whether federal and state legal privacy protections prohibit disclosure of that information; and (3) whether the United States' motivations for the data sought are permissible. Proposed Intervenors' distinct perspective on the issues will complement or amplify Defendant's arguments and sharpen the issues and the quality of the record, aiding the Court in resolving the issues before it.

Because of this unique perspective, district courts routinely grant permissive intervention

to advocacy organizations, even when a government party defends a challenged action. *See, e.g.*, *Republican Nat'l Comm. v. Aguilar*, 2024 WL 3409860, at *1–3 (D. Nev. July 12, 2024) (permitting intervention by voter advocacy group as defendant in litigation seeking purge of voter rolls). The Court should do the same here.

## CONCLUSION

For all these reasons, the Motion should be granted.

Dated: January 9, 2026                    Respectfully submitted,


Ethan Herenstein                          /s/    Kevin Fee
Sophia Lin Lakin                          Kevin Fee
Theresa J. Lee                            Rebecca Glenberg
Will Hughes                               Priyanka Menon
AMERICAN CIVIL LIBERTIES UNION            ROGER BALDWIN FOUNDATION OF
FOUNDATION                                ACLU, INC.
125 Broad St., 18th Floor                 150 North Michigan Avenue
New York, NY 10004                        Chicago, IL 60601
(212) 549-2500                            (312) 201-9740
eherenstein@aclu.org                      kfee@aclu-il.org
slakin@aclu.org                           rglenberg@aclu-il.org
tlee@aclu.org                             pmenon@aclu-il.org
whughes@aclu.org


Patricia Yan                              Aneel Chablani
AMERICAN CIVIL LIBERTIES UNION            Ami Gandhi
FOUNDATION                                CHICAGO LAWYERS' COMMITTEE FOR
915 15th St. NW                           CIVIL RIGHTS
Washington, DC 20001                      25 E. Washington St., Ste. 1300
(202) 457-0800                            Chicago, IL 60602
pyan@aclu.org                             (312) 888-4193
                                          achablani@clccrul.org
                                          agandhi@clccrul.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 5,625 words and therefore complies with the type volume limitation of Civil LR 7.1.

*/s/   Kevin Fee*
Kevin Fee

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record on January 9, 2026.

*/s/   Kevin Fee*
Kevin Fee
