# Exhibit 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)


UNITED STATES OF AMERICA,     ) CASE NO: 2:25-cv-09149-DOC-ADSx
                              )
              Plaintiff,      )            CIVIL
                              )
     vs.                      )    Los Angeles, California
                              )
SHIRLEY WEBER, ET AL,         )  Thursday, December 4, 2025
                              )  ( 7:38 a.m. to  9:09 a.m.)
              Defendants.     )  (12:01 p.m. to 12:58 p.m.)
                              )  ( 2:00 p.m. to  2:31 p.m.)
                              )  ( 2:31 p.m. to  2:33 p.m.)


HEARING RE:

MOTION TO DISMISS [DKT.NO.67];

PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
(52 USC 20701)
[DKT.NOS.87,88,89]


BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE


APPEARANCES:              SEE PAGE 2


Court Reporter:           Recorded; CourtSmart


Courtroom Deputy:         Karlen Dubon


Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES**:


For Plaintiff:   ERIC V. NEFF, ESQ.
        U.S. Department of Justice
        150 M St. NE, Suite 8-139
        Washington, DC 20002
        202-532-3628


For Intervenors:   GRAYCE S.P. ZELPHIN, ESQ.
        American Civil Liberties
        Union of Northern California
        39 Drumm Street
        San Francisco, CA 94111
        530-515-8978

        CHRISTOPHER D. DODGE, ESQ.
        Elias Law Group
        250 Massachusetts Ave. NW
        Suite 400
        Washington, DC 20001
        202-987-4928


For Robert Page:   SUZANNE E. SHOAI, ESQ.
        Orange County Counsel
        P.O. Box 1379
        Santa Ana, CA 92702
        714-834-3300


For Defendants:   MALCOLM A. BRUDIGAM, ESQ.
        Office of the Attorney General
        1300 I Street
        Suite 125
        Sacramento, CA 95814
        916-210-7873

        ROBERT W. SETRAKIAN, ESQ.
        California Department of Justice
        300 S. Spring Street
        Suite 1702
        Los Angeles, CA 90013
        213-269-6668

| | |
|---|---|
| 1 | **Los Angeles, California; Thursday, December 4, 2025; 7:38 a.m.** |
| 2 | **(Call to Order)** |
| 3 | **THE COURT:** -- Shirley Weber. |
| 4 | **(Pause)** |
| 5 | **THE COURT:** And, counsel, as you're seated, let me |
| 6 | take one more matter. Just remain seated for a moment. |
| 7 | **(Pause)** |
| 8 | **THE COURT:** All right. Thank you then. I think that |
| 9 | resolves the rest of the morning calendar. So first of all, |
| 10 | good morning. |
| 11 | **MR. NEFF:** Good morning, Your Honor. |
| 12 | **THE COURT:** This is the matter of United States v. |
| 13 | Shirley Weber. It's case number 25-09149. And, counsel, you |
| 14 | can just remain seated. You can pretend it's state court if |
| 15 | you want to, but make your appearances. |
| 16 | **MR. NEFF:** Eric Neff on behalf of the United States. |
| 17 | Good morning, Your Honor. |
| 18 | **THE COURT:** Thank you. |
| 19 | **MR. BRUDIGAM:** Deputy Attorney General Malcolm |
| 20 | Brudigam on behalf of defendants Secretary of State Shirley |
| 21 | Weber and the State of California. |
| 22 | **THE COURT:** Okay, thank you very much. |
| 23 | **MR. SETRAKIAN:** Deputy Attorney General Will |
| 24 | Setrakian on behalf of defendants State of California and |
| 25 | California Secretary of State Shirley Weber. |

1              THE COURT:  Thank you very much.  I appreciate it.

2              MR. DODGE:  Chris Dodge on behalf of Intervenors

3    NAACP and Siren.

4              MS. ZELPHIN:  Grace Zelphin on behalf of Intervenors

5    League of Women Voters of California.

6              THE COURT:  Is anybody here representing what I call

7    the County case?

8              MS. SHOAI:  Good morning, Your Honor.

9              THE COURT:  Come on up.  What we're doing here may be

10   of interest to you.  So we want your appearance.

11             MS. SHOAI:  Thank you, Your Honor.  Deputy County

12   Counsel --

13             THE COURT:  No, no, wait, wait till we get a good

14   recording of you.

15             MS. SHOAI:  Good morning, Your Honor.  Deputy County

16   Counsel Suzanne Schoai on behalf of --

17             THE COURT:  I see.  Why don't you have a seat?  Do

18   you have any other colleague with you today?

19             MS. SHOAI:  No, Your Honor.

20             THE COURT:  All right.  So first, I'd like to address

21   plaintiff's motion for order to produce records pursuant to 52

22   U.S.C. 20701 that was filed on Monday, set for hearing

23   today.  I appreciate the speed, but not at the expense of due

24   process.  And although I've encouraged us to move forward as

25   quickly as possible concerning the substantive issues, this is

1  not the due process because there needs to be at least 28 days'

2  notice before a date for hearing under CD California Rule 6-1.

3         The plaintiff is seeking to reach the ultimate

4  question in this case regarding the production of records and

5  thousands of voters' lives will be impacted by this case.  And

6  the Court will not be setting the matter on any legal -- I

7  don't want to say gamesmanship, but therefore, the motion for

8  order to produce records pursuant to 52 U.S.C. 20701 is

9  denied.

10        Now, you can once again follow the process and

11 procedure in terms of due process.  We'll have time

12 potentially, but this doesn't supply the due process needed.

13        Second, I'd like to hear arguments if there are any

14 on two motions regarding amicus briefs.  First, there was a

15 motion for leave to file an amicus brief brought by 16 states.

16 Those states are Arizona, Colorado, Delaware, Hawaii, Illinois,

17 Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico,

18 New York, Oregon, Rhode Island, Vermont, and Washington.

19        The second request was to file an amicus brief and it

20 was filed by the former secretaries of state and the proposed

21 amicus briefs are allegedly from a bipartisan group of state

22 secretaries for the states of Colorado, Connecticut, Minnesota,

23 Nebraska, Oregon, Pennsylvania, and Washington.

24        Does any party have a statement to make regarding

25 these amici briefs and any wisdom on your part that if I allow

1    these amici briefs, whether I should then extend for some

2    period of time the opportunity for additional briefs from

3    interested parties, because these are the parties that have

4    directly contacted the Court, but there may be other parties

5    that piecemeal choose to come in, and then I'm deciding that on

6    an almost ex-parte basis, case by case as they come to me,

7    unless you're flying out here for every single hearing for

8    every requested amici brief.

9          So I was thinking if I was going to allow these, that

10   I should throw this open for 7 days or 14 days for the amici

11   briefs to come in during the period of argument and try to sort

12   through whatever the Court's opinion would be and give you that

13   courtesy and simply extend it.  But I'm looking for your wisdom

14   on that because you can anticipate if I'm getting these amici

15   requests now, I promise you, as soon as you leave the

16   courtroom, there's going to be another request.  And I don't

17   want to do that ex parte without your wisdom on both parties'

18   parts.

19         So let's start with the first group.  This motion for

20   leave to file an amici brief by 16 states, and one of my

21   concerns was whether this would become a bipartisan effort, for

22   instance, of Democrats and Republicans using the Court in a

23   sense, in a political sense, not necessarily a substantive

24   sense.  But I noticed there are what I consider some swing

25   states, New Mexico certainly was during the last election,

1    Minnesota was, Michigan certainly was, Arizona was and has been

2    what is popularly referred to as a swing state in a number of

3    elections, and I don't know the voting history, for instance,

4    of Illinois or Maryland, for instance.  I don't know how

5    they've swung in different elections between the parties, and I

6    don't know if that's even a consideration, but I was inclined

7    to accept this amici brief, but only after discussing this with

8    you folks.

9         So why don't you talk amongst each other or to

10   yourself, and then state what your respective positions might

11   be on this.

12        **(Pause)**

13        **(Recessed at 7:46 a.m.; reconvened at 7:48 a.m.)**

14        **THE COURT:**  Well, let me start with plaintiffs in

15   this matter.  What are your thoughts?

16        **MR. NEFF:**  The United States' biggest concern is that

17   this is resolved.  The United States' foremost and only concern

18   is that this is resolved in a manner that, as the Court shares

19   the concern, that it needs to be handled expeditiously.  As

20   long as --

21        **THE COURT:**  Yeah, because it's got to get to the

22   Ninth Circuit and probably the Supreme Court.

23        **MR. NEFF:**  And then there's, yes, and as long as

24   amici don't get in the way of that, we have no objection.

25        **THE COURT:**  Okay.  And then I'll ask, if we do this,

1  what the time period is and how, but let me turn, and I've got

2  my entities turned around, so please, once again, on behalf of?

3          **MR. NEFF:**  The State, Your Honor.

4          **THE COURT:**  The State.

5          **MR. NEFF:**  Yeah.  So we consent to the filing of

6  these amici briefs, and we're happy to do a blanket consent.

7          **THE COURT:**  Okay.  That way you're not flying down or

8  up in each occasion, because I'm a little hesitant to start

9  parsing out which ones.  I just assumed to give a time period,

10 and those that are relevant, et cetera, we can all focus on.

11 Those that aren't, we'll read anyway.  Counsel?

12         **MR. DODGE:**  The NAACP intervenors joined the State's

13 position and agreed to blanket consent.

14         **THE COURT:**  Okay, and Women, League of Voters?

15         **MS. ZELPHIN:**  Same.  We --

16         **THE COURT:**  And just a case for the County, we don't

17 want to exclude them.  What would your position be?

18         **MS. SHOAI:**  We have the same position, we don't have

19 any objection, although the Court knows that the case against

20 the County is stayed, but for the record.

21         **THE COURT:**  Yeah, but no objection really.

22         **MS. SHOAI:**  Correct.

23         **THE COURT:**  All right.  What time period would I give

24 these and how would -- I think I would simply docket this.  I'm

25 going to put this case on a public website also, which we often

1  do in federal court, and that way the public has access to the

2  transcripts, they have access with transparency when we have

3  matters of this import.  How long?  Two weeks, three weeks?  In

4  other words, we'll hear the arguments today, but it's going to

5  take a while for the Court to write.

6          **MR. BRUDIGAM:**  I think two weeks would be fine, Your

7  Honor.

8          **THE COURT:**  Two weeks?

9          **MR. BRUDIGAM:**  Yeah.

10          **THE COURT:**  Counsel, what's your wisdom?

11          **MR. DODGE:**  I would join in two weeks as I was

12  explaining to co-counsel.  I think, you know, the Department of

13  Justice has now brought something like 14 of these suits

14  against various states, and so I think that has given the

15  public good awareness of these proceedings, and so I think two

16  weeks is sufficient to give any interested amici time to --

17          **THE COURT:**  Okay.  What's your wisdom on behalf of

18  the Women, League of Voters and NAACP?

19          **MS. ZELPHIN:**  I agree with the --

20          **THE COURT:**  Two weeks?  What's your wisdom on behalf

21  of plaintiff?

22          **MR. NEFF:**  As long as it doesn't delay this

23  proceeding.

24          **THE COURT:**  Well, two weeks won't delay it.

25          **MR. NEFF:**  Yeah.  So that two weeks --

1          **THE COURT:**  It's actually pretty quick for amici

2   briefs.

3          **MR. NEFF:**  Two weeks sounds fine to the United

4   States.

5          **THE COURT:**  Now, you just said something that this

6   case is one now of 14 cases.  I didn't know that before.  Are

7   we, in a sense, the lead case, or are cases more recently

8   filed?

9          **MR. NEFF:**  This is, I think, the case moving at the

10  fastest speed, Your Honor.  There were two cases filed before

11  this one, but this one is out ahead of all of them.

12         **THE COURT:**  I see.  All right.  Would you reach a

13  joint stipulation for me, then, and help the Court with the

14  wording that amici briefs are requested by the Court.  Give

15  that a two-week period of time.  Certainly that way we're

16  before the holidays.  Well, just a moment.  We've got

17  Thanksgiving coming up, don't we?

18         **MR. NEFF:**  We just had Thanksgiving, yeah.

19         **THE COURT:**  Yeah, we just passed it, so we're through

20  that holiday, thank goodness.  No, I mean with goodness.

21  Thanksgiving, good.  You know, it's perfect.  Two weeks because

22  we're not going to get caught on the Jewish/Christian holidays

23  anyway, and if we do, it's a short period of time for the

24  Jewish faith.  So, all right, then two weeks.

25              Could you fashion that for me today by agreement, and

1  I'll send out that docketed minute order today and get copies

2  to you.

3          **MR. NEFF:**  We will.

4          **THE COURT:**  All right, this is the time for argument.

5  You can take as long as you want, and there will be two rounds.

6  I'm going to ask the intervenors to argue in this matter.  If

7  the County wants to contribute in any way, you're welcome to,

8  although in a sense you're not involved today.  But if you have

9  something to say, I don't want to shortchange that.

10          And as intervenors, when I appointed two of you, that

11  doesn't mean you necessarily agree.  I'm not looking for a

12  concerted position on some issues.  There may be a variance.

13  So you're not here as a uniform body.  When I appointed each of

14  you, I think you're a broad and representative group, and

15  therefore, in a sense, as intervenors, you're arguing your

16  position either collectively, if you decide to, or

17  individually.  And let's begin with who?

18          **MR. NEFF:**  I think it would be the people that

19  brought -- the party that brought the motion, but submitted to

20  the Court, Your Honor.

21          **THE COURT:**  Let's do it by procedure and start with

22  them.  So, counsel, go to the lectern then and restate your

23  name, because we're on Court Smart.  Otherwise, we don't have a

24  very good record.

25          **MR. BRUDIGAM:**  Deputy Attorney General Malcolm

1  Brudigam, on behalf of Defendants Secretary of State Shirley

2  Weber and the State of California.  And for the Court's

3  awareness, Your Honor, I'm going to be handling the portion of

4  the State's motion related to Title III of the Civil Rights Act

5  of 1960, the National Voter Registration Act, and the Help

6  America Vote Act, while my colleague, Will Setrakian, is going

7  to handle the balance of the arguments concerning the federal

8  privacy laws.

9          **THE COURT:**  Thank you.

10          **MR. BRUDIGAM:**  So, this case is before you today,

11  Your Honor, because DOJ has insisted that California send it an

12  unredacted electronic copy of its statewide voter registration

13  list, which contains the personal information of over 23

14  million California voters.  Now, when DOJ approached California

15  requesting this information, as federal law requires,

16  California did make some records available for their

17  inspection.  And as California law also requires, it only did

18  so with appropriate redactions to voters' most sensitive

19  personal information.  But DOJ, they didn't accept this offer,

20  and they brought this lawsuit.

21          And so I want to be clear that this lawsuit is about

22  DOJ wanting to get the social security numbers, the driver's

23  license numbers, and the personal information of California

24  voters, and it wants them all in an electronic format.  But

25  federal law doesn't require this, and in fact, California law

1   prohibits it.

2          So, as you can tell, there's a, at the heart of this

3   case, there is a question of whether federal law preempts state

4   law.  That's a key issue.  But before we even get to that

5   question, Your Honor, there's a series of initial legal and

6   pleading hurdles that DOJ cannot even overcome.  And so I'm

7   going to address those initial legal hurdles claim by claim.

8          So first, with respect to Title III of the Civil

9   Rights Act of 1960, that claim faces both a jurisdictional and

10  a substantive defect.  So to start, DOJ sued in the wrong

11  court.  The text of Title III is clear that the court that has

12  jurisdiction to compel relief is the one where the records were

13  demanded or where the records were located.  And here, that's

14  Sacramento.  And so the proper district court to compel relief

15  would be the Eastern District of California.  And the only

16  response that DOJ provides for this jurisdictional defect in

17  their opposition is that it erroneously asserts that millions

18  of these records are created and maintained in the Central

19  District, but the fact of the matter is, is that the records

20  are located and they can only be accessed in Sacramento.  And

21  also, their assertion isn't entirely true either, because a

22  vast majority of the records within the statewide voter

23  registration database, they flow in there through the DMV or

24  the statewide online voter registration form.

25          And, you know, last year that accounted for almost 90

1    percent of the records -- that 90 percent of the registrations

2    or updates to registrations.  So on that ground, Your Honor,

3    you should dismiss this Title III claim because the Court lacks

4    jurisdiction to compel any relief under that statute.

5           So even if the Court does decide to take

6    jurisdiction, DOJ encounters another statutory hurdle in Title

7    III's text, which is that the demand doesn't contain a valid

8    statement of the basis and the purpose for the records sought.

9    So DOJ's demand lacks any basis at all.  None has been alleged

10   in the complaint.  And the alleged purpose, evaluating -- a

11   single sentence saying that they want all these records to

12   evaluate compliance, to evaluate California's compliance with

13   the NVRA, that's not a valid purpose under Title III.

14          A valid purpose would be one that relates to a civil

15   rights investigation into discrimination in voting, and DOJ has

16   admitted that that's not the purpose of their investigation

17   here.  So we have two hurdles already that DOJ can't

18   overcome.  But beyond that, even the relief that they seek in

19   the complaint is inconsistent with the text of Title III.  The

20   Title III only requires that the Secretary make records

21   available at her principal office, and that's something that

22   the Secretary already offered them.  And that's demonstrated

23   through the letters that were exchanged between the Secretary

24   and DOJ in advance of this litigation and which have been

25   incorporated into the complaint and are properly before the

1  Court on this motion to dismiss.

2          And so what those records show is that DOJ can't --

3  has not pled any plausible entitlement to relief based on

4  what's already been offered.  And so again, there's another

5  legal hurdle that DOJ cannot overcome.  And even assuming they

6  could get past all three of those, Your Honor, then we're faced

7  with the preemption question: whether this Title III law would

8  even preempt California's voter information protections.  And

9  there's no precedent involving Title III preempting a state

10  law, but I would say that the analysis would be very similar to

11  cases evaluating the NVRA and whether that law's disclosure

12  provision would preempt a state law.

13          **THE COURT:**  What's the Court's standard in deciding

14  that issue?

15          **MR. BRUDIGAM:**  I'm sorry, what was that?

16          **THE COURT:**  What's the Court's standard in deciding

17  that issue.

18          **MR. BRUDIGAM:**  So yes, that standard is first, the

19  Court would look at the text, of course, and see if there is a

20  conflict between the text of the federal law and the state

21  law.  And so here, Title III's text, it says nothing about

22  prohibiting or redacting sensitive voter information.  And I

23  would point Your Honor to a First Circuit case, Public Interest

24  Law Foundation v. Bellows, where the same silence in the text

25  on this question of redaction in the NVRA was found to be

1   sufficient to find that the State could properly redact records

2   that were being disclosed.  So that's the first question that

3   the Court looks at.

4          The next thing that the Court should consider is

5   whether the State law would, you know, get in the way of the

6   objective of this federal law, you know, hinder whatever Title

7   III is aimed to do.  And here, there's just no connection

8   between protecting voters' personal information, on the one

9   hand, and then an investigation into a civil rights violation

10  or discrimination in voting.  There's just a disconnect between

11  these two goals of these two laws.  And I think it's important

12  to remember that states didn't begin collecting this sensitive

13  information until 2002, when the Help America Vote Act was

14  enacted.  That's over 40 years after Title III was

15  enacted.  And so they weren't even contemplating social

16  security numbers and driver's license numbers being turned over

17  in those records.

