E-FILED
Monday, 23 March, 2026  10:37:08 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

THE UNITED STATES OF AMERICA,

*Plaintiff*,

v.

BERNADETTE MATTHEWS, in her official
capacity as Executive Director of the State
Board of Elections for the State of Illinois,

*Defendant.*

No. 3:25-cv-3398

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**HER MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

March 23, 2026

KWAME RAOUL,
Attorney General of Illinois

By:    Vikas Didwania
Holly Berlin
R. Henry Weaver
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
*vikas.didwania@ilag.gov*
*holly.berlin@ilag.gov*
*robert.weaver@ilag.gov*
(312) 814-3000

**TABLE OF CONTENTS**

I.  Introduction ................................................................................................................ 1

II.  Background ................................................................................................................ 1

    A.  Statutory Background ........................................................................................ 1

    B.  DOJ's Demand for an Unredacted Voter File.................................................... 4

    C.  Procedural History and Related Litigation ........................................................ 5

III.  Applicable Legal Standards ...................................................................................... 6

IV.  Argument .................................................................................................................. 7

    A.  The Court must scrutinize, not rubber-stamp, DOJ's demand for records. ........ 7

    B.  The text of the Civil Rights Act of 1960 does not authorize DOJ's demand for an
        electronic copy of the unredacted voter file......................................................... 9

    C.  DOJ lacks any lawful basis or purpose for demanding these data under Title III. ........... 12

        1.  DOJ has not articulated any "basis" for its demand. ................................... 13

        2.  DOJ has given an illegitimate "purpose" for its demand........................... 14

    D.  A static snapshot of all Illinois voters' personal identifying information is irrelevant
        to enforcement of the NVRA and HAVA.......................................................... 16

    E.  Dismissal of the complaint avoids serious constitutional doubts about the sweeping
        authority that DOJ asserts under Title III of the Civil Rights Act. ................................. 18

V.  Conclusion ................................................................................................................ 20

Certificate of Compliance .............................................................................................. 21

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) .................................... 10

*Alexander v. Sandoval*, 532 U.S. 275 (2001)................................................................. 16

*Am. Civil Rights Union v. Phila. City Comm'rs*, 872 F.3d 175 (3d Cir. 2017) ............................ 3

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ................................................ 19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 6

*Bogie v. Rosenberg*, 705 F.3d 603 (7th Cir. 2013) ................................................................ 13

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ..................................................................... 12

*Bufkin v. Collins*, 604 U.S. 369 (2025) .................................................................................. 13

*Califano v. Yamasaki*, 442 U.S. 68 (1979) ............................................................................ 8

*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) ............................................. 16

*Consumer Fin. Prot. Bureau v. Accrediting Council*, 854 F.3d 683 (D.C. Cir. 2017) .................. 9

*Commodity Futures Trading Comm'n v. Tokheim*, 153 F.3d 474 (7th Cir. 1998) ....................... 8

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020)............................ 14

*E.E.O.C. v. Quad/Graphics, Inc.*, 63 F.3d 642 (7th Cir. 1995) .............................................. 6

*Edmond v. United States*, 520 U.S. 651 (1997). ..................................................................... 20

*Foster v. Love*, 522 U.S. 67 (1997)....................................................................................... 19

*Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012) ................................................... 4

*Greater Birmingham Ministries v. Sec. of State for Ala.*, 105 F.4th 1324 (11th Cir. 2024)......... 12

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017) ............................................. 10

*Honeycutt v. United States*, 581 U.S. 443 (2017) ................................................................. 10

*Huddleston v. United States*, 415 U.S. 814 (1974) ................................................................ 10

*Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006).................... 15, 19

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ....................................................................... 20

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)......................................................... 3, 15–16

*Kennedy v. Lewis*, 325 F.2d 210 (5th Cir. 1963) ................................................................... 15

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)............................................................. *passim*

*Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039 (7th Cir. 1999) ................................... 6

*La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355 (1986)........................................................ 7

*League of United Latin Am. Citizens v. Exec. Off. of the President*, --- F. Supp. 3d ---, 2026 WL 252420 (D.D.C. Jan. 30, 2026) .................................................... 19–20

*League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714 (7th Cir. 2021)........................... 19

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................................ 7

*Neita v. City of Chicago*, 830 F.3d 494 (7th Cir. 2016).............................................................. 6

*Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697 (E.D. Va. 2010) ...................... 18

*Pub. Int. Legal Found. v. Benson*, 136 F.4th 613 (6th Cir. 2025) ......................................... 17–18

*Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024)........................................ 18

*Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932 (C.D. Ill. 2022) ........................ 18

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021) ......... 18

*Rucho v. Common Cause*, 588 U.S. 684 (2019) ......................................................................... 1

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966)............................................................ 2, 19

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2014)........................................... 18

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ............................................................................. 11

*United Mine Workers of Am. v. Dole*, 870 F.2d 662 (D.C. Cir. 1989) ................................... 13–14

*United States v. Benson*, --- F. Supp. 3d ---, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026)................................................................................... 6, 9–11

*United States v. Clarke*, 573 U.S. 248 (2014)........................................................................... 9

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962). ................................................................ 13

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)........................................................ 7, 9, 16

*United States v. Oregon*, 2026 WL 318402 (D. Or. Feb. 5, 2026) ................................ 6, 9, 14–15

*United States v. Raffensperger*, No. 5:25-cv-00548, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026) ............................................................................................. 6

*United States v. Powell*, 379 U.S. 48 (1964). ..................................................................... 6–8, 16

*United States v. Weber*, --- F. Supp. 3d ---, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) .............................................................................. 6, 9, 14–15

*Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182 (1990) ............................................................ 6

*Util. Air Reg. Grp. v. EPA*, 573 U.S. 302 (2014)..................................................................... 20

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978) ............. 14

*Walsh v. Alight Sols. LLC*, 44 F.4th 716 (7th Cir. 2022)............................................................ 12

*West Virginia v. EPA*, 597 U.S. 697 (2022)............................................................................. 20

**Statutes & Constitutional Provisions**

U.S. Const. art. 1, § 4, cl. 1 ....................................................................................................... 19

U.S. Const. art. 1, § 2, cl. 1 .................................................................................... 19

Enforcement Act of 1870, ch. 114, 16 Stat. 140 .............................................. 1, 2, 15

Help America Vote Act of 2002, Pub. L. 107-252, 116 Stat. 1666 ........................... 3

National Voter Registration Act of 1993, Pub. L. 103-31, 107 Stat. 77 ................... 3

Pub. L. 85-315, § 131, 71 Stat. 634 (1957) ..................................................... 2, 15

Pub. L. 86-449, tit. III, 74 Stat. 86 (1960) ............................................................... 2

5 U.S.C. § 553 ........................................................................................................ 13

10 ILCS 5/1A-16.1 *et seq.* ..................................................................................... 11

18 U.S.C.
    § 1831 ............................................................................................................. 11
    § 924 ............................................................................................................... 11

42 U.S.C. § 1971 (1952) ........................................................................................... 2

42 U.S.C. § 1974 (1964) ........................................................................................... 2

52 U.S.C.
    § 10101 ............................................................................................................. 2
    § 20503 ........................................................................................................... 19
    § 20504 ........................................................................................................... 11
    § 20506 ........................................................................................................... 11
    § 20507 .......................................................................................... 3, 16–17, 20
    § 20510 ........................................................................................................... 16
    § 20701 ..................................................................................................... 2–3, 10
    § 20703 ............................................................................................................. 3
    § 20705 ......................................................................................................... 3, 7–8
    § 21083 ................................................................................................... 4, 11, 17
    § 21111 ........................................................................................................... 16

**Rules**

Fed. R. Civ. P. 81 ...................................................................................................... 8

**Other Authorities**

H.R. Rep. No. 86-956 (1959) .................................................................................. 15

S. Rep. 79-248 (1946) ............................................................................................. 14

10 Oxford English Dictionary (2d ed. 1989) ......................................................... 10

*Basis (n.)*, Oxford English Dictionary (Dec. 2025). ............................................ 14

Judge J. Michelle Childs, *Voting Rights: Mechanism for Social Change*,
    76 Ala. L. Rev. 603 (2025) ................................................................................ 2

Office of the Law Revision Counsel, *Editorial Reclassification: Title 52, United States
    Code*, https://uscode.house.gov/editorialreclassification/t52/index.html ............... 2

Random House Dictionary of the English Language (1966)........................................................ 10

Statement by the President Upon Signing the Civil Rights Act of 1960,
　1 Pub. Papers 398 (May 6, 1960)................................................................................. 2

Webster's New International Dictionary (3d ed. 1966)................................................................ 10

## I. INTRODUCTION

The Department of Justice ("DOJ") has sued election officials in Illinois and dozens of other jurisdictions to force them to turn over the sensitive personal identifiers—driver's license and social security numbers—of every registered voter, a privacy invasion that could chill the exercise of the fundamental constitutional right to vote. No legal authority supports DOJ's breathtaking demand. In fact, every court to rule on DOJ's demand has rejected it.

To justify its far-reaching demand, DOJ does not rely on a clear grant of authority from Congress. Rather, DOJ attempts to transform Title III of the Civil Rights Act of 1960, which allows DOJ to demand in-person inspection of certain records that "come into [] possession" of an election official, into a general grant of authority to supervise voter list maintenance. This ambitious project fails. To start, the plain text of Title III does not cover DOJ's demand on multiple levels: the voter list is not tied to a specific election; it does not "come into" Matthews's possession because the Board compiles it; and Title III authorizes only in-person copying, not electronic production. Title III also requires DOJ to state in writing the basis *and* purpose for its demand. DOJ gave no "basis," and the "purpose" that DOJ provided—to enforce other, unrelated laws about list maintenance—is invalid. Congress enacted Title III of the Civil Rights Act to empower DOJ to root out entrenched racial discrimination in voting effectuated by local election authorities, a purpose that DOJ is not pursuing here. The Civil Rights Act of 1960 does not authorize DOJ's brazen power grab, so the complaint should be dismissed for failure to state a claim.

## II. BACKGROUND

### A.    Statutory Background

The Enforcement Act of 1870, ch. 114, 16 Stat. 140, was "the first comprehensive federal statute dealing with elections as a way to enforce the Fifteenth Amendment." *Rucho v. Common Cause*, 588 U.S. 684, 698 (2019). The Enforcement Act restated the core commitment of the

1

Fifteenth Amendment, that "all citizens of the United States … shall be entitled and allowed to vote … without distinction of race, color, or previous condition of servitude." Ch. 114, § 1, 16 Stat. at 140. Some parts of the 1870 law were later repealed, *see South Carolina v. Katzenbach*, 383 U.S. 301, 310 (1966), but the core substantive guarantee survived and was still codified at 42 U.S.C. § 1971 at the dawn of the civil rights era. *See* 42 U.S.C. § 1971 (1952).