18         And if you look at the Kennedy v. Lynd decision, a

19  Fifth Circuit decision that DOJ basically -- their whole case

20  relies on this decision, which is obviously nonbinding.  But if

21  you go through that, you'll notice at the very end that they

22  talk about the records that are being turned over were public

23  records.  They didn't contain the type of sensitive information

24  that we're dealing with here.  And so --

25              THE COURT:  What's the sensitive information in this

1  case?

2          **MR. BRUDIGAM:**  What's the sensitive information?

3          **THE COURT:**  Let's start with social security

4  numbers.  The government certainly already has access to

5  those.  Is it the linking of those social security numbers to

6  the individual voter that causes a privacy concern or a Title

7  III concern?

8          **MR. BRUDIGAM:**  Yeah.  I mean, it's the linking of

9  that social security number with not just the voter's name, but

10  their address, their method of registering to vote, their voter

11  participation history, their political party registration.

12          **THE COURT:**  Just a moment.  So voter registration

13  history?

14          **MR. BRUDIGAM:**  Yeah.  And voter participation, which

15  elections they voted in, which party they're registered with.

16  It's the connection of all of this information.

17          **THE COURT:**  Would the government be able to ascertain

18  how that person voted?

19          **MR. BRUDIGAM:**  No.  No.  That's -- yeah, the secret

20  ballot is protected, but --

21          **THE COURT:**  So the privacy concerns so far that I'm

22  hearing in your papers are the social security numbers, the

23  addresses of the voter, the history -- I'm sorry, voter

24  registration, the history of the turnout at the poll, in other

25  words, the fact whether they voted or not, but not the way that

1  they voted.

2          **MR. BRUDIGAM:**  So to be clear, Your Honor, the

3  specific information we're concerned about, which is protected

4  by California law, is driver's license numbers and social

5  security numbers.  That other information, they are entitled to

6  inspect that information, and we've given them that opportunity

7  already.

8          **THE COURT:**  All right.

9          **MR. BRUDIGAM:**  But the big problem is --

10          **THE COURT:**  Go through a list for me what you've

11  given them.

12          **MR. BRUDIGAM:**  Well, we haven't given them anything.

13  What we did is we offered them to come to the office and

14  inspect all these records.

15          **THE COURT:**  What did you offer them?

16          **MR. BRUDIGAM:**  We offered them to inspect the entire

17  statewide voter registration.

18          **THE COURT:**  No, I want you to list it for me now.  In

19  other words, I want to parse out what you believe is worthy of

20  protection and what you've already offered to disclose, and I

21  want a clear record of that.

22          **MR. BRUDIGAM:**  Sure.

23          **THE COURT:**  So slow down and go through that, point

24  by point.

25          **MR. BRUDIGAM:**  Of course, Your Honor.  So what we

1    want to protect are the social security numbers and the

2    driver's license numbers in voters' records, and there's other

3    information protected by California law.

4              **THE COURT:** Other? Not good enough for my record.

5              **MR. BRUDIGAM:** Which is the voter's signature.

6              **THE COURT:** Okay, signature.

7              **MR. BRUDIGAM:** Whether they made a choice of a

8    language preference of how they want to receive their ballot.

9              **THE COURT:** All right.

10             **MR. BRUDIGAM:** And also related to driver's license

11   number, if they have an ID number rather than a driver's

12   license number.

13             **THE COURT:** All right. Thank you.

14             **MR. BRUDIGAM:** And everything else we've made

15   available.

16             **THE COURT:** And I want you to list everything else.

17             **MR. BRUDIGAM:** So everything else, I'm not sure if I

18   have a comprehensive list, but it would be name.

19             **THE COURT:** If you don't, I don't.

20             **MR. BRUDIGAM:** So that comprehensive list is located

21   in a regulation that we cited in our brief.

22             **THE COURT:** Then recite it to me. We've got lots of

23   attorneys here. I've got lots of time.

24             **MR. BRUDIGAM:** Sure. I believe I'd have to look up.

25             **THE COURT:** Would you step over?

1    **MR. BRUDIGAM:**  Okay.

2    **THE COURT:**  This lumping together isn't going to get

3    it for me.  All right.  So I want to know exactly what you're

4    seeking to protect and what you're not.

5    **(Pause)**

6    **THE COURT:**  Thank you.

7    **MR. BRUDIGAM:**  Of course.  So the regulation that

8    specifies exactly what they're permitted to inspect is Title II

9    of the California Code of Regulations, Section 19-001

10   subdivision H.  That includes name, address, phone number,

11   email, birth dates, voter participation history, registration

12   method, their current registration status.  Are they active?

13   Are they inactive?  And I believe that's everything.  That is

14   everything.

15   **THE COURT:**  And you're seeking to protect that?

16   **MR. BRUDIGAM:**  No.

17   **THE COURT:**  You're seeking to turn that over?

18   **MR. BRUDIGAM:**  Yes.  We've offered it.

19   **THE COURT:**  Go through that again very slowly.

20   Names, addresses, voter participation.

21   **MR. BRUDIGAM:**  Yeah.

22   **THE COURT:**  Registration method.

23   **MR. BRUDIGAM:**  Right.

24   **THE COURT:**  What else?

25   **MR. BRUDIGAM:**  Registration status.

1          **THE COURT:**  Registration status.

2          **MR. BRUDIGAM:**  And contact information, phone number

3    and email.

4          **THE COURT:**  Okay.

5          **MR. BRUDIGAM:**  Not every voter necessarily provides

6    an email.

7          **THE COURT:**  Okay.  Thank you.

8          **MR. BRUDIGAM:**  Okay.  And so that's what we've made

9    available.  And so I just want to, and again, the focus is just

10   the --

11         **THE COURT:**  Once again, you have not made available

12   social security numbers and driver's license.

13         **MR. BRUDIGAM:**  Correct, Your Honor.

14         **THE COURT:**  Okay.

15         **MR. BRUDIGAM:**  Okay.  So I want to just bring us back

16   to the preemption question.  So we have no direct conflict

17   between state law and federal law, and I think it's also

18   important to look at the federal law that requires the State to

19   collect social security numbers and driver's license numbers.

20   That statute is the Help America Vote Act.  And in requiring

21   states to collect that information, they did not limit the

22   state's ability to make that information confidential.  In

23   fact, HAVA specifically stated that the choices on the methods

24   of complying with this requirement shall be left to the

25   discretion of the states.  That's 52 U.S.C. Section 21085.

1           So California, in its discretion delegated under

2    HAVA, chose to keep voters' social security numbers and

3    driver's license numbers confidential.  And if you look at the

4    state law making them confidential, this is Elections Code

5    Section 2194(b)(1).  It says that information added to the

6    voter registration records to comply with the requirements of

7    the Federal Help America Vote Act of 2002 are confidential and

8    shall not be disclosed to any person.

9           So the bottom line is that the best way to read Title

10   III with California's state law protections and HAVA is a

11   reading where there is no conflict.

12          **THE COURT:**  And what part of jurisprudence deals with

13   this issue?  Is there any?

14          **MR. BRUDIGAM:**  So there is no jurisprudence

15   specifically dealing with Title III preemption of state laws.

16   And that's why we think the case law evaluating NVRA

17   preemption, which has a disclosure provision, is the most

18   suitable vehicle for that analysis.

19          And so, Your Honor, what I just went through were

20   three legal hurdles that the Government cannot overcome in

21   their Title III claim.  And even if they were able to get past

22   these three legal hurdles, the state law protecting this

23   specific information is not preempted by Title III.  And so

24   that's our argument on Title III of the Civil Rights Act.

25          I want to move on to the NVRA claim.  This is the

1   second count.

2         **THE COURT:**  Sure.  Let me ask you a question along

3   the way, and we've got plenty of time.

4         **MR. BRUDIGAM:**  Sure.

5         **THE COURT:**  On one hand, you're arguing that this

6   Court would use a procedural means and find that this Court

7   didn't have jurisdiction and potentially the Eastern District

8   did or Sacramento, as you've termed it.  That then would not

9   resolve this case on the merits.

10        **MR. BRUDIGAM:**  It wouldn't resolve that claim on the

11  merits.

12        **THE COURT:**  Well, resolve that claim.  But I thought

13  each of you were looking for a broader resolution.  In other

14  words, I don't what I'm going to do with the jurisdictional

15  issue right now, but I do know that it's important to all of us

16  to get this issue resolved in some form, get it to the circuit,

17  get it to the Supreme Court, but that could take place in

18  another state.  That could become your lead case.

19        So do you want this resolved on substantive grounds,

20  or are you seeking to have this resolved on procedural grounds?

21  And if I accept your jurisdictional argument, you're not going

22  to have a substantive ruling.  Maybe Michigan issues it, or New

23  Jersey.  I mean, think about that for a while.  You don't have

24  to respond right now, but make sure you don't, in a sense, win

25  a battle and lose a war, okay?  Because I thought that you were

1   here for one reason, and that was to get this resolved as a

2   precedent-setting case by both sides.  And then if there's a

3   conflict in another jurisdiction, it goes up in another

4   circuit, et cetera, or it goes up on appeal, however this Court

5   decides these issues for the Ninth Circuit.

6           So think about whether you really want this resolved

7   substantively or not.  Now, that doesn't mean you give up your

8   argument, of course, but if I did rule in your favor, then

9   you're going to have a substantial portion of this case that's

10  not resolved here.  It'll be resolved in some other

11  jurisdiction, like Arizona, maybe, okay?  Up to you.  So think

12  about that.  All right.  Now, your next argument.

13          **MR. BRUDIGAM:**  Yeah, we will think about that.  Thank

14  you, Your Honor.

15          **THE COURT:**  I want to hear from the Women League of

16  Voters.  Do we want these issues resolved here, or do we want

17  to potentially piecemeal these out, okay, and the NAACP as

18  intervenors, okay?  I'll be asking those questions.

19          Counsel, thank you, but please continue.

20          **MR. BRUDIGAM:**  Of course.  So turning to the NVRA

21  claim.  So DOJ just simply hasn't alleged a plausible violation

22  under the NVRA.  So as I mentioned at the beginning, the

23  alleged facts in this case, they show that the Secretary has

24  complied with that law's public inspection provision.  As I've

25  mentioned, the Secretary made the statewide voter registration

1  list available to DOJ for its inspection, and nothing more is

2  required under that statute.  And so they haven't plausibly

3  alleged a violation of the NVRA's public inspection provision.

4  And here, we have a lot better case law on the question of

5  redactions.  And courts have universally permitted that

6  disclosures under the NVRA are that states can redact highly

7  sensitive information like social security numbers and driver's

8  license.  And DOJ doesn't cite any contrary authority.  And, in

9  fact, until this case, it has repeatedly taken the position in

10  legal briefs before court of appeals, federal court of appeals,

11  that the NVRA does permit these kind of redactions.

12         **THE COURT:**  In those cases and the circuits that

13  they're in.

14         **MR. BRUDIGAM:**  Sure.  So the most recent one would be

15  the Public Interest Foundation v. Benson, which is a Sixth

16  Circuit case that was decided earlier this year, and the brief

17  that DOJ filed stated that position.

18         **THE COURT:**  And is that in the briefing that was

19  submitted to the Court?

20         **MR. BRUDIGAM:**  That's cited.  It isn't.  It's not in

21  our briefing, but it is in --

22         **THE COURT:**  Because I've missed that, so that's why

23  I'm slowing you down.

24         **MR. BRUDIGAM:**  Sure, sure.

25         **THE COURT:**  I'd like to see that briefing.  I'd like

1   to see if DOJ has taken a contradictory position in the past

2   and what their argument was on one hand if you're arguing today

3   that they're changing their position.  So you've got time.

4           **MR. BRUDIGAM:**  Sure.

5           **THE COURT:**  As colleagues, you don't have to dig that

6   out right now.  Just make a note of that.  I want to see if

7   there's a constant, as I call it, in terms of DOJ's position or

8   if it's contradictory.  I didn't see that reading the record or

9   at least I didn't pick that up.

10          **MR. BRUDIGAM:**  So there's that case.  And I think the

11  one that we do cite in our moving papers is the First Circuit

12  case, Public Interest Law Foundation v. Bellows.  And in that

13  case, DOJ, again, takes the same position.  That's a 2024 case.

14          **THE COURT:**  But at least then, if both cases were

15  before the Court, the Court would see in both the First and the

16  Sixth Circuit.  From your standpoint, Judge, this just isn't

17  the First Circuit as a one-off.  This is a consistent position.

18  Do you know of a contradictory position that the DOJ has taken

19  prior to arguments today in another circuit?

20          **MR. BRUDIGAM:**  I do not.  And, in fact, I'll give you

21  one more brief.  In the Fourth Circuit, this is a 2012 case,

22  and I think their brief was submitted in 2011.  This is the

23  Long case.

24          **THE COURT:**  Public Interest v. Long?

25          **MR. BRUDIGAM:**  No, it's -- it's Project Vote v.

 1   Long.

 2          **THE COURT:**  Is this in the briefing?

 3          **MR. BRUDIGAM:**  That's -- it's in Intervenors NAACP

 4   Siren's briefing.

 5          **THE COURT:**  All right.  When you argue that, please

 6   call that back to my attention because you've got briefing

 7   that's pretty scattered right now.  I'm going to want all of

 8   those, and I'm going to want any contradictory position or any

 9   synonymous position that DOJ has taken so I can see the

10   reasoning before different courts across the country, and if

11   they're filed in the Sixth, the First, and the Fourth, I'd be

12   interested to see if these are like positions or varying

13   positions and what the arguments are.

14          **MR. BRUDIGAM:**  Of course.  We'd be happy to provide

15   those.  So, again, the courts have been unanimous.  DOJ has

16   been unanimous in concluding that under the NVRA's disclosure

17   provision, highly sensitive voter information can be redacted.

18          **THE COURT:**  Why is the social security number that

19   the Government already has access to, highly sensitive

20   information?  Is it what it leads to after you obtain that

21   information, or is it the social security number in and of

22   itself?

23          **MR. BRUDIGAM:**  I mean, I think it would be both, and

24   I think it's a good question, Your Honor.  If they have these

25   social security numbers, why are they coming and getting them

1    --

2            **THE COURT:**  Well, the argument's going to be we, the

3    Government, already have this.  What's the sensitive

4    information if we have access to it?  And therefore, I expect

5    the argument, and the briefing argument seems to allude to the

6    fact that it's not highly sensitive.  That's going to be DOJ's

7    position.

8            **MR. BRUDIGAM:**  Well, whether or not they want to

9    construe social security numbers as sensitive or not, the

10   bottom line is that the claims that they're suing under do not

11   require us to turn this over, period.

12           **THE COURT:**  Driver's license information, that's

13   uniquely California.  That's not, in our case anyway, uniquely

14   a California, what I view as a state.

15           **MR. BRUDIGAM:**  I think that's right.

16           **THE COURT:**  Information.

17           **MR. BRUDIGAM:**  Right.

18           **THE COURT:**  And in that case, much more information

19   could be available, let's say, that you would have concerns

20   about.  There, DOJ normally, I would think, doesn't have

21   information to California information, which could be more

22   extensive than just a social security number.  What are you

23   concerned about concerning driver's license information?

24           **MR. BRUDIGAM:**  I mean, driver's license information

25   is connected to many different, you know, state programs,

1  participation in various programs, and so that's information

2  that, you know, many voters wouldn't want to be --

3          THE COURT:  So name those programs.

4          MR. BRUDIGAM:  I don't --

5          THE COURT:  Well, go over and talk to your counsel.

6  Slow down.  Go over and consult.

7          MR. BRUDIGAM:  Okay.

8          THE COURT:  Okay.  This is your opportunity.

9          MR. BRUDIGAM:  Sure.  Sure.

10          THE COURT:  And DOJ and the other parties will have

11  the same courtesy.  Because there appears from the briefing

12  that there's a much greater, let's say, if nothing else,

13  privacy right and much more information that can be dispersed,

14  and that seemed to be uniquely California oriented, not

15  federally oriented.

16      **(Pause)**

17          MR. BRUDIGAM:  So I can't give you a list right now.

18          THE COURT:  Sure you can.  You've got lots of

19  time.  Step over and talk to your colleague now.

20          MR. BRUDIGAM:  Well, so we don't have that

21  information at the tip of our fingertips.  We, of course, can

22  go and talk to our client and figure out exactly what that

23  information is connected to, but I would just say that the key

24  point here is less what it's connected to and the fact that

25  California law protects it.  The legislature has made a

1  decision that this voter information is confidential, and the

2  federal laws that are being invoked cannot overcome that

3  protection.  And so --

4          **THE COURT:**  So no preemption.

5          **MR. BRUDIGAM:**  That's right.

6          **THE COURT:**  Just a moment.  Eventually, I'm going to

7  ask each of you a very broad question that you should

8  anticipate.  And that is, it may be that in some areas, such as

9  the Social Security information, that there is a state and

10 federal interest, and if I find that both have an interest, how

11 does the Court balance that?  What factors would I use in

12 making my decision to citing preemption or not?  In other

13 words, in balancing the factors.  And what would be my standard

14 preponderance, clear and convincing?  How do I make that

15 decision?  What standard am I basing that on?  Or is it simply

16 textual?  Now, don't answer that.  You've got lots of time.

17         The second is, in other areas, there may be a unique

18 state right, or different states, whether it's Arizona or

19 California, request information of voters.  And there, there

20 may be a much greater right, and federal preemption may not

21 take place, but I need to know what you're protecting, because

22 the argument from DOJ will and should be, Judge, we also should

23 have access to this information, and I'll wait for their

24 argument.

25         Uniquely, it seems, historically, that the states

1  have controlled the process and procedure in terms of a voter.

2  The federal government has rarely moved into this area, except

3  in the civil rights era in the South.  And those were

4  extraordinary circumstances.  But normally, each individual

5  state not only enforces these rights through their local

6  district attorneys or their local law enforcement agencies, but

7  historically, these rights have seemed to be state rights.

8         When I get to DOJ, I'm going to be asking you, why

9  are you requesting driver's license in particular?  And what's

10 the federal, you know, nexus to this?  Okay, so be forewarned

11 about that question.  So, counsel, please continue.

12        **MR. BRUDIGAM:**  Sure, and I just want to make a

13 comment in response to that, Your Honor.  I think that that's

14 really a great point.  And if you look at the amicus brief

15 submitted by the group of bipartisan former Secretaries of

16 State, they make this point very strongly in their brief that

17 states are the default --

18        **THE COURT:**  Can I present to you something?  I

19 haven't read those carefully for one reason.

20        **MR. BRUDIGAM:**  Sure.

21        **THE COURT:**  I want to read all the amicus briefs if

22 I'm going to allow them at one time.  I don't want to start

23 forming opinions in a piecemeal fashion as I get one amicus

24 brief from one party, which is why I've delayed having this

25 discussion with you and gotten your position if I can get these

1  amicus briefs at one time.  I think it's dangerous for a court

2  to piecemeal that, in a sense.  So I want to, now that we know

3  we're going to get amicus briefs in two weeks, I've glanced at

4  them in terms of trying to make a determination whether I would

5  allow them or not, but I was waiting for your input.

6        So I represent to you, it's been a quick, quick read

7  and brief discussion with my law clerks, and that's about the

8  extent of it.

9        **MR. BRUDIGAM:**  Got it.

10        **THE COURT:**  Okay?  So when you refer me to that, I'll

11  go back now and read, but --

12        **MR. BRUDIGAM:**  Yes, bookmark it.