The Civil Rights Act of 1957 then began a "new generation of civil rights laws." Judge J. Michelle Childs, *Voting Rights: Mechanism for Social Change*, 76 Ala. L. Rev. 603, 609 (2025). The 1957 Act amended 42 U.S.C. § 1971 with new enforcement mechanisms, "authoriz[ing] the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *Katzenbach*, 383 U.S. at 313; *see* Pub. L. 85-315, § 131, 71 Stat. 634, 637 (1957). Three years later, Title III of the Civil Rights Act of 1960 "gave the Attorney General access to local voting records" to aid his enforcement efforts. *Katzenbach*, 383 U.S. at 313; *see* Pub. L. 86-449, tit. III, 74 Stat. 86, 88–89 (1960). As President Eisenhower explained in his signing statement, the "provision[] which requires the retention of voting records[] will be of invaluable aid in the successful enforcement of existing voting rights statutes." Statement by the President Upon Signing the Civil Rights Act of 1960, 1 Pub. Papers 398 (May 6, 1960). The Title III record-access provisions were codified in a new section immediately following the Enforcement Act and the 1957 Act. *See* 42 U.S.C. § 1974 (1964).[1]

Title III requires an "officer of election" to "retain and preserve, for a period of twenty-two months from the date of any" federal election all "records and papers which *come into his*

---

[1] Not until 2014 did a re-codification appear to separate the Civil Rights Act of 1957 from the Civil Rights Act of 1960 in the new Title 52. *See* Office of the Law Revision Counsel, *Editorial Reclassification: Title 52, United States Code*, https://uscode.house.gov/editorialreclassification/t52/index.html. Due to codifiers' choices, not any act of Congress, the Civil Rights Act of 1957, codified at 52 U.S.C. § 10101(b)–(d), has been distanced from the Civil Rights Act of 1960, codified at §§ 20701–20706.

2

*possession* relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701 (emphasis added). The Attorney General may make a "demand in writing" to inspect and copy—"at the principal office" of the records' custodian—records required to be retained under Title III. *Id.* § 20703. The demand "shall" provide both a "basis" and a "purpose" for the demand. *Id.* If a dispute over the demand arises, a district court for the district in which the records are held can "compel production" of the records "by appropriate process." *Id.* § 20705.

More than three decades after the Civil Rights Acts, Congress passed the National Voter Registration Act of 1993 ("NVRA"), Pub. L. 103-31, 107 Stat. 77 (codified at 52 U.S.C. § 20501 *et seq.*). "[T]he NVRA both protects registered voters from improper removal from the rolls and places limited requirements on states to remove ineligible voters from the rolls." *Am. Civil Rights Union v. Phila. City Comm'rs*, 872 F.3d 175, 179 (3d Cir. 2017). As to the latter, the NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or a change in residence. 52 U.S.C. § 20507(a)(4). This NVRA provision aims to address "failures to purge voters who have moved away or have died," which the Fifth Circuit early on described as "a matter which does not bear any particular importance to [an] inquiry" under the Civil Rights Act. *Kennedy v. Bruce*, 298 F.2d 860, 863 n.2 (5th Cir. 1962). The NVRA includes its own provision requiring the release of certain voter maintenance lists—a narrow provision that DOJ does not invoke in its complaint here. *See* 52 U.S.C. § 20507(i).

The Help America Vote Act of 2002 ("HAVA"), Pub. L. 107-252, 116 Stat. 1666 (codified at 52 U.S.C. § 20901 *et seq.*), refined and expanded the NVRA's list-maintenance requirements. Most notable here, it required each State that registers voters to implement "a single, uniform …

3

computerized statewide voter registration list defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A). In accordance with HAVA, the Board maintains such a statewide list.

**B.      DOJ's Demand for an Unredacted Voter File**

On July 28, 2025, DOJ wrote to Matthews "to request information regarding the State's procedures for complying with the statewide voter registration list maintenance provisions of the [NVRA]." ECF 5-2 Ex. 1 (July 28, 2025, Correspondence), at 2.[2] The letter requested the "current electronic copy of the State of Illinois' computerized statewide voter registration list" and cited the NVRA's disclosure provision, 52 U.S.C. § 20507(i), and DOJ's authority to enforce the NVRA, *id.* § 20510(a), as the authorization for the request. *Id.* It did not cite Title III of the Civil Rights Act of 1960.

On August 11, 2025, the Board provided a complete copy of the then-current statewide voter list, with driver's license and social security numbers redacted. *See* Ex. 1 (Aug. 11, 2025, Correspondence), at 1. Three days later, on August 14, DOJ replied demanding "*all fields*," emphasis in original, including "driver's license number" and "last four digits of the registrant's social security number." ECF 5-2 Ex. 2 (Aug. 14, 2025, Correspondence), at 7. For the first time, DOJ claimed that not only the NVRA but also Title III of the Civil Rights Act of 1960 "empowered" DOJ to demand an "electronic copy of Illinois's complete and current" voter list. *Id.* at 8. DOJ provided the following justification for its demand under the Civil Rights Act: "The purpose of the request is to ascertain Illinois's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* DOJ demanded the unredacted list within seven days. *Id.* at 9.

---

[2] The Court may consider the correspondence discussed in this section in evaluating a motion to dismiss because the letters are "documents that are critical to the complaint and referred to in it." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see, e.g.*, ECF 4 ¶¶ 19–25.