13        **THE COURT:**  Yeah, okay.

14        **MR. BRUDIGAM:**  Yeah, yeah.

15        **THE COURT:**  I will.

16        **MR. BRUDIGAM:**  Okay.  So I just want to finish on

17  this disclosure provision under the NVRA.  So the last thing

18  you said is, okay, so this doesn't preempt California law, but

19  I want to actually just back up one step, which is that even

20  irrespective of state law, courts that have looked at this

21  question have allowed redactions of this highly sensitive

22  material, whether or not there was necessarily a state law

23  involved.

24        **THE COURT:**  Which courts?

25        **MR. BRUDIGAM:**  So I think the main one would be the

1    First Circuit, the Public Interest Legal Foundation

2    v. Bellows.  And that is really the lead case on this question,

3    and it cites a number of authorities reaching the same

4    conclusion.  So I think that would be the best --

5              THE COURT:  Behind this is your concern that there's

6    voter suppression that would take place?  In other words, as we

7    argue the different Title III, et cetera, there's always some

8    politics behind almost every case that the Court gets.  In some

9    way, is this, from your view, not only the protection of this

10   information under the statutes, but also a concern that there's

11   any voter suppression?

12             MR. BRUDIGAM:  Well, I think that's a good question,

13   Your Honor.  And part of the problem here, first thing is we

14   want to protect this information, but we're getting no

15   explanation, no rationale whatsoever for all of these records,

16   why the DOJ wants these records.  So we don't even have an idea

17   exactly what they want to do with them.  But I think voter

18   suppression is certainly something we're concerned about and a

19   possibility, but --

20             THE COURT:  I expect DOJ to argue that they want to

21   stop illegal voting.

22             MR. BRUDIGAM:  And I would say that they would need

23   to allege some sort of facts, a statement or basis in support

24   of their demand, a statement of the basis and the purpose, if

25   that is their true purpose and basis, because what they've said

1  so far is not that.  They've said very specifically, the

2  purpose of these records is to evaluate compliance with the

3  NVRA's list maintenance provisions.

4       And what those provisions require, just so you

5  understand, is that states conduct a general program that makes

6  a reasonable effort at removing ineligible voters from the

7  voter list by reason of death and those who move.  And so --

8  and that really brings me to the next point about the NVRA, is

9  that aside from not alleging a violation of the disclosure

10 provision, they also have not alleged any violation of the

11 NVRA's list maintenance provision that I just listed out

12 there.  There's just no facts whatsoever.

13      And they actually suggest that they can't even allege

14 anything in support of a violation, because they're saying that

15 these records are -- you know, not having these records

16 prevents them from assessing compliance, which is -- which

17 doesn't make sense under the legal standard for that claim.

18      And so that's our argument regarding the NVRA count.

19 So I'm going to move on to the last count.  This is the Help

20 America Vote Act claim.  And so again, DOJ really runs into the

21 same problems.  They haven't alleged a violation of that law in

22 their complaint, and it should be dismissed.

23      So the first violation of HAVA that they say, or that

24 they that they allege, is that California not turning over

25 these records in response to their demand violates HAVA.  Well,

1 | that's just not true.  If you read the statute, there is no

2 | disclosure provision in that law.  And DOJ admits this in their

3 | opposition, and that admission is dispositive on this claim,

4 | because the Ninth Circuit has held that a government

5 | investigative demand is created solely by statute.  And here,

6 | there's nothing in the statute requiring we disclose these

7 | records or turn them over.  And so when we consider whether

8 | HAVA could preempt state laws, or California state law, there's

9 | just no conflict whatsoever, and so there is no preemption

10 | there.

11 | And then beyond the nondisclosure of records, they

12 | also kind of -- they attempt to allege other violations of

13 | HAVA, which don't really make any sense.  They just assert

14 | legal conclusions about certain provisions in HAVA, but they

15 | don't allege any facts in support of them.  You know, they

16 | allege that we're violating the provision, which requires us to

17 | collect social security numbers and driver's license numbers,

18 | which doesn't make any sense, because that's why we're here

19 | today, because we have that information and we're protecting

20 | it.

21 | And so I would just say, if you look at that claim,

22 | it falls far below the Twombly-Iqbal plausibility standard.

23 | And, you know, beyond not actually alleging a violation, like

24 | with the NVRA, they also suggest that they can't allege any

25 | violation, because they need -- supposedly need these records

1 to evaluate compliance.

2      I would just -- the one point they make on HAVA is

3 that it lacks a private enforcement mechanism.  It can only be

4 enforced by the federal government.  And this is, and they're

5 basic, and they're saying that because they have the right to

6 enforce HAVA, they have the right to demand these records from

7 us, but there is no authority supporting that proposition, and

8 it's directly contrary to Ninth Circuit authority.  And so

9 there's no violation here for us not turning records over in

10 advance of litigation, simply because they can bring an

11 enforcement action and get records in discovery.  You know, we

12 have to get past the pleading stage first.

13      And so with that, Your Honor, I would say that all

14 three of DOJ's counts should be dismissed.  And at this point,

15 I want to turn it over to my colleague.

16      **THE COURT:**  All right.  Step over with your

17 colleagues, though, as a colleague, and just see how did they

18 do, okay?  Just walk over there for a moment, and I'll pay the

19 same courtesy to DOJ.  Step over with whoever, when you argue,

20 but step over and have a conversation with them.  And just, if

21 there's anything you missed, you'll have a second round, okay?

22      **MR. BRUDIGAM:**  I appreciate it, Your Honor.

23      **THE COURT:**  It'll be a little bit more brief.  Now,

24 let me ask just a couple of questions along the way.  Am I

25 going to get more requests, and you folks know, because this is

1   going to be the lead case in the country, obviously, with the

2   other 14 cases.  So far, we have the states of Arizona,

3   Colorado, Delaware, Hawaii, Illinois, Maine, Maryland,

4   Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon,

5   Rhode Island, Vermont, and Washington. And when I was

6   considering this amicus, I was wondering if I was going to have

7   a political show of two different parties on these voter rights

8   cases.

9           Here, you have a number of what I call border states,

10  Arizona, Michigan, Minnesota, arguably New Mexico.  So at least

11  your acquiescence today to have this come before the Court is

12  well received.  Do you know, though, of other state attorney

13  generals who are going to be voting just by rumor or hearsay,

14  and are we giving them enough time in two weeks to get these

15  amicus briefs in?  And if so, inform us, because if we need

16  three weeks, we can take it, okay?  But counsel your argument,

17  please.

18          **MR. SETRAKIAN:**  Good morning, Your Honor.

19          **THE COURT:**  Good morning.

20          **MR. SETRAKIAN:**  Will Setrakian for Defendants,

21  Secretary of State Shirley Weber and the State of California.

22          To start, to your most recent point, I have no

23  special insight into whether or not future amicus briefs may be

24  incoming from the organizations and individuals that you just

25  identified.

1          My colleague has explained why DOJ fails to state a

2     claim under the Civil Rights Act, the NVRA, and the Help

3     America Vote Act.  But even if the Court disagrees with

4     everything that my colleague said, it still should grant the

5     State's motion to dismiss, because three federal privacy laws

6     serve as affirmative defenses to the complaint.

7          Now, I'll begin with the Privacy Act.  Two Privacy

8     Act violations appear on the face of DOJ's complaint.  First,

9     DOJ improperly seeks information on how California's registered

10    voters exercise First Amendment protected rights, something the

11    Privacy Act directly protects.  DOJ does not dispute that the

12    choice to register to vote constitutes protected expression.

13    Now, DOJ thus cannot collect this information unless it falls

14    into one of this subsection's statutory exceptions.  Now, DOJ

15    pins its hope on the exception for records collected, quote,

16    within the scope of an authorized law enforcement activity,

17    close quote, but the Ninth Circuit gives that exception a

18    narrow reading.  That's from the McPherson case.

19         To meet this exception, DOJ must show a good reason

20    to believe that the records are pertinent and relevant to its

21    claimed law enforcement basis.  That comes from the Garris

22    case, also cited in our briefing.  Those two are the only Ninth

23    Circuit cases to construe the law enforcement exception to

24    Privacy Act Subdivision E-7.

25         DOJ cannot meet this test.  DOJ claims it needs these

1    records to enforce the NVRA and the Help America Vote Act.  But

2    personalized, unredacted voter records are not pertinent or

3    relevant to this wide ranging, amorphous investigation.

4    Instead, this is the sort of overbroad data gathering

5    disallowed when First Amendment protected rights are at stake.

6    The Privacy Act thus bars this collection.

7            And the Privacy Act bars the collection for another

8    reason.  DOJ has not followed the Act's protocols for

9    collecting sensitive information.  The Privacy Act requires the

10   Government to publish or identify something called a System of

11   Records Notice, or SORN, before collecting data.

12           Now, a SORN tells Americans how their sensitive data

13   will be collected, used, and shared.  DOJ identifies no SORN in

14   its complaint.  It thus is out of compliance with the Privacy

15   Act.  Now, in its opposition, DOJ raises three SORNs, but none

16   justify this collection.  The first SORN identified concerns

17   Civil Rights Division records, quote, indicating a violation or

18   potential violation of law, and it covers information on

19   investigations' subjects, victims, and potential witnesses.

20           Now, this SORN does not apply here for several

21   reasons.  First, California's voters are not the subjects,

22   victims, or witnesses of DOJ's claimed investigation.  That

23   targets California, not its voters.  But even overlooking this

24   issue, this SORN fairly read allows for collection of

25   information regarding discrete legal violations.  Say, I like

1  to think of maybe the statements of witnesses interviewed while

2  investigating a hate crime.  It does not let DOJ claim an

3  investigation covering all voters in a state, and indeed, maybe

4  more than just one state, then collect, store, and possibly

5  share that information based on only that representation.

6         And precedent supports this, I think, common sense

7  instinct.  In the related field of federal administrative

8  subpoenas, this circuit restricts the Government's ability to

9  overread text to engage in bulk information gathering.  That's

10 the Peters case cited in our briefing.  There's also an ejusdem

11 generis issue with DOJ's reading of this SORN.

12        As the court knows, observing other items in the

13 statutory list can help interpret disputed text.  This SORN

14 covers two groups, subjects of investigations, as we've been

15 discussing, and, quote, individuals of Japanese ancestry who

16 were eligible for restitution benefits as a result of their

17 internment during World War II, close quote.

18        I think that narrow pool of covered persons strongly

19 suggests that the subjects of investigations language cannot

20 sweep to cover all state residents.  And for all those reasons,

21 this SORN does not apply here, and the other two don't apply

22 either.  The other two cited by DOJ.  First, they're not even

23 SORNs of their own.  Instead, they just revise the SORN we have

24 been discussing.  But second, those revisions target situations

25 far afield from this one, a publicization of data after an

1    investigation ends and after a data leak.

2           The Privacy Act accordingly bars this collection.  I

3    want to address while I'm talking about this something that the

4    Court wondered about during my friend's argument, which was

5    whether or not the federal government just already has social

6    security numbers.  The way I view it, the federal privacy laws

7    require data hygiene.  Even if some agencies of Government may

8    already possess a social security number, the law still

9    restricts the Government's ability to share and use data

10   between agencies without notice.

11          The Government is composed of many different bodies.

12   And the mere fact that one agency, probably the Social Security

13   Administration, is in possession of a log of, I assume, social

14   security numbers, that does not mean that DOJ, a separate

15   agency, can access that information.  Indeed, that's what the

16   Privacy Act was designed to slow down, to block, exactly that

17   sort of exchange without any oversight process or

18   publicization.

19          **THE COURT:**  Okay.

20          **MR. SETRAKIAN:**  I'll turn to the E-Government Act.

21   DOJ, straightforwardly, has not complied with this law.  The

22   Act mandates that an agency take certain actions before it

23   collects, quote, any information in an identifiable form

24   permitting the physical or online contacting of, close quote, a

25   person if more than 10 persons are implicated.  If those

1  conditions are met, the agency must conduct something called a

2  privacy impact assessment, have that assessment reviewed by

3  agency staff, and publish it.  Now, the assessment, in turn,

4  must address --

5          THE COURT:  Now, is that an administrative process

6  decided by the executive branch, or is that statutory?

7          MR. SETRAKIAN:  This is by statute.  The E-Government

8  Act is a statute.  It leaves some elements to the executive.

9          THE COURT:  What elements are you referring to?

10          MR. SETRAKIAN:  Certainly.  So the contents of a --

11          THE COURT:  I'm sorry, what elements are you

12  referring to in the Privacy Act?

13          MR. SETRAKIAN:  Yes, the contents of a privacy impact

14  assessment.

15          THE COURT:  Read that to me.

16          MR. SETRAKIAN:  Read the entire -- I have the

17  regulation.  It's 16 pages long.

18          THE COURT:  No, you don't have to do that,

19  counsel.  But you're relying --

20          MR. SETRAKIAN:  Yeah.

21          THE COURT:  In other words, I want to be able to look

22  back and find that section.

23          MR. SETRAKIAN:  So yeah, so --

24          THE COURT:  Mr. Mitchell, in the meantime, would you

25  be kind enough to gather all the parties?  I don't know what

1  Mr. Szabo's schedule is today, but this argument is going to

2  take longer on the Voter Rights Act than I anticipated.  So if

3  he's only available a certain period of time.  So if you could

4  gather the parties, have them all come into court, and I'll get

5  a time estimate.  I'm sorry, counsel.

6         **MR. SETRAKIAN:**  Not at all.  So this is from Section

7  208, cited in our briefing, subdivision (b)(2)(A).  So the

8  director shall issue guidance to a --

9         **THE COURT:**  I'm sorry.  2-B-A?

10        **MR. SETRAKIAN:**  No, (b)(2)(A).

11        **THE COURT:**  (b)(2)(A), thank you.

12        **MR. SETRAKIAN:**  And Section 2 is called Contents of a

13  Privacy Impact Assessment.  And Section A says the director

14  shall issue guidance to agencies, specifying the required

15  contents of a privacy impact assessment.  Now, subdivision B

16  explains what that guidance must contain.  I'll give a couple

17  of examples.  The guidance shall require that a privacy impact

18  assessment address what information is to be collected, why the

19  information is being collected, with whom the information is to

20  be shared.  I could go on.

21        The specific OMB guidance is titled M-03-22 OMB

22  Guidance for Implementing the Privacy Provisions of the

23  E-Government Act of 2002.  We cite this in our briefing.

24        **THE COURT:**  Okay.

25        **MR. SETRAKIAN:**  DOJ simply has not followed this law.

1   It seeks information that triggers the statute, but it has not

2   pleaded that it completed a privacy impact assessment.  And DOJ

3   claims it need not comply with this law, but that misses the

4   mark.

5           DOJ argues it's not collecting data from individuals

6   themselves, but from California, but the law asks only whether

7   the federal government is collecting individuals' personal

8   information.  It says nothing about the information's source.

9   And to the contrary, the OMB guidance we were just discussing

10  clarified that the E-Government Act applies when collecting

11  information, quote, from or about members of the public.  So

12  not just from, but also, as here, about.

13          Perhaps recognizing this weakness, DOJ pivots to

14  policy, but its arguments fail.  They argue that the E-

15  Government Act would require DOJ to conduct many privacy impact

16  assessments before collecting this data, but the purpose of

17  federal privacy laws is to restrict the Government from

18  unrestrained access to individuals' records.  DOJ cannot paint

19  the intended operation of this law as running against policy.

20  The E-Government Act thus mandates the complaints dismissal.

21          I'll briefly conclude with the Drivers Privacy

22  Protection Act, just a couple of points on that statute.  The

23  Act prohibits the disclosure of driver's license numbers

24  obtained by a state DMV in connection with a motor vehicle

25  record.  Now, it covers California's Secretary of State because

1    she receives these numbers from DMV when voters register there

2    through Motor Voter.

3            Now, recognizing the law's application, DOJ argues

4    that it fits into a statutory exception.  The law exempts data

5    collected, quote, for use by any government agency in carrying

6    out its functions.  But as precedent explains, we cite a

7    Seventh Circuit en banc opinion that goes deeply into this, the

8    phrase "for use" plays a key role in that analysis.  The

9    Government falls into this exception only if it plans to use

10   the specific information collected for an identified

11   purpose.  Now weighed against that standard, DOJ's argument

12   collapses.

13           As the Seventh Circuit recognizes, the act's purpose

14   is to prevent all but a limited range of disclosures.  Here

15   though --

16           **THE COURT:**  What was the Seventh Circuit dealing with

17   in that case?

18           **MR. SETRAKIAN:**  Yeah, it's called Senne v. City of

19   Palatine or village of Palatine.  Yes, Senne v. Village of

20   Palatine.  The cite is 695 F3rd 597.  As I mentioned, that's an

21   en banc opinion from the Seventh Circuit cited in our papers.

22           **THE COURT:**  Okay.

23           **MR. SETRAKIAN:**  Here, DOJ has not pleaded that it

24   will use the specifically requested material, these unredacted

25   driver's license numbers, to conduct its NVRA and Help America

1   <u>Vote Act</u> investigations.  This exception thus does not

2   apply.  I'm happy to answer any further questions the Court

3   has.  Otherwise --

4           **THE COURT:**  Not now.  There'll be a second round, but

5   step over with your colleagues.  Make certain that there's

6   something that you might have missed.  Just take a moment as a

7   courtesy and consult with them.

8           **MR. SETRAKIAN:**  Absolutely.

9       **(Pause)**

10          **MR. SETRAKIAN:**  Nothing further at this time, Your

11  Honor.

12          **THE COURT:**  Okay.  LA Alliance and the City, I'll be

13  right with you.  I'm going to ask about the time constraints

14  and the availability of witnesses in just a moment, but I want

15  to hear one other segment.

16          For the intervenors, who would like to go first, the

17  NAACP or the League of Women Voters?

18          **MR. DODGE:**  I'll be going first on behalf of the

19  NAACP, Your Honor.

20          **THE COURT:**  All right, please.  And, counsel, once

21  again, I'm going to continually ask, if you know of any other

22  states joining us, Arizona, Colorado, Delaware, Hawaii,

23  Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New

24  Mexico, New York, Oregon, Rhode Island, Vermont, or Washington,

25  tell me immediately, in case I need to extend this briefing

1  schedule or their input.

2          Number two, with the amici that are requested so far

3  from the Secretaries of States of Colorado, Connecticut,

4  Minnesota, Nebraska, Oregon, Pennsylvania, Washington, once

5  again, if we get that kind of hearsay out there, you have

6  a contact, let's get together very quickly so we can get that

7  briefing and the amici briefs before the Court as quickly as

8  possible, in case we're making a mistake in terms of two

9  weeks.

10          I've allowed you to intervene.  You do not have to

11  take the same position as the Women League of Voters.  You're

12  arguing potentially collectively, but you're arguing also

13  individually.  And I'll say to both counsel, once again, when

14  you're asking the Court to reflect upon jurisdiction, make sure

15  that that's what you want, because I could decide this

16  procedurally and refer this to another district.  Therefore,

17  this may not be the lead case in the country.  Arizona may

18  decide this, New Jersey, Washington.  So be careful.