On September 2, 2025, the Board replied to the demand for an unredacted list. The Board noted that the request implicated "Illinoisans' interests in exercising their right to vote without risking the privacy of their personal information." ECF 5-2 Ex. 3 (Sept. 2, 2025, Correspondence), at 12. The Board explained that none of the cited authorities entitled DOJ to demand an unredacted list. *Id.* at 12–13. Given that the alleged purpose of the demand was to assess "compliance with the NVRA's list maintenance provisions," the Board promised that its forthcoming September 10 response on those subjects would "satisfy [DOJ] that Illinois' list maintenance program meets (and exceeds) NVRA requirements." *Id.* at 13–14.

On September 10, 2025, the Board provided detailed responses on the topics regarding NVRA list maintenance that were the primary subject of DOJ's original July 28 information demand. *See* Ex. 2 (Sept. 10, 2025, Correspondence). DOJ never replied.

## C.    Procedural History and Related Litigation

Instead, on December 18, 2025, without warning, DOJ filed suit against Matthews. ECF 1. The filing was stricken for failure to comply with Civil Local Rule 11.4(A)(2). *See* Text Order Dated Dec. 19, 2025. The following day, DOJ re-filed its suit. *See* ECF 4. The complaint pleads a single count under Title III of the Civil Rights Act of 1960. *Id.* ¶¶ 26–28. It seeks a declaration that Matthews has violated Title III and an order for Matthews to produce "the current electronic copy" of the Illinois statewide voter list, including a driver's license number or social security number for each voter. *Id.* at 9.

On December 31, counsel for Matthews reached out to DOJ and offered to waive service pursuant to Civil Rule 4(d), but DOJ rejected the offer and instead attempted to serve Matthews on January 5, 2026. *See* ECF 18. DOJ failed to do so, instead delivering process to an employee at Matthews's workplace. *See* ECF 42-3. After Matthews pointed out this failing in her original

motion to dismiss, ECF 41–42, DOJ properly effected service on March 2, 2026, resulting in the new responsive pleading deadline of March 23, 2026. *See* ECF 53, 59.

The United States has filed similar lawsuits against at least 33 other jurisdictions that, like Illinois, have refused to turn over their residents' sensitive identifiers to DOJ unredacted. A chart of the lawsuits is attached as Exhibit 3. As of this writing, three of DOJ's related lawsuits have reached final disposition; all were dismissed. *United States v. Weber*, --- F. Supp. 3d ---, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, --- F. Supp. 3d ---, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026).[3]

### III. APPLICABLE LEGAL STANDARDS

A defendant is entitled to dismissal under Rule 12(b)(6) where a complaint's allegations, even if true, fail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim for relief must also be "legally sound." *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016). So a complaint devoid of "legal merit" is "vulnerable to dismissal under Rule 12(b)(6)." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999).

Before enforcing a civil investigative demand, a court must examine the agency's asserted authority and purpose. *See United States v. Powell*, 379 U.S. 48, 57–58 (1964). The demand must "seek[] reasonably relevant information … and relate[] to an investigation within the agency's authority." *E.E.O.C. v. Quad/Graphics, Inc.*, 63 F.3d 642, 645 (7th Cir. 1995). The Court must also assure itself that the demand "has not 'been made for an illegitimate purpose.'" *Id.* (quoting *Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 191 (1990)).

---

[3] A fourth was dismissed without prejudice because DOJ filed in wrong judicial district. *United States v. Raffensperger*, No. 5:25-cv-00548, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026).

## IV. ARGUMENT

DOJ's complaint should be dismissed because Title III of the Civil Rights Act of 1960 does not authorize DOJ to demand a copy of the statewide voter file, let alone an unredacted copy. DOJ starts from the faulty premise that this Court lacks authority to evaluate the legality of DOJ's written demand. ECF 4 ¶ 4. Not so. Title III requires this Court to use "appropriate process" when enforcing a demand. 52 U.S.C. § 20705. The Supreme Court has held, under a statute with identical language, that a court must scrutinize the agency's asserted authority and purpose before enforcing a civil investigative demand. *See Powell*, 379 U.S. at 57–58.

Here, DOJ has no legal authority because the text of Title III's retention provision does not extend to the voter file. *See* 52 U.S.C. §§ 20701, 20703. Title III further requires that a written "basis" accompany DOJ's demand, *id.* § 20703, but DOJ articulated none. DOJ also lacks any legitimate "purpose" under Title III, *id.*, because it seeks to enforce the NVRA, not to protect the right to vote free from discrimination. Even if DOJ's stated goal of enforcing the NVRA were a valid purpose, a static, unredacted copy of the voter roll has no relevance to NVRA enforcement. Finally, rejecting DOJ's overbroad interpretation of its Title III power avoids serious questions about the constitutionality of DOJ's asserted authority in this and similar cases.

### A.    The Court must scrutinize, not rubber-stamp, DOJ's demand for records.

Any investigative demand must lie "within the authority of the agency," *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950), because "an agency literally has no power to act … unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). The court, not the agency itself, polices that boundary. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("[C]ourts decide legal questions by applying their own judgment."). So DOJ is wrong that it "need only show" the existence of a "written demand" and that Matthews "refused" it, because this is a "special statutory proceeding." ECF 4 ¶¶ 3–4. Instead,

7

the established standards for judicial scrutiny of civil investigative demands apply, and the Federal Rules of Civil Procedure govern that process.