19          Number two, I have the Obama birth certificate case.

20  I could have decided that in one paragraph on standing.  We

21  took 30 some pages to anticipate that this issue would arise

22  again under the 25th Amendment.  And sure enough, in the

23  election, it was right back to us.  So just if you want this

24  resolved on the merits, fine.  If you want it, if your argument

25  holds water with the court, then you're maybe in some other

1  jurisdictions.  So decide how quickly you want this decided,

2  because I know about 40 million voters, minimally or depending

3  upon this, just in this case submitted to us.  So counsel,

4  please.

5       **MR. DODGE:**  Good morning, Your Honor.  Chris Dodge of

6  the Elias Law Group on behalf of Intervenor NAACP.

7       **THE COURT:**  Nice meeting you.

8       **MR. DODGE:**  I wanted to start by getting immediately

9  to Your Honor's concerns about what this case is really about.

10 This case is about voter registration, and voter registration

11 is a canonical area of state government and state domain.  The

12 elector's clause in the Constitution assigns, in the first

13 instance, responsibility for voter registration and all that it

14 entails to the 50 states.

15      Now, the federal government, as Your Honor has

16 alluded to, has limited tools that permit it to supervise that

17 process when there's a breakdown, when there's not adequate

18 list maintenance, when there's racial discrimination, when

19 there's suppression of the right to vote.  But DOJ's tools to

20 do that are extremely limited.  They can only exercise the

21 power that Congress has given them to intrude upon this

22 historical state domain.  And that is what this case is really

23 about, because what's going on here is completely

24 unprecedented.

25      To give some context to the Court, which I think gets

1  to this amici issue, this issue starts with the Department of

2  Justice demanding the full unredacted state voter registration

3  lists of over 40 states.  It has now sued 16 of those states in

4  three tranches.  It started with Maine and Oregon.  California

5  was in the second tranche.  And just two days ago, it sued

6  another six states.  I can give you those 14 states if you

7  would like.  It overlaps somewhat with the states that have

8  submitted an amici brief.  But that's sort of what's going on.

9  This is a national issue.  And this Court is out front right

10 now in terms of the briefing and the scheduling, but those

11 cases will be following in short order.

12         There are two others in the Ninth Circuit in

13 Washington and Oregon that are also underway.  So that's the

14 context here.

15         So what really this case is about is, is the

16 Department of Justice using its limited tools given to it by

17 Congress properly to intrude upon California's state voter

18 registration system by demanding that it turn over a full

19 unredacted voter list?  And, you know, there's extensive

20 briefing on the three tools that they point to.  They claim

21 three tools here: the Civil Rights Act, the NVRA, and

22 HAVA.  And my colleagues from the states have sort of gone

23 through those.  You know, we've raised similar arguments in our

24 briefing, and I don't want to, you know, waste the Court's time

25 repeating them because they are in the papers.  I want to focus

1   on some of the more discreet arguments we raise in our brief.

2   And I guess one more piece of context for the Court

3   that I think the Court will find interesting.  In its most

4   recent tranche of cases, the six cases they filed just a couple

5   days ago, the Department of Justice is only pursuing a single

6   claim.  They abandon their NVRA and HAVA claims in these six

7   most recent cases against, I believe, Vermont, Rhode Island,

8   Delaware, Maryland, New Mexico, and Washington.  They only, in

9   those most recent cases, are pursuing their Title III Civil

10  Rights Act claim, which I think tells you something about the

11  degree of confidence they have in their NVRA and HAVA claims.

12  And I think the briefing very adequately explains why they do

13  not have any plausible claim for using those two tools, HAVA

14  and the NVRA, for the purpose they're seeking here.

15  HAVA has no disclosure provision.  Period.  Full

16  stop.  It is not there.  There will be -- you can find nothing

17  in the Department of Justice's briefing about how HAVA entitles

18  them to demand documents from a state.  Non-existent.

19  The NVRA, it has a limited public inspection

20  provision that applies to everyone, but it gives no special

21  access to the Department of Justice.  It means anyone in this

22  courtroom could make a demand of a state and say, hey, I would

23  like to see certain documents about how you maintain your voter

24  rolls.  But that's a limited public inspection right, and it

25  does not get them the information they're seeking here.  It

1    gives them documents about sort of the mechanics of voter

2    registration, and it gives them certain information like names

3    and addresses that the state has offered to give here, but it

4    doesn't give them social security numbers.  It doesn't give

5    them driver's licenses.  That's not in the statute.  And there

6    is a boatload of precedent on the NVRA, the Bellows case from

7    the First Circuit that my friend alluded to, extensive, you

8    know, cases cited in the briefing, throughout the briefing,

9    that uniformly say states are allowed to enforce their own

10   privacy laws to redact information that is requested under the

11   NVRA.

12           THE COURT:  You're referring to the Bellows case out

13   of the First Circuit?

14           MR. DODGE:  That would be the best one, Your Honor.

15   And I think, and to Your Honor's earlier point, that is the

16   paradigmatic instance of the DOJ just flip flopping its

17   position here.  There are numerous briefs from the Department

18   of Justice in these NVRA cases.  There are a lot of NVRA cases

19   out there.

20           THE COURT:  Okay.  Just a moment.

21           MR. DODGE:  The Bellows case is one --

22           THE COURT:  Counsel, slow down.  We've got lots of

23   time.  So far you've cited Benson out of the Sixth Circuit.

24   You've cited Bellows out of the First, and the Long case out of

25   the Fourth.  My question to all of you is going to be if DOJ

1    has taken a consistent position as you're arguing, I also want

2    to know if they've taken a contra position, and I want that

3    briefing in front of the Court so I can see what the arguments

4    were in this different circuits.  Are you relying on the

5    Bellows case?

6              **MR. DODGE:**  Yes, Your Honor.

7              **THE COURT:**  All right.  Thank you.

8              **MR. DODGE:**  And to that point, Your Honor, what I

9    would say is in those three cases, which are the three I'm

10   familiar with, in each of them, DOJ took the position that the

11   NVRA permits states to redact certain voter registration

12   information, in every single one across administrations, that

13   was DOJ's position.  I am not aware of the DOJ ever arguing

14   until this case or, you know, this collection of cases that the

15   NVRA permits the federal government to demand all of this.

16             **THE COURT:**  Were the redaction the same areas that

17   this Court's dealing with?  Because here, slowing all of you

18   down, the willingness of the State and potentially the County,

19   when I hear from the County, are the names, addresses, voter

20   registration, registration method, status, contact information

21   is permissible, but you have strong arguments concerning Title

22   III Privacy Act and privacy rights, from your viewpoint,

23   concerning social security numbers and certainly the state

24   driver's license information, which has a larger breadth of

25   information.

1          Are you concerned -- as your briefing seems to allude

2   to in some of the amicus so far, concerning voter registration,

3   in other words, as you argue statutory language behind that,

4   there's some motivation.  And you -- I think we can all note

5   that the federal government on occasion has moved in the civil

6   rights issues, especially in the south, but rarely in terms of

7   states.  So for DOJ, you know that that question is coming.

8   Why the state of California?  Why these different

9   jurisdictions?  What's behind this?  What is your real concern?

10          **MR. DODGE:**  It's a great question, Your Honor.  And

11   you know, I do not have a direct link to AG Bondi's mind on

12   this issue, but there is some --

13          **THE COURT:**  We'll call her.  I'm just joking.

14          **MR. DODGE:**  That there is -- you know, their stated

15   purpose, the Department of Justice's stated purpose is to

16   supervise each individual state's list maintenance, how they

17   maintain their voter rolls?  We think that's not -- you know,

18   that's not really suitable for the various tools they're trying

19   to use here.

20          There is public reporting out there that is cited in

21   the briefing that I think the Court can take notice of that

22   says that what the Department of Justice is trying to do

23   through these requests is in essence to compile a national

24   voter registration list, which is something that has simply

25   never existed in American history before because it's a

1  state responsibility, by design, so that there is not an over

2  centralization of the electoral process in this country to sort

3  of, you know, avoid one person controlling the voter rolls?

4      **THE COURT:**  What do I do if I find that both the

5  state and the federal government have a substantial interest?

6  How do I balance that?  What standard do I use because there's

7  no jurisprudence in this area?

8      **MR. DODGE:**  It's governed by the statutory text, Your

9  Honor, because DOJ, of course, the federal government is a

10  government of limited powers.  The Department of Justice does

11  have tools in its belt.  Congress has given them the tools

12  we're discussing here today, the Civil Rights Act, the NVRA,

13  HAVA.  The problem is they are trying to expand those tools

14  beyond what the statutory text will permit to get more than

15  what Congress has chosen to allow them to acquire.  That's the

16  nub of the issue here.

17      You know, I think everyone would agree that the

18  federal government has a limited role to play in supervising

19  the voter registration process, but it is limited.  It is

20  limited by design.  And what is going on here is unprecedented

21  and they are exceeding their authorization in trying to compile

22  these full lists from essentially every state and that's sort

23  of the nub of the issue.  So it's not a balancing

24  inquiry.  It's a -- the question is is DOJ acting within the

25  scope of their limited authority to intrude upon the state

1  voter registration process.

2          **THE COURT:**  So you're relying upon statutory?

3          **MR. DODGE:**  Yes, that's exactly right, Your Honor.

4  So, you know, I've sort of briefly alluded to HAVA and the

5  NVRA, which have -- you know, HAVA has no inspection power for

6  DOJ, the NVRA has a universal public inspection that gives no

7  special power to DOJ, and there's uniform case law saying that

8  states are allowed to enforce their own privacy laws.

9  California has a very robust state privacy law that protects

10  voter information even when there's an VVRA request from the

11  public.

12          So that leaves their last tool, which is the Civil

13  Rights Act.  The public documents request provision of the

14  Civil Rights Act has collected dust over the years.  It really

15  hasn't been used much since the '60s.  It was passed in 1960

16  during the Civil Rights era to bolster DOJ's ability to

17  collect certain kinds of records for civil rights

18  investigations.  That's what the legislative history says,

19  that's what the case law says.

20          And I want to raise one specific statutory argument

21  that I think the NAACP alone has raised which is that when you

22  look at the text of that document production requirement in the

23  Civil Rights Act, what it says is that states are required to

24  retain and preserve all records and papers which come into

25  their possession relating to any application, registration, or

1   payment of a poll tax back when poll taxes existed before they

2   were eliminated by the Civil Rights Act of 1964.

3           And the key language that I want to bring to the

4   Court's attention there is come into possession.  The only

5   kinds of documents, states are required to preserve and turn

6   over to the federal government are those that come into their

7   possession and that obviously might refer to something like a

8   voter registration application that someone submits to their

9   local registrar, that comes into their possession.  When you

10  receive a letter in the mail that comes into your possession,

11  when you write a letter yourself, it doesn't come into your

12  possession.  You don't receive it.  You don't acquire

13  it.  That's what that language means.  Come into possession

14  means to acquire or to receive.  That's what Black's Law

15  Dictionary says.  That's what a litany of decisions from the

16  Supreme Court in the Ninth Circuit say.  Huddleston is the

17  Supreme Court case, I'll give you, but it's in the briefing.

18          So the question is the records they're seeking here

19  under the Civil Rights Act, the full statewide voter

20  registration list, is that a document that came into the

21  possession of California election officials?  No, of course

22  not.  It's one they created.  It's something they created in

23  the first instance.  They didn't receive it from voters the way

24  they might a registration application.

25          And I understand Your Honor hasn't fully read the

1   amici briefs, but I think the Maryland brief --

2           **THE COURT:**  I won't until they're all before me at

3   one time, so I don't read them piecemeal.

4           **MR. DODGE:**  One point raised in that is that the

5   animating concern behind this document preservation and

6   production requirement in the Civil Rights Act was that

7   southern registrars, when a black person came in to register to

8   vote in the '60s, they'd oftentimes just destroy it.  They

9   wouldn't preserve it and they were -- so the Act is

10  specifically concerned with making sure that election officials

11  preserve documents they receive from voters so that there

12  is documentary evidence for a subsequent civil rights

13  investigation.

14          The Department of Justice has no explanation in its

15  briefing.  They're welcome to try and explain it here today how

16  the state registration list is --

17          **THE COURT:**  Does the executive branch have to give a

18  reason?  In other words from your perspective, they have to

19  have, for want of a better word, some noble reason behind

20  seeking to obtain this information.  With the separation of the

21  branches, why do they have to have and why do they have to

22  explain that right?

23          **MR. DODGE:**  Because the operative constitutional

24  provision underlying all of this is the elections clause, and

25  the elections clause says that in the first instance, the time,

1  manner, and place of elections for Congress is determined by

2  the states.  That is the default rule.  Congress and never mind

3  the executive branch, do not get the first say on that.

4          What it does say then is that Congress may supplant

5  state laws, specifically as to the manner of holding elections,

6  and that's so that states don't frustrate federal elections

7  with suppressive rules or obstruction or what-have-you.  So to

8  Your Honor's question, the issue is has Congress here chosen to

9  supplant state prerogative to give the executive branch a tool

10 to intrude upon the states.  That's the question and, you know,

11 as has been discussed here, they point to three purported tools

12 from Congress: Civil Rights Act, HAVA, NVRA, but they can't

13 really explain how any of those tools actually gives them --

14 how the text of any of those laws authorizes them to make these

15 demands of California or any other state.  That's the essence

16 of my argument, Your Honor.

17         **THE COURT:**  Okay.  Then step over just a moment and

18 talk to your colleagues.

19         **MR. DODGE:**  Sure.

20         **THE COURT:**  Whether you have the same or different

21 arguments.  Take a moment.

22     **(Pause)**

23     **(Discussion regarding another case)**

24         **THE COURT:**  This would be the League of Women

25 Voters.  And if you'd make your appearance, please.

1          **MS. ZELPHIN:**  Thank you, Your Honor.  Grace Zelphin

2     on behalf of the League of Women Voters of California.  And

3     I'll attempt to keep it short, given the Court's calendar

4     today.

5          **THE COURT:**  We've got plenty of time, trust me.

6          **MS. ZELPHIN:**  What the Department of Justice is doing

7     here is putting the cart before the horse.  It wants the

8     sensitive personal information of 23 million Californians, but

9     it simply does not have any legal authority by which to obtain

10    this.  And when I say that sensitive personal information, yes,

11    it's the driver's license, it's the social security numbers,

12    but it also includes the tranche of data, right?  And these

13    personal sensitive pieces of information in a larger context,

14    in the whole set of 23 million Californians.

15          And as, you know, a lot of argument has already been

16    taken here, the cases and the law cited by the Department of

17    Justice simply do not give them any authority to obtain that

18    information, which is housed rightly in the state of

19    California.

20          I won't belabor the point as to preemption, but the

21    NVRA public disclosure provision, upon which the Department of

22    Justice originally relied heavily upon, requires disclosure of

23    public voter rolls, but it does not require that information to

24    include that sensitive information as prohibited by California

25    and federal law.  HAVA has no disclosure.  And in its

1  opposition, the Department of Justice appears to have waived

2  that argument, not addressing it at all in opposing the

3  intervenor's motion to dismiss.

4        **THE COURT:**  I'm sorry, you dropped your voice.  State

5  that again.

6        **MS. ZELPHIN:**  Which the Department of Justice did not

7  raise at all or argue on at all in their opposition.

8        **THE COURT:**  Okay.  Thank you.

9        **MS. ZELPHIN:**  So that brings us to Title III of the

10  Civil Rights Act, which also allows the Attorney General to

11  demand records.  But again, it still cannot require the

12  sensitive data of 23 million Californians.

13        First of all, they failed to comply with the

14  statutory regulations to request records under that statute.

15  They have failed specifically to make a demand that contains a

16  basis of the purpose, therefore.  So they simply have not

17  provided that.  They have not said, what is the information,

18  what is it based, what is it going to be used for?  They

19  attempt to cobble together some arguments based on their

20  response -- the California's responses to EACS, but it just

21  does not coincide with their request.

22        And even if they were able to put together a demand

23  that includes a purpose and basis, that must be read in

24  conjunction with state and federal privacy laws.  And in doing

25  that, again, there is absolutely no --

1    **THE COURT:** And let me slow you down. What's your

2 concern about privacy? What areas are you specifically

3 concerned about if the Government's argument is we already have

4 access to social security numbers, the State is already willing

5 to turn over names, addresses, voter registration, voter

6 method, registration status, and contact information, or at

7 least that's the representation made by your colleague. What's

8 your concern?

9    **MS. ZELPHIN:** The League of Women Voters has used the

10 NVRA public disclosure provision, which also provides this

11 information, allows for public disclosure of those records,

12 which are necessary to review to ensure that folks are not --

13    **THE COURT:** And what are those records? What are

14 those records?

15    **MS. ZELPHIN:** That includes the state voter roll,

16 which is what the federal government is seeking here. What it

17 does not include in that voter roll -- right, so the voter roll

18 is, I think, a set of data. But in that set of data, that

19 cannot include specific information tied to each of those

20 voters, which includes their driver's license number and their

21 social security number, right?

22    So it's not just that the federal government doesn't

23 have access to social security numbers anywhere, but in this

24 tranche of data, as a voter, as someone who has registered to

25 vote, complete information cannot be completing that data set

1  with sensitive information like driver's license.  And that is

2  exactly how it should be applied in the NVRA context, and that

3  would also apply in the CRA context, where -- and similarly,

4  there are instances, there have been historically, where folks

5  are disenfranchised, and the League of Women Voters wouldn't

6  say that that cannot be investigated, but what cannot happen is

7  using the CRA as an unfettered discovery tool to gather

8  tranches of information, including sensitive data, without any

9  restriction.

10        **THE COURT:**  And that's a privacy concern?

11        **MS. ZELPHIN:**  Yes.

12        **THE COURT:**  Okay.

13        **MS. ZELPHIN:**  And to two of your other questions --

14  or one of your other questions, the League of Women Voters is

15  very concerned about voter suppression and the use of this

16  data, as it could be done directly to counter the actual

17  purpose of these statutes, which is to franchise the citizen.

18        **THE COURT:**  Okay.  Check with your colleagues for

19  just a moment, if you care to.  And there'll be a second round,

20  eventually, after I hear from DOJ.  You okay?

21        **MS. ZELPHIN:**  Okay.

22        **THE COURT:**  Okay, when we come back, you can

23  anticipate -- the question I've got for the Government will be,

24  while the federal government has been active in the South,

25  especially during the Civil Rights Movement in the 1960s, what

1    are you relying upon for intervention in your request of the

2    states for this information?  And the case started with the

3    Orange County filing, and there were either 13 or 17, I

4    believe, subject to the county's correction of the court --

5           MS. SHOAI:  Seventeen.

6           THE COURT:  -- instances of what was a concern of

7    some kind of voter manipulation or fraud.

8           MS. SHOAI:  Your Honor, just to clarify, the request

9    was for voter registration data related to individuals who were

10   no longer able to vote because they didn't meet the citizenship

11   requirements?

12          THE COURT:  That's correct.  But there were 13 or 17,

13   I forget.

14          MS. SHOAI:  Correct.  It was 17.

15          THE COURT:  Seventeen, thank you.  But what caught

16   the notoriety was the dog who voted twice.

17          MS. SHOAI:  Which is not the subject of the

18   complaint, by the way.

19          THE COURT:  I understand.  But your former colleague

20   argued that in the court.

21          When the states set up our voting apparatus, whether

22   it's Arizona, California, or whatever, uniquely, the states

23   have been in charge of just how we voted a polling place.

24   Historically, they've been in charge with the local district

25   attorneys, at least in this state, of any kind of voter fraud,

1   and therefore, the states have had a strong interest in the

2   past, except with those exceptional circumstances in the South,

3   of a state's rights, if you will, not only in terms of

4   procedure, but enforcement.