As for the substantive standard, Title III states that this Court "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). The plain meaning of "appropriate process" is that, contrary to DOJ's assertion, courts must provide the recipient with appropriate process to challenge the demand. Sixty years ago, the Supreme Court held the same under an identically worded statute. *United States v. Powell* involved an IRS effort to enforce a summons where the statutes stated that the court "shall have jurisdiction by appropriate process to compel" testimony and production. 379 U.S. at 52 & n.10. The Court held that, pursuant to this language, the federal government, among other things, "must show that the investigation will be conducted pursuant to a legitimate purpose [and] that the inquiry may be relevant to the purpose." *Id*. at 57–58. The summons recipient is "entitled" to an "adversary hearing" at which he "may challenge the summons on any appropriate ground," including whether "the summons had been issued for an improper purpose." *Id.* at 58. The *Powell* standard governs civil investigative demands to this day. *See, e.g.*, *Commodity Futures Trading Comm'n v. Tokheim*, 153 F.3d 474, 477 (7th Cir. 1998).

As for procedure, "because [the statute] contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 & n.18; *see also Califano v. Yamasaki*, 442 U.S. 682, 700 (1979) (there must be "clear expression of congressional intent to exempt actions … from the operation of the Federal Rules of Civil Procedure"). Rule 81(a)(5) is to the same effect, providing that the federal rules apply in subpoena enforcement proceedings "except as otherwise provided by statute, by local rule, or by court order." Fed. R. Civ. P. 81(a)(5). So, in enforcement of DOJ's civil

investigative demand here, as in any other context, "[t]he summoned party must receive notice, and may present argument and evidence on all matters bearing on a summons's validity." *United States v. Clarke*, 573 U.S. 248, 253–54 (2014).

Multiple district courts have thus rejected DOJ's argument that, under Title III, this Court has no role to play in reviewing the substance of DOJ's demands or their compliance with the statutory procedures. *See Weber*, 2026 WL 118807, at *8 & n.15 (holding that *Powell* controls and the Federal Rules apply to a Title III demand); *Oregon*, 2026 WL 318402, at *8 (same); *Benson*, 2026 WL 362789, at *7 (same). As required by *Powell*, this Court also should reject DOJ's efforts to strip Matthews of appropriate process under the Federal Rules.

**B.      The text of the Civil Rights Act of 1960 does not authorize DOJ's demand for an electronic copy of the unredacted voter file.**

DOJ's demand for a copy of the unreacted voter file is not "within the authority of the agency," *Morton Salt*, 338 U.S. at 652, because it falls outside the text of Title III's retention provision. The authority of a federal agency to issue civil investigative demands "is created solely by statute." *Consumer Fin. Prot. Bureau v. Accrediting Council*, 854 F.3d 683, 690 (D.C. Cir. 2017). Thus, as the Fifth Circuit held immediately after Title III's passage, "whether or not any specified particular paper or record comes within" Title III's ambit is "determin[ed]" by the court. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) [hereinafter, *Lynd I*]. DOJ's demand exceeds its authority under the text of Title III: the voter file does not relate to registration or other act requisite to voting in a specific prior election, as the plain text of the statute requires, nor does it "come into [Matthews's] possession," because the Board compiles it.

*First*, Title III applies only to records tied to a *specific election*, which Illinois's unredacted voter list is not. Title III's document retention provision is limited to records relating to voter registration in federal elections "for a period of twenty-two months from the date of … *such*

9

*election*." 52 U.S.C. § 20701 (emphasis added). This language limits the scope of Title III to records given to an election official in connection with registering for a specific federal election. *See Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961) ("Regardless of when these records came into the possession of the election official … they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election' *if* they relate to acts requisite to voting *in such election*." (emphases added)). The date of the federal election as to which DOJ requests records is used to calculate the preservation period requirement. But DOJ's demand for a snapshot of Illinois's voter list does not relate that demand to a specific federal election in the last twenty-two months. DOJ demanded the "current" list in July 2025—when no election was occurring. Therefore, Title III does not require its production.

*Second*, Title III requires Matthews to retain and produce only those records that "come into [her] possession." 52 U.S.C. § 20701. The voter file does not "come" to Matthews because the Board itself creates and maintains it. "Come into possession" means to get something—to obtain or acquire it. *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) (defining "obtain" as "to come into the possession or enjoyment of (something)" (quoting 10 Oxford English Dictionary 669 (2d ed. 1989))); *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting Random House Dictionary of the English Language 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting Webster's New International Dictionary (3d ed. 1966))). Thus, the phrase "come into [an official's] possession," 52 U.S.C. § 20701, "refer[s] to only those documents that state election officials *receive* from prospective voters." *Benson*, 2026 WL 362789, at *9 (emphasis added).

10

The Board does not receive the voter file; the Board and local election authorities create it. HAVA requires "each State, acting through the chief State election official" to implement a statewide voter list. 52 U.S.C. § 21083(a)(1)(A); *see also* ECF 4 ¶ 9. The Board maintains the database that compiles information for the voter list not only from individual voter registration forms processed by local election authorities but also from numerous other sources. *See, e.g.*, 52 U.S.C. §§ 20504, 20506 (NVRA provisions requiring States to accept information from motor vehicle offices and other state agencies); 10 ILCS 5/1A-16.1 to 16.8 (Illinois law implementing the same); Ex. 2 at 2–4 (describing this process). So "the voter registration list is not assembled purely from information in voter registration applications." *Benson*, 2026 WL 362789, at \*10.

This reading is consistent with how Title III has long been interpreted not to cover an agency's internal work-product. The Fifth Circuit observed that the Civil Rights Act did not aim to expose "confidential, private papers and effects" but merely "public records which ought ordinarily to be open to legitimate reasonable inspection." *Lynd I*, 306 F.2d at 231. Thus, internal documents collating sensitive voter information would not be discoverable.