5          Eventually, during your argument, I want to hear what

6   interest the federal government has that is unique that causes

7   the request of this information, and if the executive branch

8   can request this information without a purpose, because you

9   hear the other side arguing, in a sense, that this is a fishing

10  expedition, and behind the scenes is voter suppression, of

11  course.  You have unlimited time, but for LA Alliance and the

12  City, how long is Mr. Szabo available today?

13          **UNIDENTIFIED SPEAKER:**  Until 2:00 p.m., Your Honor.

14          **THE COURT:**  Can you bear with me?  You have no

15  choice, but could you take a recess for a moment, and one of

16  you sit in the audience so you see our time frame.  We could be

17  done in five minutes or by 2:00 p.m., okay?  But we'll come

18  back to you.  We'll try to resolve this today.

19          You're from D.C. or you're from Sacramento?

20          **MR. BRUDIGAM:**  I'm from Sacramento, Your Honor.

21          **THE COURT:**  Okay.

22          **MR. SETRAKIAN:**  I'm here in Los Angeles.

23          **MR. DODGE:**  I'm from D.C., Your Honor.  In theory,

24  I'm flying to San Francisco later this afternoon for another

25  matter.

1          **THE COURT:**  No, you won't.  You'll be here.  Okay.

2   Where are you from?

3          **MS. ZELPHIN:**  Sacramento.

4          **THE COURT:**  Sacramento.

5          **MR. NEFF:**  Washington, D.C., but I'm at the Court's

6   discretion.

7          **THE COURT:**  I can hold a nice session.  I can go from

8   6:00 to 10:00, okay?  That's not a threat.  I'm just telling

9   you I have unending hours, okay?  So if you need it to get

10  resolved tonight, I can reconvene in another court.  This court

11  closes at 6:00, but I can stay open until minimally 10 o'clock

12  if you need to.  So tell me -- we'll complete it today for you,

13  okay?  I promise you.

14         You have unlimited time, so when DOJ comes back,

15  (indisc.).  Don't worry about the time, okay?  And if you need

16  to make a call, I'm joking with you.  They want you to call

17  Bondi.  You don't have to do that.  But if you need to make a

18  call, you're entitled to make that, all right?  And then

19  there'll be a second round.  Fair enough?  Okay.

20         So one of you sit out in the audience, and let's see

21  how long this will take LA Alliance, all right?

22     **(Recessed at 9:09 a.m.; reconvened at 12:01 p.m.)**

23         **THE COURT:**  If you'd come forward.  If you folks come

24  forward on the voting rights case, I'm going to make this a

25  public case because of the nationwide interest in it.  So I'm

1  going to create for you folks a public website, publish the

2  transcripts and those will be done at court expense.  They

3  won't be a cost to either party.  This has too much

4  significance across the United States, not only California but

5  I think nationwide.  So I'll create that website for you, we'll

6  get those transcripts up for you in a period of time and that

7  way other districts, other courts considering this matter can

8  see what's occurring here.  Fair enough?  And guess what?  It's

9  not going to cost you.  Okay?

10         **MR. NEFF:**  Thank you, Your Honor.

11         **THE COURT:**  All right.  Yeah.  Thank you.

12         All right.  Then, counsel, we're back on the record

13  in the matter of the Weber case and I'm going to turn to the

14  Department of Justice.  And once again, you have as little or

15  as much time as you want.  If you need to stop at any time,

16  consult with somebody, make a phone call, I don't find that any

17  affront.  Okay.

18         So once again, would you just identify yourself for

19  the record and you can remain seated if you'd like to if you're

20  more comfortable like state court or you can go to the lectern.

21         **MR. NEFF:**  I do have a state court history, Your

22  Honor, but for a change I'll go to the lectern.

23         **THE COURT:**  It's entirely different than state court

24  so go to the lectern then and just identify yourself for the

25  record.

1            And counsel, all of you've hopefully had an early

2   lunch.  And with your permission, after DOJ argues, if we have

3   the time, one of you have some engagement some place.  Let that

4   person, whether they're a party or an intervenor, argue first

5   in terms of rebuttal and then if they want to stay but please,

6   in the future, please don't tell me you've got something in the

7   afternoon because I'm giving you unlimited time, okay?  So

8   okay.

9            So Counsel, on behalf of the Department of Justice.

10           **MR. NEFF:**  Thank you, Your Honor.

11           Your Honor got straight to an issue that is

12  overhanging this entire hearing today which is the procedural

13  posture of it.  What is truly the procedural posture?  And I

14  want to get to that because it's important here.

15           This is not just some other complaint that was filed.

16  This was filed under the Civil Rights Act of 1960 which is a

17  very particular unique law.  That law has been interpreted when

18  it's used as an equivalent of an OSC.  There really is an OSC

19  pending before this court.

20           The counsel opposed to this are really trying to

21  bootstrap in a merits argument in a motion to dismiss.  It's

22  inappropriate.

23           However -- and I appreciated the Court's discussion,

24  both of the People's motion to compel as well as questioning

25  opposing counsel about where they stand as far as their

1    jurisdictional argument because the parties should be serious

2    about what's going on here.  The People, or the United States,

3    while we believe that the motion to dismiss brought by various

4    counsel is inappropriately bootstrapping in merits arguments,

5    we also do believe that this deserves a resolution and that

6    arguing it on the merits on the papers, regardless of what we

7    call it, is an important matter for this country but we should

8    be honest about what we're doing here.

9            The United States is asking for this court to issue,

10   in accordance with the Civil Rights Act of 1960 and caselaw

11   interpreting that, a prompt order that California produce

12   records that we are clearly entitled to.  That's what this

13   motion really -- that's what this litigation really boils down

14   to and we shouldn't lose sight of that.

15           The various issues brought up by Defense either fall

16   into trying to avoid the text of that statute of the Civil

17   Rights Act of 1960 or pure speculation or both.  We can take

18   each one in turn -- I'm happy to address the ones the Court

19   would particularly like me to address more than we have in the

20   briefing -- but if -- we want to start with the Civil Rights

21   Act.  The language just couldn't be clearer.

22           The records that the Civil Rights Act refers to under

23   52 USC 20701 through 6 is that every officer of election shall

24   retain and preserve all records and papers related to any act

25   requisite to voting.  The scope is quite clear.

1    Then we go down from Section 301 to Section 303.  It

2  becomes very clear.  Any 301 record shall, upon attorney

3  general demand, be made available to us.  We provide a

4  statement of basis and purpose.

5    And Your Honor, it's the United States' position that

6  that is the only thing that could even conceivably be litigated

7  in a motion to dismiss if we're really calling it that.  The

8  United States believes that's not really what counsel is trying

9  to do but let's take it -- let's stay in the motion to dismiss

10 basket for right now.

11    The would have to challenge the complaint on its

12 face.  A <u>Civil Rights Act</u> (inaudible) complaint challenged on

13 its face could really, I guess, only be argued that, (a), it

14 wasn't the attorney general bringing the case; (b), it's not

15 election records or, (c), that there's no statement of basis or

16 purpose.  And they spent a lot of time talking about basis or

17 purpose.

18    But basis and purpose under this statute is not

19 something that is reviewable and the courts have found that and

20 it's clear from the text of the statute.  Your Honor, it's

21 equivalent of a requirement that the Court enter its meaning on

22 the minutes.  It can then be reviewed as to whether the Court

23 put in a reason on the minutes but the reason itself is not

24 reviewable for a -- for whatever action the Court took.

25    We only need to state a purpose.  We have done that.

1   We actually went far beyond that.  The counsel has to ignore

2   many, many concerns with California that we cited in our

3   complaint as to why we want these records.  However, we are not

4   required to do so.  There is no burden.  There is just simply a

5   requirement that we state our purpose.

6           Now, our purpose is free and fair elections.  Our

7   purpose is to seek to make sure that voter rolls are clean and

8   that every vote is represented and our purpose was clearly

9   stated.  And to understand our purpose the Court is going to

10  need to read the three election statues at play here in their

11  entirely and in totality.

12          The three statutes, the Civil Rights Act of 1960, the

13  NVRA and HAVA all work together.  It is a statutory framework

14  for having free and fair elections in the country.

15          Counsel for the intervenors and for the State of

16  California would like you to look at each of them individually.

17  Piecemeal it out and not see them in totality, much the way you

18  would instruct a jury that they should read all the

19  instructions in totality and not get overfocused on one.  In

20  fact, they all are clear on their face what they say but in the

21  big picture what it provides is a framework of how voters are

22  protected under the NVRA for their registrations and then under

23  HAVA what minimum requirements the state has as to what they

24  have to do to maintain those voter rolls to be accurate.  And

25  then the Civil Rights Act provides the mode by which we can get

1  those records to make sure we are doing our duty as the federal

2  government to make sure that these federal elections remain

3  free and fair.

4         And counsel simply has to rely on both

5  misrepresentations of the law and our position, stating our --

6  for example, that our whole case relies on Lynd.  No.  This

7  action relies on the Civil Rights Act of 1960 and its very

8  clear text, which is the one thing they don't want to talk

9  about because it's very clear.

10         Privacy concerns are first not a proper concern for

11  this motion to dismiss but even if they were, they're

12  unfounded.  Privacy -- the United States is going to comply

13  with all federal laws.  That includes the Federal Privacy Act.

14  The DOJ Civil Rights Division itself has a stated policy

15  available on a website as to how we will comply with the

16  Federal Privacy Act and have before.

17         **THE COURT:**  Explain that to me.

18         **MR. NEFF:**  Yes, sure.

19         So we publish a series of regulations.  They're

20  called the SORNs that show how we tend to the data and make

21  sure everything is properly protected under, not just Federal

22  Privacy Act, but other obvious concerns when you're dealing

23  with large databases.

24         **THE COURT:**  Is that part of my record?

25         **MR. NEFF:**  Yes.

1          **THE COURT:**  And what would I look at that?  What

2    exhibit?

3          **MR. NEFF:**  At our -- in our response to our motion to

4    dismiss and the supporting data for that, the attachments for

5    that.

6          However, I would state, that to any extent,

7    especially the state privacy-type acts would contradict the

8    Civil Rights Act, that the Civil Rights Act would rule.

9          The United States does this on a regular basis.  We

10   have multiple states that don't even see this as a dispute,

11   that simply just -- in fact, on their own do this on a regular

12   basis, share the information with the federal government so

13   that we can run crosschecks to make sure that people are

14   properly on voter rolls.

15         **THE COURT:**  What states are those that have shared

16   either their DMV registrations or the social security numbers

17   of voters?

18         **MR. NEFF:**  Offhand, right now, off of memory I

19   believe the states are Kansas, Indiana -- there are four.

20         **THE COURT:**  That's okay.

21         **MR. NEFF:**  I'll also state the biggest one is -- so

22   we also have an MOU that we produce at the state request.  Some

23   states request it, some don't.  Some say, yes, you're entitled

24   to this data, here you go.  And we have a whole data-sharing

25   setup ready.  It's essentially the Box program, plus some

1  federal proprietary encryption technology to make sure that

2  this is as secure as it needs to be.  And we -- so Texas just

3  told us today they're going to enter in the MOU and share us

4  the data in the next few days.  We believe many more states are

5  going to follow just in the next few days but so we have four

6  states that have already sent us the data.  No questions asked.

7  Probably another dozen or so states in the next week or so that

8  are just going to sign the MOU and share with us.  This really

9  shouldn't be controversial.  It's clearly stated as part of our

10  duty under HAVA and the Civil Rights Act is clear that this is

11  the mechanism in which we do it.

12          **THE COURT:**  Do you think that those states with

13  attorney generals complying with your request would be

14  interested in filing an amicus just as other states who may be

15  opposed to your request are filing amicus?  In other words,

16  what I want to do is make certain if we have states coming late

17  to the table but in compliance that we're looking at the

18  reasoning by all of the atty generals in the respective states.

19          And what I was worried about before, frankly, is if I

20  had red and blue states lining up when I started to look at the

21  amicus, I was particularly interested in the states bringing

22  that to me.

23          Now, I don't know how you define what I call -- well

24  those states that have voted for different -- in different

25  elections in different ways.  Arizona, New Mexico, Michigan,

1    Minnesota, seem to be what I call those states that

2    traditionally doesn't go Democrat or Republican.

3           And then I looked down at the state secretaries for

4    the states and if you notice, there are three states out of

5    there on the amicus.  Connecticut is in for the first time.

6    They are not part of the amicus for the 16 states that we

7    initially named but these are the state secretaries for the

8    states of and Connecticut is an addition, Nebraska is an

9    addition, Pennsylvania -- which has certainly been a swing

10   state.

11          So I was a little worried and that's why I sought

12   your wisdom about whether you all were going to stipulate to me

13   accepting this because I didn't know the weight if I was just

14   dealing with a party disagreement.  And I'm not saying that

15   these swing states necessarily carry greater or less weight but

16   I want to be alert that if this is a partisan effort.  And

17   certainly the country is divided so ...

18          **MR. NEFF:**  I would be --

19          **THE COURT:**  ... so I've got a stipulation that I'm

20   accepting all of these amicus briefs.  I just want to pay you

21   the courtesy if other states are coming onboard, like Texas, et

22   cetera, that we give them a chance for those attorney generals

23   to get this to us but by the same token, I'm going to be

24   writing over the next couple weeks.

25          Is two weeks enough time for you?

1          **MR. NEFF:**  We can inform the states that --

2          **THE COURT:**  Okay.

3          **MR. NEFF:**  -- a judge has invited them to file amicus

4   but --

5          **THE COURT:**  Will you do so?  In other words, for both

6   parties.  Get it out to all the states that you can and I'll

7   docket this, et cetera.  And there may even be disagreements

8   between different courts examining this matter and different

9   circuits.

10          **MR. NEFF:**  I think the bigger picture is that the

11   states that are complying are likely not going to see this as

12   something that they need to delve issue.

13          **THE COURT:**  But I just want to pay you the courtesy

14   in terms of due process.  Okay.

15          **MR. NEFF:**  Yes.  And I would say that's because this

16   really shouldn't be a political issue.  One side can make it a

17   political issue if they want to just simply in a single

18   position declare it that but it doesn't change the fact that

19   the Civil Rights Act of 1960, the text is quite clear and that

20   no one is in favor of faulty voter rolls.

21          **THE COURT:**  We've also had for both parties we've had

22   a series of state rights issues in the federal court for years.

23   And different states have taken a perspective on what the

24   states' rights issues are.  Some are much more state-right

25   oriented, others aren't.  That's why I was interested in the

1    division.  But since you've all stipulated, I'm accepting this

2    amicus at the present time.  I just want to make sure you've

3    got the courtesy on both sides of any other parties coming

4    onboard so if we need an extra week we can take it, okay?

5            Okay.  Won't you continue.  I'm sorry.

6            **MR. NEFF:**  Thank you, Your Honor.

7            The -- would emphasize that this data is necessary

8    for the United States to conduct its HAVA operation -- its HAVA

9    enforcement compliance and that is why that data is

10   specifically cited in the statute.  It simply couldn't be

11   clearer that it needs to be the last four digits of a social

12   security number or the driver's license; otherwise, we are not

13   able to make a verified finding as to the various voter roll

14   registrations that might have problems.  In fact, we sometimes

15   even have to follow up after that data is run.  It's rare but

16   there's a reason that was put in the statute because it's

17   something like we can verify it from what I've talked to our

18   database analysts something like 99.999 percent of the time.

19   That's enough for us to be able to know if it's an actual

20   person that lives in that location and is who the voter

21   registration role says it is.

22       **(Pause)**

23           Again, with the caveat that we do not need to ever --

24   that we do not need to get to this.  This is essentially an OSC

25   where we only need to state our purpose and then we are

1  entitled to the records.  Also under a prompt order, according

2  to caselaw, a prompt order that this is essentially an OSC

3  hearing.

4         The facts of California itself are particularly

5  worrisome.  Maybe the most worrisome state in the union.

6         The state is required to provide various data to the

7  Election Assistance Commission which is a nonpartisan

8  commission.  The state -- the agency created by HAVA in order

9  to try and keep this as neutral as possible and California

10 doesn't provide the complete data.  Their data doesn't have Los

11 Angeles County in it.  It's one-fourth the state's population.

12 That on its own should cause concern countrywide that they've

13 not submitted that data.  It would be irresponsible of the

14 United States to not come in at this point and say we need to

15 see your data to ensure fair and free elections.

16        All of the harms that opposing counsel have pointed

17 to are based on speculation, logical leaps and there is no

18 concrete evidence they can point to.

19        That being said, with the overarching point that this

20 is before the Court right now as essentially an order for an

21 order to show cause, dressed up as a complaint, and that you

22 have a dismissal that is essentially fighting that order to

23 show cause, dressed up as a motion to dismiss, I believe the

24 Court should act within what would be its lawful authority to

25 issue a prompt order that California needs to turn those

1    records over to us that we are entitled to.

2          **THE COURT:**  How do you deal with the state provisions

3    concerning the DMV?  In other words, the state is arguing to

4    the Court that that has a -- for want of a better word -- a

5    special category that is not subject to the <u>Voting Rights Act</u>

6    <u>of 1960</u> or HAVA, and that they have a privacy interest in a

7    sense as well.  What does the Court do with that?

8          **MR. NEFF:**  Any state privacy interest would be

9    trumped by federal law.  It would be trumped by both the

10   <u>Federal Privacy Act</u>, which we're complying with.  It would be

11   trumped by HAVA, which is a -- I repeat -- a federal minimum

12   standards law for state compliance that specifically mentions

13   driver's license number or last four digits of social.

14         The state is required to produce and provide this

15   data under the statute.  If they have some issue with the

16   driver's license; hypothetically, if a state just said we have

17   some real concerns about our driver's license, they comply with

18   the statute if they provide the last four of the social

19   security number.

20         Does the Court have other questions or concerns?

21         **THE COURT:**  Just one moment.  Let me look at a note

22   that I made.

23         **(Pause)**

24         The state represents that they have offered -- and I

25   think both in the Orange County case with the registrar -- and

1  it's represented today in the statewide case -- the names and

2  addresses.  Has that offer in fact been made?

3          **MR. NEFF:**  Has that offer --

4          **THE COURT:**  Yes.  To you.

5          **MR. NEFF:**  Oh --

6          **THE COURT:**  Not to you but to the government, the

7  DOJ.

8          **MR. NEFF:**  California has taken the unique in the

9  nation position that they are -- that they -- we are permitted

10 to come and inspect it in their offices, that data; which, (a),

11 is not sufficient; (b), we argue is not an appropriate way of

12 providing it in today's day and age where it's actually more

13 secure to share this data electronically through our shared

14 file-sharing --

15         **THE COURT:**  Kind of slow-walking you.  Kind of slow

16 walking.

17         **MR. NEFF:**  I think --

18         **THE COURT:**  For want of a better term.

19         **MR. NEFF:**  That is the United States' interpretation

20 of it but --

21         **THE COURT:**  How about the voter participation and the

22 registration methods?  Have those been offered to you?  In

23 other words, that's been argued to me but behind the scenes I

24 don't have that record right now.  Has that been offered to

25 you?

1      **MR. NEFF:**  It is in the back-and-forth is in the

2   letters attached as exhibits in the filings, Your Honor;

3   however, the United States' position is that the responses have

4   been woefully inadequate.