DOJ seeks to collapse "come into possession" down to the single word "possess," but there is no basis to rephrase the statute to DOJ's liking. A statue should be construed so that "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quotation marks omitted). DOJ's reading would assign no meaning at all to the words "come into." Congress knows how to say "possess" more broadly when it so desires. *See, e.g.*, 18 U.S.C. § 1831 (whoever "receives, buys, or possesses" trade secrets has committed a felony, thereby distinguishing between possessing and coming into possession of items); *id.* § 924(a)(1)(B)(ii) (penalties related to juveniles "carry[ing] or otherwise possess[ing]" firearms); *Benson*, 2026 WL 362789, at \*9 (collecting numerous other statutes). Here, as explained below,

Congress was concerned about racial discrimination in voting and reasonably sought to reach records revealing such discrimination, like records received related to poll taxes, without giving DOJ expansive authority to reach all records possessed.

*Third*, in any event, even if the unredacted voter file *were* within the scope of Title III—which it is not—Matthews still could not be required to comply with DOJ's demand for an electronic copy of the file. Title III entitles the Attorney General to inspect and copy particular records "at the principal office of [the] custodian." 52 U.S.C. § 20703. DOJ's demand letter did not ask for an in-person visit but instead expressly limited its demand to "an electronic copy." ECF 5-2 Ex. 2 (Aug. 14, 2025, Correspondence), at 8. Inserting into the 1960 statute an implied requirement of electronic production, which is what DOJ seeks, is improper and unsupported. *See Greater Birmingham Ministries v. Sec. of State for Ala.*, 105 F.4th 1324, 1335 (11th Cir. 2024) (refusing to "read electronic production" into the disclosure requirements of the NVRA); *see generally Bostock v. Clayton Cnty.*, 590 U.S. 644, 654–55 (2020) (courts cannot "add to, remodel, update, or detract from old statutory terms"). For all these reasons, the text of Title III does not require Illinois to acquiesce to DOJ's demand for an unredacted voter list.

**C.     DOJ lacks any lawful basis or purpose for demanding these data under Title III.**

DOJ's demand also failed to satisfy the statutory requirement that it set forth "the basis and the purpose" for the demand. 52 U.S.C. § 20703. First, the August 14, 2025, letter did not even purport to identify a "basis" for the demand, and DOJ cannot now provide a post-hoc "basis" in litigation. As to DOJ's stated "purpose," enforcement of the NVRA and HAVA, the Civil Rights Act of 1960 did not confer investigative power on DOJ to enforce those laws. Title III empowered DOJ to investigate racial discrimination in voting, not voter list maintenance. DOJ's demand was thus "issued for an illegitimate purpose," *Walsh v. Alight Sols. LLC*, 44 F.4th 716, 722 (7th Cir. 2022), and it cannot be enforced.

1.    **DOJ has not articulated any "basis" for its demand.**

Title III requires DOJ to provide "the basis *and* the purpose" for the demand. 52 U.S.C. § 20703 (emphasis added). The full explanation that DOJ gave in its August 14, 2025, demand letter was: "The purpose of the request is to ascertain Illinois's compliance with the list maintenance requirements of the NVRA and HAVA." ECF 5-2 Ex. 2 (Aug. 14, 2025, Correspondence), at 8. DOJ thus provided a purported purpose—to assess compliance with the NVRA and HAVA—but it did not mention any "basis." Congress, by using "shall," required DOJ to provide a basis, and DOJ failed to do so. *E.g.*, *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("[T]he word 'shall' imposes a mandatory command."). This fact suffices to dismiss the complaint.[4]

In any event, even setting aside DOJ's simple failure to name a basis, the demand letter read as a whole fails to provide one. A lawful "basis" means some factual "foundation, support" for DOJ's demand. *Basis (n.), sense II.8*, Oxford English Dictionary (Dec. 2025). Specifically, under Title III, the "basis" must be an "assertion by the Attorney General of the United States that there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) [hereinafter, *Lynd II*]; *accord Lynd I*, 306 F.2d at 229 n.6. Nearly identical language appears in the Administrative Procedure Act ("APA"), which requires federal agencies to support rules with "a concise general statement of their *basis and purpose*." 5 U.S.C. § 553(c) (emphasis added). This language requires the agency to provide "'the complete factual and legal basis' for the new regulations." *United Mine*

---

[4] DOJ makes a conclusory allegation that it provided a basis, quoting the statute. ECF 4 ¶ 27. But that allegation is not taken as true where the demand letter is attached as an exhibit to DOJ's filings and contradicts the allegation. *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) ("When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss.").

*Workers of Am. v. Dole*, 870 F.2d 662, 667 (D.C. Cir. 1989) (emphasis removed) (quoting S. Rep. 79-248 (1946)). Similarly, here, DOJ must provide "a factual basis for investigating a violation of a federal statute," specifically a statute with a "relation to civil rights violations." *Oregon*, 2026 WL 318402, at *8–9; *see also Weber*, 2026 WL 118807, at *9 (basis means "articulable facts pointing to the violation of federal law").

DOJ's demand letter makes not even the barest factual assertion about violations of *any* statute, let alone the Civil Rights Act. And DOJ could not now provide a basis after the fact in litigation. Title III requires the written demand itself to contain the basis, 52 U.S.C. § 20703, which DOJ's demand did not. Under the APA's materially identical language, a court must examine the "contemporaneous explanation of the agency decision," upon which the decision must "stand or fall." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (quotation omitted). Courts cannot accept "impermissible *post hoc* rationalization." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 21 (2020) (quotation omitted). Similarly, here, Title III's requirement of a *contemporaneous* written basis is not a mere formality. A stated basis allows state election officials to assess whether compliance with the demand is appropriate and the Court to evaluate the legitimacy of DOJ's demand, thus preventing DOJ from asserting a pretextual purpose. It is "a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9.