5          **THE COURT:**  Okay.  So we've never gotten down to

6   really how that information would be exchanged.  It's flowing

7   back and forth in terms of representations but as a practical

8   matter there's a big difference between a representation and

9   conveying the information to you.

10         **MR. NEFF:**  Well actually in our letters we did lay

11  out to opposing counsel our file-sharing program, how it works,

12  that it is secure and we invite them to -- assuming they have a

13  change of heart, to use it.

14         **THE COURT:**  About the registration status and the

15  contact information, has that been offered to you?

16         **MR. NEFF:**  That, I'm not sure about.  I'm not sure

17  what the scope of their offer is.

18         **THE COURT:**  Okay.

19         **MR. NEFF:**  I just know that it does not include the -

20  - for sure, does not include the driver's license number or the

21  last four of the social as required by the HAVA statute.  And

22  in other states as well, that has always been the crux of the

23  dispute.

24         **THE COURT:**  In their opening arguments they'd argued

25  that in the Benson case out of the Sixth Circuit, Bellows out

1   of the First and Long case out of the Fourth, that there's an

2   inconsistent and uniformed position taken by the government.

3   How do you respond to that?

4           **MR. NEFF:**  That the -- there is no inconsistency in

5   position.

6           **THE COURT:**  Explain that to me.

7           **MR. NEFF:**  What there is is difference in posture of

8   those cases.  It is a true statement to say that the United

9   States, as an agency, has yet to go to states to enforce the

10  minimum standards of the HAVA statute.  One can argue whether

11  that was a wise or unwise decision but here we are 23 years

12  later and the federal government has yet to do it.  It is

13  still, for certain, good law.  The United States believes it is

14  a law that should be enforced and complied with.  Therefore,

15  because of that history where this hasn't been done before, all

16  of those cases relate to private parties trying to in some way

17  get in.

18          The DOJ's position is that private parties do not

19  have a right of action under HAVA and therefore they should not

20  be allowed to go to states and say, I would like your driver's

21  license or social security number.  However, there are states

22  around the country, including ones that are fighting us, that

23  interestingly, have been willing to turn over that data to a

24  private organization without the same protections as the United

25  States.  That's been cited in our briefing, the ERIC

1   Organization.

2          So what I would say is all those cases are

3   inapplicable.  It often requires selectively quoting them to

4   make it sound like in some way the United States government is

5   not entitled to it.  No, the United States government is

6   uniquely mentioned in both the CRA and HAVA.  And therefore

7   just because this is the first time the United States is coming

8   in and doing it, doesn't mean that it's not clearly what the

9   statute states.

10         **THE COURT:**  For both parties, you mentioned that

11  California is one of the main outliers, for want of a better

12  word, from the DOJ and the executive branch's position.  Is it

13  the position of the executive branch that there need not be any

14  stated purpose that there's an absolute right to obtain this

15  information per statute?

16         **MR. NEFF:**  Statute requires we state a purpose.  A

17  purpose.

18         **THE COURT:**  And what is the purpose here?

19         **MR. NEFF:**  The purpose is for, as stated in our

20  letters to them, for voter roll maintenance enforcement and

21  compliance.

22         **THE COURT:**  And we stated in Orange County with a

23  limited county case involving Page.  There, there were -- and I

24  keep 13 or 17 but 17, I believe, allegations.  The most

25  notorious became the dog that voted twice.

1          Is that, out of 1.2 million voters, what's the basis,

2    for instance, of that kind of request because of course we're

3    always going to have error, including people who legitimately

4    die.  So what's the threshold that this stated purpose has?

5    How should I interpret that?

6          **MR. NEFF:**  Under the CRA there is no threshold.

7          **THE COURT:**  Okay.  Now, do you need to -- and thank

8    you.  Do you need to make any calls?  You're all by yourself,

9    you're doing -- there's nobody to consult with but do you need

10   to make any calls?  Are you satisfied with your argument?

11         **MR. NEFF:**  I appreciate the offer, Your Honor, but

12   no, we're satisfied.

13         **THE COURT:**  Okay.  There'll be a second round.

14         **MR. NEFF:**  Yes.

15         **THE COURT:**  So counsel, however you'd like to proceed

16   then.  One of you has another obligation, I don't care which

17   order.  You can take the intervenors first or the parties.

18       **(Pause)**

19         **MR. BRUDIGAM:**  So there was a lot going on there,

20   Your Honor, and so I'm going to try to be thorough in making

21   sure I cover all of those points.

22         So I think the first thing I want to talk about is

23   this notion that the complaint is just an order to show cause.

24   And essentially what the federal government wants to do is take

25   the Court and sideline them in this dispute and say that the

1  Court has no room for any judicial review here.  And that's

2  just not supported by the text of the statute.

3          There's nothing in the <u>Civil Rights Act</u> that creates

4  a special statutory procedure.  The words "order to show cause"

5  are not in the statute at all and I'll just read you the text

6  right here.

7          It says that:

8          "The appropriate district court shall have

9          jurisdiction by appropriate process to compel the

10         production of such record or paper."

11         That's what it says, "By appropriate process."  And

12  so that's up to the Court to decide what the appropriate

13  process is here.

14         And I'd also just point Your Honor to the fact that

15  the Federal Rules of Civil Procedure contemplate what rules

16  apply when you have a government investigative demand.  I mean

17  Federal Rule of Civil Procedure 81(a)(5) specifically says:

18         "The Federal Rules of Civil Procedure apply to

19         proceedings governing demands for records by the U.S.

20         government."

21         And so this idea that some other procedure applies,

22  it's not supported by the text, it's not supported by the

23  Federal Rules of Civil Procedure.  The only thing that supports

24  this purported procedure are these early 1960s' cases and like

25  we've said, the federal government, they pin their hopes on

1    this one <u>Kennedy v. Lynd</u>, Fifth Circuit case from 1962.  That's

2    the one they're referring to which says that the Court

3    shouldn't have any role here.

4          But that case is obviously nonbinding on Your Honor

5    and it's really been overruled.  I would point you to the

6    <u>United States v. Powell</u> case.

7          **THE COURT:**  I'm sorry, what -- just a moment.

8          **MR. BRUDIGAM:**  Sure.

9          **THE COURT:**  All right.  Please continue.  I've got my

10   note.

11         **MR. BRUDIGAM:**  So the Supreme Court in United States

12   v. Powell found that the Federal Rules of Civil Procedure, they

13   apply to a proceeding like this.  And in that case it involved

14   an IRS document request statute which used the very same

15   language that we have here which is that the Court shall, by

16   appropriate process, compel relief under that statute.  So even

17   if Your Honor found Kennedy v. Lynd persuasive, it's obviously

18   unbinding, that's been overruled.  So just to be clear, the

19   Federal Rules of Civil Procedure govern this action.

20         **THE COURT:**  Well, you've cited on both parties'

21   parts, different enactments by council, statutory provisions.

22   I think we can all agree that we want qualified voters to vote

23   without any chilling effect.

24         **MR. BRUDIGAM:**  I agree.

25         **THE COURT:**  Is there -- well I think we can all

1  stipulate to that.

2          **MR. BRUDIGAM:**  We can.

3          **THE COURT:**  And I'll use the word "qualified voters".

4          Is there a chilling effect in the request by the

5  government and if so, what is that chilling effect?  How would

6  there allegedly be persons who may believe that the government

7  has no business in the sense of getting more information.

8          **MR. BRUDIGAM:**  Sure I mean I think --

9          **THE COURT:**  And behind this the concern of this court

10  eventually, besides the statutory following the law, is going

11  to be the impact of what we write and do.  And this case will

12  probably be the first case that comes out that other circuits

13  look at.  So with that noble goal in mind of having voter

14  participation, is there a chilling effect or not?

15          **MR. BRUDIGAM:**  I think there's absolutely a chilling

16  effect here because --

17          **THE COURT:**  And I need you to define that for me.

18          **MR. BRUDIGAM:**  Sure.

19          **THE COURT:**  And it may not be relevant to the opinion

20  but behind all of this, we need voters who are qualified to be

21  able to vote.

22          **MR. BRUDIGAM:**  Right.

23          **THE COURT:**  Now the ease of that could be differences

24  between different administrations and whether you have

25  different methodologies.  And I know there's a huge controversy

1    about mail-in ballots and voter registration and drive-in, et

2    cetera, but when we're finally done with this, we want

3    qualified voters to vote.  And if there's a chilling effect, or

4    this privacy right that we've somewhat skipped over, I want to

5    hear how you define that.

6            **MR. BRUDIGAM:**  Sure.  Your Honor, I think this action

7    should make the stomach of every American turn, knowing that

8    this executive branch is going in, state by state, collecting

9    and vacuuming up everybody's voter registration information.

10   It is on a scale that we have never seen before.  Okay.

11           And what this is going to do --

12           **THE COURT:**  It is their disparity argument.  In other

13   words, remember when I started this conversation early on, and

14   I discussed the amicus briefs, I was particularly interested if

15   I was getting just red and blue states.  That's why I was

16   looking to see if there were these swing states.

17           **MR. BRUDIGAM:**  I mean I point Your Honor to --

18           **THE COURT:**  Or is this a argument also that a

19   particular group of states are being examined versus other

20   states?  Because here, the government has represented while

21   California from their perception might be an outlier, they've

22   also made inquiries of the let's say more, from their

23   standpoint, compliant states like Kansas and -- I forget which

24   one -- just a moment -- Indiana, and that Texas was coming

25   onboard.

1          **MR. BRUDIGAM:**  Yeah.  Well, what I would say is I

2   mean those aren't states that are complying, they're

3   voluntarily giving that information to the federal government.

4          **THE COURT:**  But regardless, the government has made

5   an inquiry so if there's an argument that the government is

6   reaching out and being selective, if the state is voluntarily

7   complying that doesn't seem to me to be singling out

8   progressive states.  And if you think that, then I need to hear

9   that and hear your reasoning behind that.

10          **MR. BRUDIGAM:**  I'm not saying they're singling out

11   states.

12          **THE COURT:**  Okay.  Then we can pass that.

13          **MR. BRUDIGAM:**  They're going after every state and

14   California is by no means --

15          **THE COURT:**  So I'm not going to have a disparity

16   argument.

17          **MR. BRUDIGAM:**  Right, right.  I just mean in terms of

18   the position the secretary has taken, I mean the reason they

19   had to sue 14 different states is because nobody wants to turn

20   this data over.  The representations that Counsel just gave

21   today, that's the first that I've heard of any state turning

22   over that information.  So we are by no means an outlier in

23   taking this position.

24          **THE COURT:**  Wait just a moment.  For the government

25   or DOJ, how do we validate Kansas and Indiana?  What validation

1  do I have about that?

2      **MR. NEFF:**  I was actually looking that up right now,

3  Your Honor, because --

4      **THE COURT:**  Well go ahead and look it up.  You've got

5  lots of time.

6      **MR. NEFF:**  And I --

7      **THE COURT:**  By the way, I'm not holding you to it.  I

8  know it's in good faith but I'd like to hear what states that

9  we have validation for turning this document over.  And there

10  may be numerous states.

11      **MR. NEFF:**  It's a good-faith representation here.  I

12  am kind of a point --

13      **THE COURT:**  Okay.  Well now take away the good faith.

14  I accept that.  Okay, I'm asking for proof now.

15      **MR. NEFF:**  Okay.  Wyoming, Kansas, Indiana and

16  Arkansas all complied voluntarily.

17      **THE COURT:**  Okay.  Just a moment.

18      **MR. NEFF:**  Texas --

19      **THE COURT:**  Kansas, Indiana, Wyoming and Arkansas ...

20      **MR. NEFF:**  ... have already complied ...

21      **THE COURT:**  ... voluntarily.

22      **MR. NEFF:**  ... voluntarily.

23      **THE COURT:**  Okay.  Texas?

24      **MR. NEFF:**  Texas, Virginia, Utah, Tennessee, South

25  Dakota --

1          **THE COURT:**  Just a moment.

2          **MR. NEFF:**  Oh it's gonna go long, yeah.  South

3  Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama,

4  all fall into the list of they have expressed with us a

5  willingness to comply based on the represented MOU that we have

6  sent them.  And so we expect full --

7          **THE COURT:**  Now apparently Nebraska can't make up its

8  mind because of the proposed amici briefed to the Court, they

9  have the former state secretaries of state for Colorado,

10  Connecticut, Minnesota and guess what?  Nebraska.

11          **MR. NEFF:**  Well those are former.  And furthermore,

12  just because some states are representing certain things in

13  court, there are still discussions going on now that this MOU

14  we have is fully blessed.  There are the -- I don't think it's

15  safe at this point to go beyond those states but --

16          **THE COURT:**  Then that's fine.

17          **MR. NEFF:**  -- that's a fair representation of the

18  state of discussions as of today.

19          **THE COURT:**  And Counsel, back to you.

20          **MR. BRUDIGAM:**  Sure.  And yeah, so all I heard there

21  was we've heard a willingness.  It doesn't sound like those

22  states have actually turned over any data, just to be clear.

23          So I want to talk a little bit about --

24          **THE COURT:**  No, I think he said that four states have

25  actually.  Kansas --

1          **MR. BRUDIGAM:**  Four states have actually turned over

2  but the broader list --

3          **THE COURT:**  -- Indiana, Wyoming and Arkansas.

4          **MR. BRUDIGAM:**  Right.

5          **THE COURT:**  The others were a purported willingness.

6          **MR. BRUDIGAM:**  Right.

7          So Your Honor, the federal government is really

8  leaning hard into the text of these statutes and they say that

9  we don't want to talk about the text but that's just absolutely

10 not true.  And I want to just start with the Civil Rights Act

11 of 1960.

12         There is a very clear statutory limitation in that

13 provision and it's in Section 20703.  And it says that the

14 attorney general's demand shall contain a statement of the

15 basis and the purpose therefore.  DOJ has not satisfied this

16 requirement and so their demand is invalid plainly under the

17 statutory text.

18         **THE COURT:**  So the plain representation by the

19 government is too broad; and that is, they want to stop voter

20 fraud.

21         **MR. BRUDIGAM:**  Well, so they've mentioned a couple of

22 things.  It keeps changing so I want to unpack this a little

23 bit.

24         So they said that the purpose is free and fair

25 elections, clean voter rolls.  Then he said up here that it's

1    for enforcing HAVA.  So these are multiple different bases.

2    And also it's different than the -- or than the purpose that

3    was originally articulated in the letters to the secretary.

4         The original request said that it was -- they were

5    seeking it for NVRA voter list -- list maintenance compliance.

6    So the reason and rationale keeps shifting and changing.  And

7    that's a problem, not just because it's suspicious, it's a

8    problem because, again, the text says, "The demand shall

9    contain a statement of the basis and the purpose therefore.

10   The text use of the article."  'The,' twice, in front of the

11   basis and the purpose indicates that there is only one basis

12   and one purpose.

13        And the federal government has explicitly rejected

14   this plain text reading.  They said it up here that they just

15   need to give you any old basis and then the demand is good.

16        **THE COURT:**  That's my question also to both of you;

17   and that is, does the executive branch need to state a purpose?

18   Your argument is that they do.

19        **MR. BRUDIGAM:**  They do.

20        **THE COURT:**  Counsel for DOJ puts that in broad terms.

21        **MR. BRUDIGAM:**  Right.  Well but again, it's not just

22   a purpose, it's -- or not just the purpose, it's also the

23   basis.

24        **THE COURT:**  Okay.

25        **MR. BRUDIGAM:**  And they have not alleged any basis

1  anywhere in their action.

2       Now, I also want to talk about -- and just -- you

3  know this -- I'm sorry.  I want to talk a little bit more about

4  HAVA, which is the law that apparently now that's the main

5  method of enforcement we're now learning today, that that's

6  what they want to enforce and they specifically reference the

7  requirement under HAVA that states collect social security

8  numbers and driver's license numbers.  Well let's look to the

9  text of HAVA.  What does it say?

10          "The state shall determine whether the information

11          provided by an individual is sufficient to meet the

12          requirements of this subparagraph in accordance with

13          state law."

14       And that is -- when it says "this subparagraph," it's

15  referring directly to the requirement that states collect that

16  information when processing voter registration applications.

17  So there is nothing for the federal government to enforce here.

18  This is solely the state's domain.

19       And as I said in my original motion, another

20  provision of HAVA explicitly delegates discretion of

21  implementation of HAVA to the states.  So again, we're not

22  afraid of the text in this case, we think it strongly supports

23  our position.  And so I also want to talk about what this data

24  could be used for.

25          So we've heard a lot of different reasons.  I just

1    explained why it's not relevant for HAVA.  I want to also talk

2    about why it's not relevant for List Maintenance under the

3    NVRA.

4           So the legal standard under the NVRA requires states

5    to conduct a general program that makes a reasonable effort.

6    So the Sixth Circuit held this year in that Benson case that

7    this just means a serious attempt, a rational, sensible

8    approach.  It need not be perfect or optimal.  And so under

9    this standard, getting line-by-line voter information of their

10   social security numbers and driver's license numbers, that's

11   entirely unrelated to whether a general program exists or

12   whether the state is making a reasonable effort.  And so,

13   again, at every turn, the supposed reason why they need this

14   information, it just doesn't add up.

15          And then finally, I want to talk about they claimed,

16   as they did in their brief, that California has, quote, "the

17   most worrisome voter registration data in the nation."  That's

18   just absolutely wrong, okay?  That's an assertion in a brief

19   without any support.

20          And they also incorrectly say that in submitting data

21   to the Election Administration Commission in response to the

22   EACs survey, this is an election administration survey, they

23   said the LA County didn't submit any data.  That's not true.

24   That's simply not true.  You can go to the survey and look at

25   the data that LA submitted and you can look at our explanation

1    to DOJ in our letters in advance (inaudible) litigation

2    explaining the questions they had about that survey.  So to the

3    extent that they want to rely on EACs as some after-the-fact

4    rationalization for this demand, it just doesn't make sense.

5    It doesn't add up.

6           So those are the main --

7           **THE COURT:**  Were there inconsistent or consistent

8    offers if you're aware of the Page case, as well as this case.

9    In other words, when this started in Orange County, originally

10   counsel was here, there's a representation about the registrar

11   there making the same or similar representations about what

12   they were willing to share with DOJ but I've never compared the

13   two.  And I don't know what the state's position is because

14   DOJ's argument might be, we're getting inconsistent data.  In

15   other words, even when we're sharing, with the different

16   entities promising that they'll share some amount of this data,

17   the different counties are supplying this in different ways.

18          **MR. BRUDIGAM:**  Sure.  So I won't speak too much about

19   that case but I would say that case is different and there

20   isn't a problem of inconsistent data sharing because in the

21   state case, they're saying, give us the whole list.  We want

22   every voter.

23          In Orange County, they said, we want a list of just

24   the individuals that have been removed from your list because

25   of non-citizenship, people who renounced or for whatever

1    reason.

2         **THE COURT:**  So this is much broader from your

3    perspective in terms of protection, privacy, HAVA.

4         **MR. BRUDIGAM:**  Yeah.  It's not an issue of can they

5    be reconciled.

6         So I do want to just back up again and just zoom out

7    on the big picture here in this case.