### 2.   DOJ has given an illegitimate "purpose" for its demand.

As for DOJ's asserted "purpose," enforcing "the list maintenance requirements of the NVRA and HAVA" is not a legitimate purpose under Title III. Rather, the Attorney General "is entitled to inspect and copy all of the voter papers and records as defined" "in fulfillment of the duties imposed upon him by the Civil Rights Act of 1957 and 1960." *Lynd I*, 306 F.2d at 228. If

14

any purpose whatsoever could suffice, the requirement would be devoid of any meaning. *See Weber*, 2026 WL 118807, at *9; *Oregon*, 2026 WL 318402, at *10.

DOJ's purpose under the Civil Rights Act of 1960 must be related to combatting various forms of discrimination in voting, such as the payment of poll taxes or refusal to register Black voters, because the Act was enacted to enable meaningful enforcement of the Enforcement Act of 1870 and the Civil Rights Act of 1957. Those laws, in turn, were "enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements." *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008). The 1870 Act guaranteed voting rights "without distinction of race, color, or previous condition of servitude," Act of May 31, 1870, ch. 114, § 1, 16 Stat. at 140, and the 1957 Act provided for enforcement of this guarantee, Pub. L. 85-315, § 131, 71 Stat. at 637. Title III of the Civil Rights Act of 1960 was designed to further develop the enforcement scheme because existing law "lack[ed] a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit." H.R. Rep. No. 86-956, at 1944 (1959).

Contemporaneous decisions are clear: "[Title III's] purpose is to enable the Attorney General to determine whether [Civil Rights Act suits] or similar actions should be instituted." *Lynd I*, 306 F.2d at 228. "[T]he entire history of the Act reflects that it was and is designed to provide a means of enforcing the basic federally guaranteed rights of citizenship (to vote) against state action." *Gallion*, 187 F. Supp. at 852. Title III served to grant "the Attorney General an opportunity to inspect the records as to those who may have been illegally denied the right to qualify" to vote. *Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963). On the other hand, "failures to purge voters

15

who have moved away or have died," the problem targeted by the NVRA, are irrelevant to the Civil Rights Act. *Bruce*, 298 F.2d at 863 n.2.

Congress did not intend Title III to serve as an enforcement mechanism for the NVRA and HAVA. The Civil Rights Acts preexisted the NVRA and HAVA by decades, so Congress could not have meant that a valid "purpose" for demanding records under the Civil Rights Act was to examine compliance with those later acts. Moreover, the NVRA has its own records disclosure provision, 52 U.S.C. § 20507(i), and both the NVRA and HAVA include their own enforcement provisions, *id.* §§ 20510, 21111. Congress carefully crafted the enforcement provisions of the later-enacted laws; layering on top the disclosure provision of a separate law from decades earlier for a different purpose would disrupt the NVRA and HAVA enforcement schemes. Means of redress in a statute generally foreclose other types of remedies. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) ("[M]eans of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983."); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). DOJ's stated purpose of exploring NVRA and HAVA compliance is illegitimate.

**D.    A static snapshot of all Illinois voters' personal identifying information is irrelevant to enforcement of the NVRA and HAVA.**

Even if enforcement of the NVRA and HAVA were a legitimate purpose for a Civil Rights Act investigation, a point-in-time snapshot of Illinois voters' sensitive information would not be "reasonably relevant" to voter roll maintenance. *Morton Salt*, 338 U.S. at 652; *see also Powell*, 379 U.S. at 57 (agency must show that "the inquiry may be relevant to the purpose"). Collecting every Illinois voter's driver's license and social security number would not help DOJ enforce the NVRA and HAVA. These laws require only that States implement a "general program" that

16

"makes a reasonable effort" to remove from the rolls voters who have moved or died. *See* 52 U.S.C. §§ 20507(a)(4), 21083(a)(4)(A). The reasonable mechanisms that a State employs to remove ineligible voters—the State's efforts—are what the NVRA makes relevant. What DOJ demands here, a static copy of the voter list, would reveal nothing meaningful about those efforts.

DOJ already has the relevant information. On September 10, 2025, Matthews sent DOJ an 11-page letter detailing Illinois's "general program" for voter roll maintenance that complies with NVRA requirements. *See* Ex. 2. The letter described, for example, the numerous sources of information Illinois uses to identify and remove ineligible voters from the list.

But DOJ has demonstrated little interest in engagement with the Board on the technical details of how the Board undertakes vital list-maintenance work. After asking a series of accusatory questions about list maintenance in its July 28 correspondence, ECF 5-2 Ex. 1 (July 28, 2025, Correspondence), at 3–4, DOJ has never again mentioned the topic. On September 10, the Board provided detailed responses to DOJ's specific questions, Ex. 2 at 8–10, but DOJ has not followed up since. For example, the NVRA includes a safe harbor provision: if a State undertakes certain measures, then it complies with the NVRA's "reasonable effort" requirement. 52 U.S.C. § 20507(c)(1). DOJ not inquired whether the Board undertakes these efforts and is entitled to the safe harbor.