8         You know, as we talked about -- my colleague talked

9    about, in his motion, that the states really have the primary

10   role in administering elections and the voter registration

11   process.  The Constitution makes that quite clear in the

12   elections clause.  And it makes sense to prioritize the state

13   in this process because they're the ones that are closer to the

14   voters, more accountable to the voters.  And so this is an

15   arrangement that it depends on the principle of subsidiarity

16   where a decision should be made at the local level.  And here,

17   we don't -- there's no place for the federal government to come

18   in and start demanding these records under that constitutional

19   framework.

20        And not only are the states the default entity

21   running elections but it's only Congress that can make or alter

22   those rules.  Here, we have the executive branch in court

23   trying to get this information.  The Constitution says nothing

24   about the executive branch having any role in federal

25   elections.

1          And I would just say that this is not a unique

2    position by this administration.  The president has been

3    meddling in state election law since he came into office.  And

4    I would point Your Honor to a case in the District of

5    Massachusetts, California v. Trump, where the executive was

6    doing something sort of similar where they were going in under

7    the guise of federal law and trying the change the way states

8    administer and conduct elections and that was pursuant to an

9    executive order the president issued.  And so here, we're

10   having another situation where the federal government is coming

11   in under the guise of inapplicable federal laws and trying to

12   interfere with the state's role in elections.  And so I'd just

13   say against that backdrop, it's important to keep that in mind;

14   but even if, you know, considering all that, if you'd just go

15   back to the text of these statutes, the federal government is

16   not entitled to this information under those laws.

17          And so at this point I want to turn it over to my

18   colleague, Will Setrakian, to just provide some rebuttal on the

19   federal privacy laws issue.

20          **THE COURT:**  Thank you.  And once again, would you

21   state your name because we're on CourtSmart.

22          **MR. SETRAKIAN:**  Good afternoon, Your Honor.  Will

23   Setrakian for defendants, The State of California and

24   California Secretary of State Shirley Weber.  Just four quick

25   points on the federal privacy statute.

1          First, I want the Court to recognize between the

2    briefing and the argument, we have given the Court law on these

3    three statutes.  Statutory law, regulatory law and decisional

4    law.  And my friends on the other side have not.

5          Now, turning to my friend on the other side's

6    reference to DOJ's Civil Rights Privacy Policy -- this is cited

7    in their opposition to the motion to dismiss -- ECF 63 on Page

8    23 and Footnote 11.  That privacy policy clearly does not apply

9    here.  The policy concerns some sort of form.  It says to the

10   reader, quote:

11              "The information you provide through this form will

12              be used in some way or another."

13          And among other things, it says:

14              "All the information you give via this form is

15              voluntary."

16          Now that, of course, is miles from this case where

17   individuals are not providing data via some form to the

18   government and they are not doing so voluntarily.

19          Third, my friend on the other side said the <u>Civil</u>

20   <u>Rights Act</u> prevails over the <u>Privacy Act</u>.  Now they, of course,

21   offer no citation, no opinion for that proposition.  And it's

22   true that the question has not been litigated as between the

23   <u>Civil Rights Act</u> and the <u>Privacy Act</u> but in the NVRA context,

24   which also contains a disclosure provision, every court to read

25   the two laws together, the NVRA and the <u>Privacy Act</u>.  Every one

1  of them.

2        **THE COURT:**  Let me stop both of you and just ask a

3  naïve question.

4        Your argument is that the states not only set up the

5  process and procedure for voting but they also have the

6  enforcement applications.

7        (To Clerk):  Oh, you want to check CourtSmart and

8  just make sure it's operating?  Still going?  Let's make sure,

9  Counsel, because we sent the staff to lunch, okay?

10        **MR. SETRAKIAN:**  Yes.

11        **THE COURT:**  And if it's not, guess what?  We get to

12  argue again on this record, okay?  (laughs)

13        **MR. SETRAKIAN:**  This would be everything since we

14  began at noon.

15        **THE COURT:**  Yeah, well it's like the Rocky horror

16  picture show.

17        **MR. SETRAKIAN:**  That's okay, Your Honor.

18        **THE COURT:**  Or Ground Hog day.

19        Is it operating?  Counsel --

20        **MR. SETRAKIAN:**  Thumbs up.

21        **THE COURT:**  -- magic electronics, it's still

22  operating.

23        **MR. SETRAKIAN:**  Excellent.

24        **THE COURT:**  So let me come back to the question.

25        It sounds to me like this court's going to eventually

1  be in the position of deciding, at least in the privacy area, a

2  unique issue of first precedence in the country and that is

3  trying to decide what those states' rights are in terms of your

4  unique position in terms of policy and practice.  And I'm not

5  referring to HAVA now or I'm not referring to statute but also

6  if we get into privacy and also one that's legitimate for the

7  federal government to intervene as they did in the civil rights

8  cases in the South.  How am I going to balance that so it's not

9  a personal opinion or predilection by a court?  Because I don't

10  think there's any jurisprudence and I guarantee you you've got

11  a good chance of whatever happens here going to the Supreme

12  Court.  In fact, I wouldn't be surprised if they took this case

13  on cert.

14          **MR. SETRAKIAN:**  Well, as to the privacy laws, I would

15  submit this is not essentially a question of first impression,

16  that several courts have already been working through, trying

17  to read together --

18          **THE COURT:**  Which courts?

19          **MR. SETRAKIAN:**  Sure.  We have six opinions that we

20  cite in our briefing.  A case called Public Interest Law

21  Foundation v. Dahlstrom; case called True the Vote v. Hosemann;

22  Public Interest Law Foundation v. Bellows; Public Interest Law

23  Foundation v. North Carolina State Board of Elections; Project

24  Vote v. Long, and a case called Greater Birmingham Ministries.

25          **THE COURT:**  Now, you cited them.

1          **MR. SETRAKIAN:**  Yes.

2          **THE COURT:**  And are they all consistent?

3          **MR. SETRAKIAN:**  They are.

4          **THE COURT:**  Because I have to go back and do my

5     homework now after argument?

6          **MR. SETRAKIAN:**  Yes.  They all are consistent in

7     concluding that the Privacy Act still compels some redaction of

8     voter information.

9          And the reasoning tends --

10          **THE COURT:**  Do they deal specifically with what those

11     redactions are?  Are they the social security numbers?  Yes or

12     no?

13          **MR. SETRAKIAN:**  I believe they all concern redactions

14     of social security --

15          **THE COURT:**  No, no, "I believe".  That's the way

16     police officers talk to me.  "I believe".

17          **MR. SETRAKIAN:**  No, yes, I believe they all concern

18     redactions of social security numbers and they all --

19          **THE COURT:**  Okay.  Do they all involve redactions

20     concerning state DMV or do they deal with that?

21          **MR. SETRAKIAN:**  I don't think they all involve the

22     DMV.  They all involve voter records.

23          **THE COURT:**  Do any of them involve DMV?

24          **MR. SETRAKIAN:**  I am not sure where the source was of

25     the data in all of them.  I think Project Vote involves DMV

1  sourced data but in any event, this data is coming from state

2  election offices and they all use similar reasoning.  They all

3  say that one of the purposes of the NVRA was to increase voter

4  participation.

5          And there would be, as Your Honor recognized earlier,

6  a chilling effect if individuals knew that by registering to

7  vote, they were putting their entire packet of information,

8  including social security numbers and driver's license numbers,

9  available for exposure.  The NVRA's case for members of the

10  public but also from the federal government if it passed.  And

11  that's the reasoning these courts take and the reasoning I

12  submit the Court should adopt here which is that we have to

13  read these statutes together and that is a way that they can

14  sort of play nicely with one another.

15          And I will just conclude with one comment on the

16  history of privacy laws.

17          You'll recall the Privacy Act was enacted in the wake

18  of Watergate and COINTELPRO.  Scandals that shook Americans'

19  faith that their data would be responsibly collected, used and

20  stored.  And this is not just attorney argument.  The Ninth

21  Circuit recognized this in the Garris case that we cite at Page

22  1295.  They talked about a, quote, "Rightful and broad

23  condemnation of government surveillance programs," close/quote.

24  Applying the Privacy Act in these related laws here vindicates

25  those ends.

1          I'm happy to answer any further questions the Court

2     has.

3          **THE COURT:**  I'm just going to joke with both of you

4     but wait till we get from Watergate to AI.

5          **MR. SETRAKIAN:**  Yeah.

6          **THE COURT:**  And your refrigerator spying on you.

7          **MR. SETRAKIAN:**  I do think there's something to that

8     insight where these statutes came about as electronic

9     surveillance was becoming more sophisticated.  And so as it

10    only continues to grow more sophisticated, the importance of

11    these statutes looms even larger.

12         **THE COURT:**  Is there any jurisprudence concerning

13    data dumps that would be of value to the Court or any

14    reasoning?  There's been quite a controversy concerning

15    government gathering information through massive data dumps

16    involving private citizens.  Is there any jurisprudence there?

17         **MR. SETRAKIAN:**  Data dumps?

18         **THE COURT:**  Because you're dealing basically data

19    dumps.

20         **MR. SETRAKIAN:**  Not that I'm aware of.

21         **THE COURT:**  Okay.

22         **MR. SETRAKIAN:**  But maybe.

23         **THE COURT:**  Okay.  All right then thank you very

24    much.

25         And you're satisfied with your argument?

1    **MR. SETRAKIAN:** Yes.

2    **THE COURT:** Now, in three minutes -- it's up to you

3    but in three minutes I'm going to take the other case because I

4    only have an hour with the gentleman here from the County. So

5    if you have three minutes, fine; if you don't, I'll see you

6    about 2:00 o'clock.

7    **UNIDENTIFIED SPEAKER:** We're going to have rebuttal,

8    right?

9    **THE COURT:** Oh, there's going to be rebuttal. In

10   other words, we're not leaving, okay?

11   **UNIDENTIFIED SPEAKER:** I think Your Honor --

12   **THE COURT:** Why don't we just resume. I'm giving you

13   the courtesy. If you wanted to catch the plane, you could

14   have. I've let you go out of order but otherwise, why don't I

15   see you folks at 2:00 o'clock. I'll take a recess -- well

16   they'll take a recess then before the next witness and we'll

17   try to finish off your arguments, okay?

18   **UNIDENTIFIED SPEAKER:** Okay.

19   **THE COURT:** Okay. Have a good recess and we'll see

20   you at 2:00 o'clock.

21   **(Recess taken at 12:58 p.m.; reconvened at 2:00 p.m.)**

22   **THE COURT:** Call the matter of *United States v.*

23   *Shirley Weber.*

24   You're not -- you don't have a 45-minute time

25   constraint but come on up for a moment and let's see if we can

1    get you on your way.

2        **(Laughter; Pause)**

3            And then, Counsel, would you just restate your name

4    for the record so we have -- we have it on CourtSmart, please.

5            Someone with Department of Justice?

6            **MR. NEFF:**  Eric Neff for the United States.

7            **THE COURT:**  Thank you.

8            **MR. BRUDIGAM:**  Malcolm Brudigam for the State.

9            **THE COURT:**  Thank you.

10           **MR. SETRAKIAN:**  Will Setrakian for the States

11   Defendants.

12           **THE COURT:**  Thank you.

13           **MR. DODGE:**  Chris Dodge for Intervenors NAACP and

14   SIREN.

15           **MS. ZELPHIN:**  Grayce Zelphin for Intervenor League of

16   Women Voters of California.

17           **MS. SHOAI:**  Deputy County Counsel Suzanne Shoai for

18   Orange County Register of Voters Bob Page.

19           **THE COURT:**  And I'll come back to you, in case you

20   have any comments that you'd like to make.  I somewhat skipped

21   over you the first time.  I'll come back.

22           **MS. SHOAI:**  Thank you, Your Honor.

23           **THE COURT:**  So Counsel, once again identify yourself

24   by name and who you represent.

25           **MR. DODGE:**  The gentleman who preceded me is quite

1  tall.

2          Good afternoon, Your Honor.  Chris Dodge on behalf of

3  the NAACP and SIREN Intervenors.  I sort of want to address two

4  things, I think, some nuts and bolts issues and then sort of

5  the bigger picture, which Your Honor keeps coming back to here.

6          On the nuts and bolts, you know, as I said on the top

7  half, this issue, this case really boils down to whether or not

8  Congress has given the Executive Branch the tools necessary to

9  make the demand that it has placed upon California.  My friend

10 on the other side during his argument said that me and my

11 colleagues were trying to avoid the statutory text.  That is

12 completely backwards.  There is one side here that is avoiding

13 the relevant statutory.  It is the Federal Government; it is

14 not the Defendants and Intervenors.  And I'll give you an

15 example.

16          So in the top half of my argument I talked about

17 Title III of the Civil Rights Act and one of the statutory

18 arguments that the NAACP raised in its briefing.  My friend on

19 the other side got up, and I will assume this was an oversight

20 on his part, but he purported to quote the statute to Your

21 Honor, it will be in the transcript, and he left out the very

22 portion of the statute that I quoted to Your Honor that decides

23 this issue and he did not address the argument raised in our

24 briefs.  So I will read the actual text of the statute that my

25 friend on the other side neglected.

1           This is 53 U.S.C. 20701 and in relevant part it says

2    every officer of election shall retain and preserve all records

3    and papers which come into his possession relating to any

4    application, registration, and payment of a poll tax.  My

5    friend on the other side did not quote that part about come

6    into possession.

7           And the same thing was true in their Complaint.  They

8    conspicuously left that portion of the statutory text out of

9    their Complaint.  And I think the reason why is quite clear.

10   It's because as a statutory matter it forecloses what they are

11   seeking in this case.

12          As I explained in the top half, that phrase come into

13   possession carries a particular meaning.  Congress oftentimes

14   will use the term possession in a statute.  As Your Honor

15   surely knows, there are a litany of federal statutes that say

16   possession.  Come into possession is not the same.  Come into

17   possession means to acquire or receive something.  I came into

18   possession of my grandmother's antique china.  I came into

19   possession of a letter a friend from Fresno sent me.  If I

20   write a letter and place it on my desk I don't come into

21   possession of that letter.  I come into possession of a letter

22   when it is sent to me and I receive it.

23          So that operative text in the Civil Rights Act means

24   that the records subject to this inspection requirement they

25   rely upon are only those that come into the possession of

1   election officials.  Period.  Full stop.  If a California

2   election official compiles a list in their office in

3   Sacramento, that didn't come into their possession, they

4   created it.  In contrast, when a voter goes down to their local

5   registrar and submits an application, that application comes

6   into the possession of the registrar.  That's the difference.

7           My friend on the other side has not addressed this

8   statutory point in their briefing.  They have not addressed it

9   here in oral argument.  And I think it's because there is no

10  good answer to it.  Simply put, if it does not come into their

11  possession, if it is not a record that comes into the

12  possession of state election officials it is not subject to

13  mandatory disclosure under this Act.  And, you know, I think my

14  friend on the other side has to account for the statutory text

15  at some point and he has not.

16          So that's sort of point number one on the text on the

17  nuts and bolts, which, you know, again I think highlights who

18  here is actually evading the statutory text.

19          The next, let's go to HAVA.  My friend from the State

20  I think addressed this very ably.  DOJ counsel got up and said,

21  well, HAVA requires a compilation of Social Security numbers

22  and driver's license numbers.  Well, that's true, but there's a

23  very important omission that my friend from the State pointed

24  out.  HAVA says the states have to do that, subject to their

25  own state voter registration laws.  It is a -- and if you read

1    the legislative history of HAVA, and I know this is quoted in

2    our brief, the NAACP brief, in the legislative history of HAVA

3    Congress specifically says it praises the historical

4    decentralization of election management in this country and it

5    says very plainly that the rationale for that that the Founders

6    had in the elections clause was that it would avoid the over-

7    centralization of power when it comes to administering

8    elections.

9           And that is precisely what the Department of Justice

10   is trying to do here.  They are trying to take unprecedented

11   steps to centralize the management of federal elections, which

12   the Constitution in the first instance assigns to the states.

13   And I think, as my friend said, that should give everyone a

14   great deal of pause.  There should be a great deal of pause at

15   the idea that federal elections are going to be run from

16   Washington, D.C. rather than state capitals' county registrar

17   offices.

18          And then with respect to the NVRA, the last of the

19   three tools they invoke, you know, I think there's been a lot

20   of discussion about that here today, the one point I would like

21   to emphasize is that statute does have a inspection provision

22   but it is one common to all people.  It is not a special

23   provision for the Government.  And my friend from DOJ in trying

24   to explain DOJ's past position in the *Long* case, the *Bellows*

25   case, the *Benson* case said, oh, well, those cases were

1    different because they involved requests from private parties.

2    There's absolutely no statutory basis to draw that distinction

3    whatsoever.  There's one public inspection provision in the

4    NVRA, it applies -- you know, if you construe that provision,

5    Your Honor, that construction will apply as much to the

6    Department of Justice as it will to your law clerk, as it will

7    to the Marshal downstairs who wants to put in a request to the

8    state to say give me these documents.  There's no special

9    solicitation to the Government under the NVRA when it comes to

10   what they are allowed to review as far as documents go.  And I

11   think my friend on the other side has played a little fast and

12   loose with that fact.

13           And I think because there's only that one common

14   public inspection provision, that's why you have, again,

15   uniform case law.  The *Bellows* case is, you know, I think a

16   really good distinction of -- articulation of it.  It collects

17   all the other relevant case law, saying because this is a

18   public inspection requirement we can't just have Joe Smith

19   requesting every little bit of data about a voter.  Of course

20   you have to redact certain sensitive information.  And the

21   courts are uniform on that.

22           So that NVRA public inspection provision is not broad

23   enough in scope to get the Government what they seek here.  It

24   is limited.  For that reason, because anyone on the street can

25   walk in and use it.  And certainly it would be very troubling

1  if any person on the street could get the same kind of data the

2  federal government is requesting here.  And that's how they're

3  asking you to construe the NVRA.

4          So that's sort of the nuts and bolts.  Unless Your

5  Honor has questions on them, I sort of want to, you know,

6  again, zoom out, like why are we here, what's the big deal.

7  The big deal is, again, this unprecedented effort on behalf of

8  the Department of Justice to create a nationwide centralized

9  voter database.

10         **THE COURT:**  And by Department of Justice, that would

11  be the Executive Branch?

12         **MR. DODGE:**  Correct, Your Honor.  Correct.  And, you

13  know, there was some discussion about, you know, are they

14  targeting certain states, are certain states complying.  You

15  know, let's sort of look at the facts that are before the

16  Court.

17         Four states have willfully complied with their

18  demands.  I suppose that's their prerogative.  They might have

19  unique state laws as far as what information is protected.  But

20  that's certainly not any sort of indication that these tools

21  they rely on actually grant them that power.  That just means

22  the leaders in these states said you know what, we're okay with

23  this or we don't have state laws that protect this information.

24  Which is not the case in California.  California has very

25  robust state laws passed by the legislature that protect this

1    information.  And so it doesn't really speak to California what

2    these four states did.

3          My friend alluded to some dozen or so states that,

4    you know, maybe kind of in the coming days are going to do

5    something.  I mean I don't know anything about that.  I think

6    we should -- I think it will be curious to see what that

7    actually looks like in reality.  You know, he's talked about

8    this memorandum of understanding the Department of Justice has

9    offered them.  I don't know what that says.  I don't know what

10   sort of, you know, terms and conditions are in it.  I think

11   that would be, you know, sort of interesting to learn more

12   about.  And I don't think the Court should take on faith that

13   these 12 states are just up and turning over their entire

14   voters lists because someone sent them a letter in the mail

15   from Washington, D.C. asking for it.