DOJ has not explained how it could instead use a static copy of voters' sensitive personal identifiers to determine compliance with the list-maintenance requirement. The presence of an ineligible voter on the list would not indicate noncompliance. For instance, the NVRA requires States to notify a registered voter and then wait for that voter to fail to vote in two federal elections before removal, *id.* § 20507(d)(1)(B), so the process of removal can take years—in compliance with the NVRA itself. More broadly, "the language of the NVRA does not require a perfect effort,

17

nor does it require the most optimal effort, nor does it even require a very good effort. Instead, the NVRA only requires a *reasonable* effort." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 628 (6th Cir. 2025). So the presence of ineligible voters on a static list would not suggest that a reasonable effort was lacking.

Similarly, the NVRA's public-disclosure provision, 52 U.S.C. § 20507(i)(1), does not require disclosure of voters' sensitive personal identifiers like social security numbers. "[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases). This Court also held that "proper redaction of highly sensitive information" from the Illinois voter list would be appropriate. *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022). Allowing the disclosure of highly sensitive personal information would burden the right to vote without promoting the purposes of the NVRA. *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267–68 (4th Cir. 2021); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711–12 (E.D. Va. 2010). It cannot be that DOJ properly enforces the NVRA by seeking information whose production is not allowed under the NVRA and whose production would undermine the purposes of the NVRA.

**E.    Dismissal of the complaint avoids serious constitutional doubts about the sweeping authority that DOJ asserts under Title III of the Civil Rights Act.**

Finally, Matthews's reading of the text of Title III avoids serious constitutional concerns about whether the Constitution authorizes DOJ's dramatic assertion of federal executive power in this matter. DOJ is attempting to use Title III of the Civil Rights Act of 1960, a law that Congress passed pursuant to the Fifteenth Amendment, for a purpose far afield from investigating discriminatory denials of the right to vote. Instead, DOJ purportedly seeks to use Title III as a

18

beefed-up enforcement mechanism for the NVRA to allow to DOJ to conduct ongoing oversight of state voter list maintenance. *See* ECF 5-2 Ex. 2 (Aug. 14, 2025, Correspondence), at 8. The Constitution does not confer power on the executive branch to expand Title III's ambit in that manner, and the Court should not construe Title III in a way that would pose a constitutional conflict.

The Constitution assigns power over elections "first to the States, and then, in some instances, to Congress," but "no role at all to the President" or his subordinates. *League of United Latin Am. Citizens v. Exec. Off. of the President*, --- F. Supp. 3d ---, 2026 WL 252420, at *1 (D.D.C. Jan. 30, 2026) [hereinafter, *LULAC*]. First, the Elections Clause "invests the States with responsibility for the mechanics of congressional elections," subject to the caveat that "*Congress*," not the executive, may "establish[] uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (emphasis added); *see* U.S. Const. art. 1, § 4, cl. 1; 52 U.S.C. § 20503(a) (States conduct voter registration as "provided for under State law"). The States again have primary authority as to voter eligibility under the Voter Qualifications Clause: Electors for federal office "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. 1, § 2, cl. 1; *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16–17 (2013).

Congress enacted Title III of the Civil Rights Act of 1960 pursuant to its power to enforce the Fifteenth Amendment. *See Katzenbach*, 383 U.S. at 310–13; *Ind. Democratic Party*, 458 F. Supp. 2d at 839. And Congress enacted the NVRA to regulate voter list maintenance pursuant to its powers under the Elections Clause. *See League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 723 (7th Cir. 2021). But Congress has not combined the two by authorizing DOJ to use Title III as a means of enforcing the NVRA on top of the NVRA's own enforcement mechanisms.

19

*See* 52 U.S.C. §§ 20507(i), 20510. "Congress must speak clearly if it intends to delegate any part of [its] power to the Executive Branch." *LULAC*, 2026 WL 252420, at \*42. Yet DOJ is instead attempting to construe broad, non-specific language in Title III to grant DOJ transformational supervisory powers over the processes for maintaining voter lists at the state level.[5]

So there are "serious constitutional doubts," *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018), that the Constitution permits what DOJ is attempting. Because DOJ's demand intrudes on functions that Congress has left to the States under the Elections and Voter Qualifications Clauses, the limited scope of Title III is important and should be strictly enforced. But "there is another reasonable interpretation available." *Edmond v. United States*, 520 U.S. 651, 658 (1997). Namely, the Court should hold that Title III does not grant DOJ the power it has claimed to demand an unredacted state voter file, for all the reasons explained above.

### V. CONCLUSION

The complaint should be dismissed with prejudice for failure to state a claim.

Dated: March 23, 2026                                          Respectfully submitted,

Vikas Didwania                                          KWAME RAOUL,
Holly Berlin                                          Attorney General of Illinois, on behalf of
R. Henry Weaver                                          Bernadette Matthews, Executive Director of the
Office of the Illinois Attorney General          Illinois State Board of Elections
115 S. LaSalle St.
Chicago, IL 60603                                  By:   */s/ R. Henry Weaver*
*vikas.didwania@ilag.gov*                                  Assistant Attorney General
*holly.berlin@ilag.gov*
*robert.weaver@ilag.gov*
(312) 814-3000

---

[5] To the extent DOJ's position is that it is exercising powers given to Congress under the Elections Clause, that position is fatally flawed. Courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (internal quotation marks omitted). Thus, Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks omitted). Title III has no suggestion that Congress intended to delegate to the executive branch the power to preempt state law under the Elections Clause. DOJ's demand is unconstitutional overreach.

**CERTIFICATE OF COMPLIANCE**

I certify pursuant to Civil Local Rule 7.1(B)(4)(c) that this memorandum complies with the type volume limitation. This memorandum contains 6948 words, including all headings, footnotes, and quotations, and excluding the cover page, table of contents, and table of authorities.

By:    */s/ R. Henry Weaver*
   R. Henry Weaver