16          The facts, as I understand them, is that at this

17   point in time the Department of Justice has made this demand of

18   almost every state in the country.  Blue, red, swing, purple,

19   whatever you want to call it.  States of all colors have

20   resisted it.  Lots of Republican led states.  You know, my

21   friend has quoted, if you add his numbers up that's 16 states.

22   There are more than 16 states in this country that have a

23   Republican government.  The states they have sued so far I

24   think do skew quite blue.  Fifteen of them are led by

25   Democratic governors.  One is led by Republican, New Hampshire.

1   Whether that is an indication of something, I don't know.  But

2   I think in aggregate most states are pushing back on this.

3           And so my friend got up and said this shouldn't be a

4   big deal, you know, this shouldn't be political.  You know, in

5   the abstract, of course, he's right.  I think if this were a

6   run-of-the-mill application of the NVRA it wouldn't necessarily

7   be very political.  But there's no precedent of the Department

8   of Justice of the Executive Branch going around with this scope

9   and breadth to the states.  And Your Honor asked, you know,

10  does that have any chilling effect on people.  Of course it

11  does.

12          You know, my friend on the other side has given very

13  ephemeral reasons to the Court for why they need this

14  information.  Oh, we want to help people vote.  We want good

15  voter lists.  Voter fraud.  Freedom.  You know, whatever.  Like

16  these very high level explanations of what they intend to use

17  the data for.  You know, I don't think those satisfy the text

18  of the statute but I also think, you know, there's public

19  reporting out there that is cited in the papers that casts a

20  fair bit of shadow over what the Department of Justice purports

21  to want this information for.

22          It is I think basically confirmed by public reporting

23  that the Department of Justice will share this information with

24  the Department of Homeland Security, an agency that is

25  typically tasked with, you know, terrorism issues, national

security issues. And I think if you are someone who's
represented by one of my clients, SIREN, which represents
working class immigrants in California, and you hear that the
Department of Justice is coming to your state and says turn
over all this voter information and there's reports out there
that it's going to be turned over to the Department of Homeland
Security, they might start thinking, gosh, you know, I don't
want -- I don't need this kind of trouble, I don't need this --
why should I bother registering to vote if my information is
going to be on the fast lane from my local registrar's office
to Washington, D.C. and the Department of Homeland Security.
That absolutely chills people. And I don't think we have
anywhere near the kind of assurances from the federal
government that would give those groups of people comfort in
knowing that their data was going to be compiled in a national
database.

I think Your Honor's alluded sort of like to the
question of they're all Social Security numbers, the federal
government has them, what's the consequence of that? To me the
consequence is voter lists are maintained at the state level by
design. By constitutional design, by statutory design. The
NVRA and HAVA, you know, actual enactments of Congress, assign
these responsibilities to the states. They don't assign it to
the Civil Rights Division of the Department of Justice.

And so I think the precedent of having a nationwide

1    voter registration database at the fingertips of the Executive

2    Branch, it is precisely the centralization of election

3    management authority that the Constitution is meant to avoid,

4    the federal statutes are meant to avoid.  But I think -- you

5    know, my fried used the term subsidiarity, which, you know, is

6    a very impressive term.  I mean it really just boils down to

7    the fact that you go to vote at your local registrar's office.

8    You know your neighbors when you go to vote at the polls.  The

9    person who checks you in is somebody who lives down the street.

10   There's a lot of trust that comes from voting at the local

11   level, from registering at the local level.  And elevating that

12   to some focal point in our nation's capital, that remove from

13   just going down to your town hall to vote, it's of huge

14   consequence to people, especially those who, I think with good

15   justification, are very hesitant to know that their information

16   is going to the Executive Branch.

17         So I think that's -- I think those are the stakes and

18   I think that on the nuts and bolts it really boils down to

19   these three statutes they have invoked.  You know, there are

20   affirmative defenses, of course the Privacy Act, I think, you

21   know, those things need to be considered as well.  But, you

22   know, in the first instance the most immediate legal question

23   before the Court is do these three statutory tools they point

24   to actually grant them the authority to compile these statewide

25   voter registration lists.  And the answer is no.

1    So if Your Honor has additional questions, I'm glad

2  to address them.  Otherwise, I know you have a busy day.

3    **THE COURT:**  Counsel, thank you very much.

4    Counsel of behalf of the League of Women Voters?

5    **MS. ZELPHIN:**  Thank you, Your Honor.  Grace Zelphin

6  on behalf of the League of Women Voters.  I'll keep this brief

7  because I think a lot of the points that we would like to raise

8  are similar to our colleagues.

9    Just big picture here, the NVRA, HAVA, and the CRA

10 were each passed for the purpose to ensure that eligible

11 Americans can participate in free, fair, and secure elections,

12 which I think are a cornerstone in America's democracy, the

13 right of every citizen to vote.  Each of these statutes was

14 passed in the context to open up the ability for folks to

15 register to vote, making new pathways for folks to get their

16 registration organized, making sure that their registrations

17 were not unfairly deleted, and that folks when they step to the

18 polls to vote they're able to do so.

19   The Department of Justice's attempt to conflate and

20 import pieces of these statutes now to authorize its line-by-

21 line evaluations of voter data simply must fail for all the

22 reasons my colleagues have spoken to earlier today.  The

23 statutes that were passed and thoroughly considered to help

24 voters access the polls do not permit the federal government to

25 use them to go line-by-line and try to find folks and any

1  imperfection in a state's data registry to disenfranchise

2  voters.

3      And the harm is great.  Having folks know that their

4  data that they have entrusted with their local registrar is

5  going to a massive database in the federal government

6  discourages folks of all walks of life, of any walk of life

7  that just does not want that kind of vulnerability in their

8  personal data.  It risks suppressing registration, it risks

9  suppressing voting in, you know, a franchise that we're already

10  less than 60 percent of eligible voters vote.

11      We should be doing everything we can to encourage

12  voting and use these statutes for the purposes for which they

13  were intended and for that reason, and for the reason that the

14  statutes clearly do not permit the Department of Justice to use

15  them in the way they are intending to, the Motion to Dismiss

16  should be granted.

17      With that, I'll rest on our papers and thank the

18  Court for their time.

19      **THE COURT:**  Thank you very much, Counsel.

20      Let me turn to the County for a moment.  In a sense

21  you don't have to make a comment, you're here on the Page

22  matter, but if you have anything that you'd like to share I

23  want to make sure you have that opportunity.

24      **MS. SHOAI:**  No, Your Honor.  I really do appreciate

25  the opportunity, but I have nothing to add at this time.

1          **THE COURT:**  Let me turn to the Department of Justice.

2          **MR. NEFF:**  Thank you, Your Honor.

3          **THE COURT:**  I want you to just state your name.

4          **MR. NEFF:**  Eric Neff for the Department of Justice --

5          **THE COURT:**  Thank you.

6          **MR. NEFF:**  -- Your Honor, the United States.  The

7  Civil Rights Act is so clear on its terms that we are ending up

8  with absurd arguments here and dealing with opposing counsel's

9  reference to language of come into possession.  We have not

10  been trying to hide from that language.  It's simply for

11  economy of briefing to not include that descriptive phrase,

12  which is referring to just the any record that is coming into a

13  state election official's possession, they then need to turn

14  that over to us if they want.  It doesn't provide any qualifier

15  that applies to this case.

16          Is counsel arguing that if a state was discriminating

17  against a whole class of voters based off of race that then the

18  federal government would not be able to request their voter

19  registration list because it was compiled by the state?  It

20  runs afoul of the very purpose of the statute.

21          It's simply saying that that is just a descriptive

22  phrase that says any record that comes into the state election

23  official's possession, if we deem it as something we need for

24  our purposes we can request it.

25          HAVA.  The language of HAVA does support subsidiarity

1    when one understands the purpose under which it was passed and

2    the legislative context in which it was passed.  Up to that

3    point there had been no law passed that provided any minimum

4    standards for the state that the federal government could

5    enforce.  Therefore, HAVA is clearly stating, while we are not

6    undermining subsidiarity, while we still have respect for

7    subsidiarity, we here are stating in very specific

8    circumstances these minimum standards for the first time are

9    ones that the federal government has statutory authority to

10   enforce.

11         Big picture in this argument, I think you can put

12   kind of the three arguments that have been made by opposing

13   counsel kind of into three buckets.  First, jurisdiction,

14   whether it's proper here in Sacramento.  We stated in our

15   papers that we believe in an electronic era any office where

16   the records are available is a principal office under the

17   statute.  The request for these rolls are made on a regular

18   basis at Secretary of States and registrars all around the

19   state.

20         Going in reverse order, I think, of depth of

21   discussion and importance.

22         The privacy issue seemingly getting lost here is that

23   we're dealing with the United States, the federal government,

24   the agency that issues this number, that has more protections

25   than any other agency to preserve private information, is

1   dealing with national security matters on a day-to-day basis.

2   And within that context, this can't be clearer.  Election

3   integrity and privacy laws do not conflict.  I repeat they do

4   not conflict.  Privacy laws are about protecting the public as

5   the government goes about its lawful business.

6           With all respect, I would push back on Your Honor

7   that this is a unique issue posed before the Court.  I would

8   say it's not.  It's a non-issue.  No one thinks that privacy

9   laws preempt the government from going about its lawful

10  business.  No one thinks the government is restricted in its

11  ability to enforce federal laws, either civilly or criminally,

12  because of privacy laws, much less getting the last four digits

13  of a Social Security number where there's a specific federal

14  statute saying that we get it.  We are pursuing clean voter

15  rolls and free and fair elections and we will protect all

16  citizens' privacy, as it is our obligation to do and as we have

17  laid out in our papers how we will do it.

18          Furthermore, the request is not something

19  extraordinary.  For example, the SAVE database has been in

20  operation in the Department of Homeland Security for at least

21  two decades that I'm aware of.  And just in the past six, I

22  believe it was instituted in May, they began running voter

23  rolls for voluntary states with this data, with driver's

24  license and last four of Social.  Twenty-one states gave it to

25  them.  Twenty-one at last count.  The states are interested in

1   having their own clean voter rolls.  The federal government is

2   interested if states are not maintaining clean voter rolls.

3           Now the final bucket I would say is falling under or

4   at least getting to the statute here of the Civil Rights Act,

5   the purpose, the requirement that we state a purpose.  Opposing

6   counsel is trying to make just a mountain out of a molehill on

7   this.  As I've said to Your Honor, I would analogize it to a

8   requirement that putting a reason on the minutes.  Because that

9   precludes their various claims and defenses here they want to

10  say things like, and I'm quoting, we need to unpack that, this

11  is -- they are giving ephemeral reasons, also that we need to

12  allege some sort of facts.  Those are all quotes.  And none of

13  those are in the statute.  The Civil Rights Act does not allow

14  for that.  The Civil Rights Act is about getting election

15  records in short order and whether the purpose is combatting

16  discrimination, voter roll list maintenance, it does not

17  matter.

18          The *Coleman v. Kennedy* (phonetic) case made it clear.

19  Quote, no prima facie case is required.  Quote, we do not need

20  to identify in a general way the reasons.  Quote, it's

21  comparable to an order to show cause.  Your Honor should

22  just -- given the proper complaint, quote, it entitles AG to a

23  prompt order requiring compliance.  A prompt order is important

24  here because we do have concerns about this -- all states

25  are -- it's an interest in the federal government in ensuring

1    free and fair elections and clean voter rolls.

2         In California we have particular concerns.  It's the

3    largest, as we've alleged in our papers, it's the largest state

4    in the Union.  Just on their own publicly available data there

5    were 2.1 million duplicate registrations.  That is 15.6 percent

6    of the voter rolls were duplicates.  That doesn't even -- that

7    number doesn't even include the largest county in the state

8    because the data was not provided to them.  There are other

9    counties that weren't provided as well.  They provided no data

10   on duplicate registration removals.  Their removal -- their

11   death removal rate, removing someone from the voter rolls

12   because they have died, was half, about half the national

13   average.  These are all concerning data points.

14        There could be many more.  We're not required to

15   allege any of them.  I myself could get up here under oath.  I

16   used to be the election -- prosecutor of election crimes here

17   in Los Angeles.  I could describe my cases, go down the list.

18   It's not required.  All we have to do is allege a purpose.  And

19   the records need to be turned over to us in short order.

20        This isn't about the Privacy Act or California

21   privacy laws and their conflict with HAVA going to the Supreme

22   Court, this is just about the most populous state in the nation

23   failing in their list obligations and then, frankly,

24   obstructing federal oversight efforts.

25        Thank you.

1          **THE COURT:**  All right.  Long, long ago when I was

2    practicing I knew that when I got to the elevator door if I

3    just would have told that judge one more thing that I had

4    forgotten I would have persuaded that judge.  So this is a

5    shotgun one round, anything you have missed, anything that you

6    want to say but now it's brief.  It's that one succinct

7    statement that says, I really want the judge to hear this.

8          **MR. BRUDIGAM:**  Your Honor, at the very beginning of

9    today you asked whether we wanted a decision based on

10   jurisdiction or the merits and I just want to be clear that we,

11   even though we raised that jurisdictional argument, we invite a

12   decision on all of the merits in this case.

13         **THE COURT:**  Okay.  I feel more comfortable -- I'll

14   follow the law, but I think we all need a decision subjectively

15   on this.

16         **MR. SETRAKIAN:**  Nothing further from me, Your Honor.

17         **THE COURT:**  Counsel?

18         **MR. DODGE:**  One thing I'll briefly add, Your Honor,

19   on whether motions to dismiss are a proper vehicle, and they

20   absolutely are.  Pure questions of law are resolved on motions

21   to dismiss all the time.  That's what this presents, whether

22   the statutes actually supply the authority the Government is

23   claiming.  And, you know, it's already been discussed a little

24   bit but nothing in any of these laws creates a special

25   proceeding where the Government doesn't have to prove its case

1    under the Federal Rules of Civil Procedure.  They filed a civil

2    action.  Literally the first rule of the Rules of Civil

3    Procedure says all civil actions shall be governed by the

4    Federal Rules.

5              So, you know, I know they're in a hurry.  I don't

6    think they want to tarry in this court long.  They want to take

7    it up.  But they have to follow the Federal Rules and the

8    Federal Rules, including Rule 12(b)(6) and, if necessary,

9    Rule 56, are the proper mechanisms for resolving this case.

10             **THE COURT:**  Counsel on behalf of the League of Women

11   Voters?

12             **MS. ZELPHIN:**  Thank you, Your Honor.  Along similar

13   lines I just wanted to reiterate that the Civil Rights Act

14   Title III does not have any special judicial process that

15   oversets the proper judicial oversight -- appropriate process

16   that this Court may exercise.  And even though the Department

17   of Justice seems to want to assert that in a CRA proceeding

18   they're above the law, that's certainly not the case and the

19   cases that they cite do not support that.

20             **THE COURT:**  County?

21             **MS. SHOAI:**  No, thank you, Your Honor.

22             **THE COURT:**  DOJ?

23             **MR. NEFF:**  Submitted, Your Honor.

24             **THE COURT:**  All right, I want to thank you for your

25   courtesy.  Obviously, I'll wait for the amicus briefing.  But

1   before you leave, I want to know that the wording meets with

2   your approval concerning the amicus briefs and it meets with

3   the time that we've tried to reflect upon.  Do we have a draft

4   of that by any chance?

5          MR. SETRAKIAN:  Yes, Your Honor.  In fact, we all

6   agreed on a draft that matched --

7          THE COURT:  Could you just read it?

8          MR. SETRAKIAN:  Well, we just -- sure.  One of my

9   colleagues is having it be submitted to the Court now.  Yeah,

10  sure, let me read it --

11         THE COURT:  Why don't you just read it.  Why don't we

12  all hear it and see if we can stipulate to it.

13         MR. SETRAKIAN:  Sounds good.  Quote:

14             "On December 4th, 2025, the parties appeared and

15             stipulated to the following briefing schedule.  All

16             potential amici have 14 days from entry of this order

17             to submit proposed amicus briefs.  Potential amici

18             need not seek leave to file proposed amicus briefs."

19         THE COURT:  Acceptable to all parties?

20         MR. NEFF:  Acceptable.  Eric Neff for the United

21  States.

22         THE COURT:  Now, is that 14 working days or is that

23  excluding weekends or not?  In other words, you've got the

24  holiday season upon you.

25         MR. SETRAKIAN:  I imagine that --

1        **THE COURT:**  You want to make sure you get the

2   briefing, depending upon where it comes from.  Working days

3   or -- for my days it's seven days a week so it doesn't matter,

4   but, you know, other people might have a different view.  So do

5   you want that court days or working days or just seven calendar

6   days?

7        **MR. SETRAKIAN:**  I viewed it as 14 calendar days.

8        **THE COURT:**  Okay.  Counsel?

9        **MR. NEFF:**  The United States as well.

10       **THE COURT:**  Okay.  So it will be calendar.  That will

11   be calendar days.  I'll put it out tomorrow, not out today,

12   just so we have enough time.  Okay?  Because people are going

13   to get this on a Friday, you've already gone through three days

14   by Monday.

15       I want to really thank you.  Just excellent briefing

16   and excellent argument.  I want to pay that compliment to you.

17   It's been very helpful.  Obviously, you're not going to get a

18   decision before two weeks.  I want to get that amicus briefing

19   and look at that also.  But obviously I'll be thinking and

20   reflecting upon it in the meantime.  Okay?

21       Thank you very much.  Have a good day now.

22       **(Counsel thank the Court)**

23       **(Proceeding adjourned at 2:31:40 p.m. and then resumed at**

24   **2:31:51 p.m.)**

25       **THE COURT:**  …and those questions to you with a page

1    limit and a time limit.  Okay?

2         **MR. BRUDIGAM:**  Your Honor, I do think --

3         **THE COURT:**  And also I think that there was some

4    briefing due concerning the position of DOJ and the

5    juxtaposition of DOJ in a number of cases that you cited to me.

6    I'll need that as quickly as possible as well.

7         **MR. BRUDIGAM:**  Yeah, we can provide a supplemental

8    notice attached --

9         **THE COURT:**  Provide that to the other parties.  They

10   should have a chance to respond.

11        **MR. BRUDIGAM:**  Of course.  Just attaching those three

12   DOJ amicus briefs that were referenced in argument --

13        **THE COURT:**  Okay.

14        **MR. BRUDIGAM:**  -- that's what we're talking about.

15        **MR. NEFF:**  Your Honor, I do think there's one more

16   issue we should deal with.

17        **THE COURT:**  Okay.

18        **MR. NEFF:**  The United States's Motion to Compel.  We

19   understand Your Honor's concern with that.  However, we would

20   submit that it is still procedurally proper for us to set out a

21   date in accordance with the Rules of Civil Procedure on that,

22   which would, being as generous as possible accounting for them,

23   would be 28 days from today I believe.

24        **THE COURT:**  Now, I didn't preclude you, just for due

25   process grounds it was filed yesterday.

1    **MR. NEFF:** Yes.

2    **THE COURT:** The Rules say 28 days, so you're not -- I

3    tried to (inaudible) you're not curtailed from filing that.

4    **MR. NEFF:** Okay.

5    **THE COURT:** Okay?

6    **MR. NEFF:** Thank you.

7    **THE COURT:** Have a good day then. Thank you very

8    much.

9    **(This proceeding was adjourned at 2:33 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____              December 8, 2025
          Signed                              Dated


*TONI HUDSON, TRANSCRIBER*