UNITED STATES DISTRICT COURT
CENTRAL ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>BERNADETTE MATTHEWS, in her Official Capacity as Executive Director of the State Board of Elections for the State of Illinois,<br><br>Defendant. | CASE NO: 3:25-cv-3398 |

**UNITED STATES' COMBINED MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS BY DEFENDANT (DKT. 64, 65), ILLINOIS AFL-CIO, ILLINOIS ALLIANCE FOR RETIRED AMERICANS, ILLINOIS FEDERATION OF TEACHERS (DKT. 56, 69), AND INTERVENOR-DEFENDANTS COMMON CAUSE, ALEJANDRA L. IBANEZ, ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, AND PABLE MENDOZA (DKT. 67, 68)**

Plaintiff United States of America respectfully submits this Combined Memorandum of Law in opposition to the Motions to Dismiss by the Defendant, Executive Director of the State Board of Elections for the State of Illinois, Bernadette Matthews ("Director Matthews"); Intervenor-Defendants Illinois AFL-CIO, Illinois Alliance for Retired Americans, Illinois Federation of Teachers ("AFL-CIO"); and Intervenor-Defendants Common Cause, Illinois Coalition for Immigrant and Refugee Rights, Brian Beals, Pablo Mendoza, and Alejandra L. Ibanez ("Common Cause"). The United States submits this combined Memorandum, instead of two separate briefs, to facilitate the Court's review of the overlapping arguments made by the Defendant.

## I.    INTRODUCTION

The Attorney General of the United States brought this action as part of the investigation of Illinois' list maintenance practices under the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). Pursuant to Title III of the Civil Rights Act of 1960 ("CRA), the Attorney General sent a written demand to Director Matthews, for copies of federal election records under her custody or control, citing the need to investigate Illinois's compliance with NVRA and HAVA. Dkt. 5-2, Ex. 2.  Those efforts were met by Director Matthews' refusal to produce records as mandated by federal law and necessary to evaluate compliance with federal election laws. This action followed. Compl., Dkt. 4.

Title III of the CRA authorizes the Attorney General to immediately obtain all records relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705. It is unique because it is purely an investigative tool that enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir.

1

1962).[1]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; 52 U.S.C. § 20703. The record before the Court demonstrates that the United States has satisfied each of these requirements.

Defendant Intervenors argue that the Department of Justice is amassing a nationwide voter database. *See* Dkt. 68 at 3-5. It is not. The Civil Rights Division's sole purpose in requesting the Illinois' VRL is to assess the State's compliance with the voting laws that the Civil Rights Division enforces. Second Declaration of Eric Neff (2d Neff Decl.) ¶¶ 2-5. When the Civil Rights Division performs this individualized assessment, the jurisdiction's VRL is compartmentalized and maintained by the Civil Rights Division separately from the VRL of any other jurisdiction. *Id*., ¶ 6. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. *Id*. The fact that the Civil Rights Division also is assessing whether other jurisdictions are complying with the list maintenance provisions is not relevant to the election records the United States seeks from Illinois.

The United States did this type of list maintenance analysis 20 years ago. The United States

---

[1] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently two District Courts in the Ninth Circuit and one District Court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by erroneous applications of the statute, are inconsistent with each other, and are currently being appealed. *See infra* at 19-22.

has used the CRA to obtain statewide voter lists to assess list maintenance in Georgia and Texas.[2] Similarly, in 2007, the United States entered into a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. *See United States v. Maine*, No. 1:06-cv-00086 (D. Me. Apr. 4, 2007). Paragraph 9(e) of the consent decree required Maine to "provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR (computerized statewide voter registration system) that includes the voter's full name, *unique identifier*, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election." (emphasis added).[3] The United States entered similar agreements with the States of New Jersey and Indiana to enforce voter registration list maintenance.[4]

And recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as 2d Neff Decl., Ex. 7). As a result of

---

[2] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Dkt. 1. The Court entered a consent decree in the Georgia case requiring production of the VRL. *See Georgia, supra*, at Dkt. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), available at https://www.justice.gov/media/1173461/dl?inline (last visited April 3, 2026). For the Court's convenience, the five documents are provided herein as 2d Neff Decl., Exs 1–3.

[3] *See* Paragraph 11 of the Consent decree explicitly invokes the CRA at 42 U.S.C. § 1974 (recodified at 52 U.S.C. § 20701). Ex. 4 *See also McIntyre v. Morgan*, 624 F.Supp. 658, 664 (S.D. Ind. 1985) (42 U.S.C. § 1974 requires preservation of election records).

[4] *See United States v. New Jersey*, No. 06-cv-4889 (D. NJ. Oct. 12, 2006). In New Jersey, paragraph five of the stipulated order required the HAVA identifiers to be provided and paragraph 14 required Defendants to retain voter registration and list maintenance records. Ex. 5. *See also United States v. Indiana*, No. 1:06-cv-1000 (D. Ind. June 27, 2006). In Indiana, paragraph 8 of that Consent Decree required the State of Indiana to "retain voter registration and list maintenance records related to the terms of this agreement for the time periods provided by… [Section 20701]." Ex. 6.

3

the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as 2d Neff Decl., Ex. 8). The extent of the litigation necessary to obtain those records in 2026 simply reflects a coordinated effort to impede federal enforcement of HAVA and the NVRA.

Defendants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for the motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the Motions to Dismiss (Dkts. 41, 49) should be denied.

## II. BACKGROUND

It is well settled that the Elections Clause grants Congress "the power to override state regulations" by establishing uniform rules for federal elections, binding on the States. *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). Congress has enacted broad regulations over the conduct of federal elections including the NVRA and HAVA. For example, HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Additionally, Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA

4

and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

Acting pursuant to the United States' authority to enforce these federal election statutes, the Department of Justice sent Director Matthews a letter on July 28, 2025 requesting, *inter alia*, a copy of Illinois' SVRL and additional information responsive to potential problems with list maintenance in Illinois as identified in the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). ("July 28 Letter"). Dkt. 5-2, Ex 1. On August 14, 2025, the United States sent another letter requesting a copy of Illinois' SVRL ("August 14, 2025 Letter"). Dkt. 5-2, Ex. 2. As stated in the letter, the basis for the demand was Title III of the CRA and the purpose was to "ascertain Illinois' compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* Director Matthews responded that she would not provide a copy of the SVRL including all fields citing state law privacy concerns. Dkt. 5-2 Ex. 3 at 1-2. As explained in the declaration of Acting chief of the Voting Section, Eric Neff, the United States seeks these documents for one purpose only: to evaluate Illinois' compliance with the list maintenance provisions of HAVA and the NVRA, and if appropriate, to bring an enforcement action. *See* Declaration of Eric Neff ("Neff Decl."), Dkt. 5-3 ¶ 2. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in

federal elections. Neff Decl. ¶¶ 3-4. Thus, the Attorney General instituted these summary proceedings to compel the production.

### III.    MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND

Defendants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. The Court should decline this invitation, deny the Motions to Dismiss and proceed summarily pursuant to the United States' Motion for Order to Compel Production of Records Demanded Pursuant to the Civil Rights Act of 1960.

#### A.    The Federal Rules of Civil Procedure are inapplicable to motions for orders to compel production under Section 305 of the CRA.

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Lynd*, 306 F.2d at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* The Attorney General is not required to know of violations of federal law, *see id*. at 228, and no factual allegations of a violation of federal law are required. Rather, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Id.*; *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960). The United States cannot be expected to effectively enforce federal election laws such as HAVA and the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See Lynd.* at 227 (the Attorney General's "right to records does not require that he show he could win without

6

them").[5] This stands in stark contrast to discovery under FRCP 34, the "chief purpose" of which is to give a party litigant the right to have records produced *after* suit has been filed. *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960).

In each case where courts dealt with the demand for records, they did so summarily. As the Fifth Circuit noted in Lynd,

> There is no place for a motion for a bill of particulars or for a more definite statement under F. R. Civ. P. 12(e), 28 U.S.C.A. There is no place for any other procedural device or maneuver— either before or during any hearing of the application— to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand. [52 U.S.C. § 20703]. Thus with respect to the reasons why the Attorney General considers the records essential, there is no place, either as a part of pleadings, discovery, or trial, for interrogatories under F. R. Civ. P. 33, oral depositions of a party under F. R. Civ. P. 26(a), 30, production of documents under F. R. Civ. P. 34, or request for admissions as to facts or genuineness of documents or other things under F. R. Civ. P. 36, 37.

*Lynd* at 226.

This line of practice was also recently followed by a District Court in the Sixth Circuit, construing a CRA record demand as akin to an administrative subpoena, finding "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…". *United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, *7 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 25, 2026). The court in *Benson*, however, denied the United States' motion on other grounds. Two other Courts in the Ninth Circuit, have also recently addressed the issue, incorrectly finding that the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48

---

[5] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975), *see also United States v. Powell*, 379 U.S. 48 (1964); *United States v. Morton Salt Co.*, 338 U.S. 632 (1950).

(1964) overruled *Lynd*.[6] The reasoning of those Courts is flawed, however, as the statute at issue in *Powell* involved an IRS summons issued under 26 U.S.C. § 7605(b). The *Powell* court found that it could inquire as to the reasonableness of the summons because the internal revenue code prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Powell* at 52-53. However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.* To hold otherwise would vitiate the entire purpose of Title III's enactment. The only questions properly before the court to decide are (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703. The answer is emphatically yes, so the inquiry ends and the Court should deny the motions to dismiss.

**B.    Defendants cannot challenge the Attorney General's basis and purpose to investigate Illinois' HAVA and NVRA compliance.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records that articulates "the basis and purpose therefor." 52 U.S.C. § 20703. The United States has done that. On August 14, 2025, the

---

[6] *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Feb. 25, 2026); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Feb. 25, 2026).

8

United States sent Director Matthews a written demand for a copy of Illinois' VRL. *See* Neff Decl., Dkt. 5-2, Ex. 2. As stated in that demand, the basis for the demand was Title III of the CRA, the NVRA and HAVA, and the purpose was to "assess [Illinois'] compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA")." *See* Dkt. 5-2, Ex. 2 at 1.

Nevertheless, Defendants argue that the United States failed to provide a sufficient statement of basis and purpose for its demand for federal election records or, in the alternative, that it has not provided the true reason for the demand. Def. Mem., Dkt. 65 at 13–16; AFC-CIO Mem., Dkt. 56 at 9–10; AFC-CIO Supp. Mot., Dkt. 69 at 2; Common Cause Mem., Dkt. 68 at 13–16. That is incorrect. Illinois's SVRL is necessary to perform an *individualized* assessment of the State's compliance with NVRA and HAVA. *See* 2d Neff Decl. ¶2-6.

As a threshold matter, the CRA does not allow these criticisms to derail the United States' demand for election records. Defendants cannot use any "procedural device or maneuver," including the Defendants' motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id*. "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, WL 362789, at *8 (W.D. Mich. Feb. 10, 2026) ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to

9

obtain federal election records under Title III of the CRA. *See In re Coleman*, 208 F. Supp. 199, 200–01 (S.D. Miss. 1962) ("*Coleman I* "). In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). Movants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied by federal courts.

Federal courts have rejected contentions that parallel those made by Defendants. The *Benson* court acknowledged the "severely limited" inquiry that was to be applied to CRA motions to compel. *Lynd*, 306 F.2d at 226. It rebuffed the state's efforts to dispute the accuracy of the Attorney General's allegations of its list maintenance practices. *Benson*, 2026 WL 362789, at *8. The court reasoned, "the CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose." *Id.* (citing *Lynd*, 306 F.2d at 226).

Defendants' contention that the demand needs to include a factual basis showing an *extant* violation of federal law, fails for the reasons discussed above. *See supra*, Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand). Instead, a reference to the statutory basis for making the demand, namely the CRA, suffices. Dkt. 5-2, Ex. 2 (explaining that the records are needed to "conduct an independent review of each state's list" under HAVA).

Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for his demand." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th

Cir. 1963) (per curiam), ("*Coleman II*"), *cert denied* 373 U.S. 950 (1963) (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642–43 (same construction of administrative subpoena by the FTC). The United States satisfied that requirement by stating, "[t]he purpose of the request is to ascertain Illinois' compliance with the list maintenance requirements of the NVRA and HAVA." Dkt. 5-2, Ex. 2 at 2.[7]

Even if the court allows the type of inquiry Defendants seek—and it should not—the United States can demonstrate its factual basis. HAVA requires that voter registration applicants provide a driver's license and SSN4 if they have one. *See* 52 U.S.C. § 21083(a)(5)(A)(i). The United States needs to verify that states are collecting these numbers by looking at an unredacted voter list. *See* 2d Neff Decl. ¶ 5.

The United States made this demand in the August 14 Letter:

> [T]he electronic copy of the statewide Voter Registration List ("VRL") must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA") to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

---

[7] Defendants are incorrect when they assert that Congress required a demand's "basis" to be distinct from its "purpose." Dkt. 65 at 1-3, 14. That is, Section 303's use of the term "the basis and the purpose therefor" is best understood to require the Attorney General or his designee to tell a State what he is looking for and a high-level explanation as to why. As a result, as in other legal contexts, the same explanation can furnish both an action's "conceptual basis and purpose." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533 (1984); *see also, e.g., Heckler v. Chaney*, 470 U.S. 821, 841 (1985) (Marshall, J., concurring in the judgment).

August 14 Ltr., Dkt. 5-2, Ex. 2 at 2. The accompanying footnote explained that when Congress charged the Attorney General with HAVA enforcement, it "plainly intended that Justice Department be able to conduct an independent review of each state's list." *Id.* at n.1. These numbers are also necessary to fulfill the purpose of assessing whether a jurisdiction is complying with list maintenance requirements because the HAVA identifiers are used to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. 2d Neff Decl. ¶¶ 4–5.

Even if more of an explanation was required, the July 28 Letter demand provided additional context, explaining that EAVS Report from the Election Assistance Commission raised significant questions about whether the State of Illinois, and numerous counties, comply with the list maintenance provisions of NVRA and HAVA. *See* Dkt. 5-2 Ex. 1 at 2–3 (reciting, among other things, that 32 counties send no confirmation notices, that the State reported sending out over 3.8 million confirmation notices representing 46.9 percent of all registered voters when the national average is 19.5 person). The United States' July 28 and August 14, 2025, letters "collectively put [Illinois] on notice of the basis and purpose of its request, which is sufficient to comply with the CRA." *See, e.g., Benson*, 2026 WL 362789 at *8 n.3 (W.D. Mich. Feb. 10, 2026).

Regarding purpose, Director Matthews argues that one cannot tell anything about list maintenance from an unredacted VRL. Dkt. 65 at 16–18. That is incorrect. First, federal law requires that a voter registration application includes "the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number." 52 U.S.C. § 21083(a)(5)(A)(i). The United States will be able to determine whether that information is being collected. Second, in 2001, the bipartisan National Commission on Federal Election Reform explained why adding driver's license information and the last four of the Social Security numbers

12

for federal elections protected individual voters and allowed better list maintenance. Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32–33 (Aug. 2001) (excerpts provided as 2d Neff Decl., Ex. 9) It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found." H.R. Rep. 107-329, pt. 1, at 36 (2001).

C.     **Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the CRA is entitled "Federal Election Records." Pub. L. No. 86-449, 74 Stat. 86, 88 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or his representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Defendants argue that race must be a factor in the Attorney General's Investigation. Dkt 65 at 12-16. This contention is belied by the clear text of the statute. Congress made clear in the CRA where it intended a remedy to be limited to racial

13

discrimination. *See*, *e.g.*, Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90;[8] 42 U.S.C. § 2000e-2;[9] 52 U.S.C. §§ 10301-10306, 10309;[10] 42 U.S.C. §§ 3604-3606, 3617.[11] No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706. No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

While investigations into racially discriminatory voting practices are among what the CRA authorizes the Attorney General to investigate, they are not the only investigations authorized. In *Gallion,* the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 855 (emphasis added). The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman I*, 208 F.Supp. at 200. (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated"). The words "race" and "racial" are conspicuously absent.

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only

---

[8] Applying Title VI of the CRA to violations of rights "on account of race or color." Codified as amended at 52 U.S.C. § 10101.

[9] Title VII of the CRA of 1964 prohibiting employment practices "because of such individual's race, color."

[10] Voting Rights Act of 1965 prohibits discrimination "on account of race, color," or language minority status.

[11] Fair House Act of 1968 prohibits discrimination in housing or rentals "because of "race, color … or national origin."

14

by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

As a result, the United States respectfully submits that the Court must decline Defendants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id.*

### D. The United States is entitled to unredacted "reproduction" and "copying" of Illinois' federal election records, including its SVRL.

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or his representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

An officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession." Director Matthews acquired the relevant records in the course of carrying out her duties as an officer of election. Her pedantic distinction that the board did not "come into possession" of the SVRL because the board created it, is a distinction without a difference. Def. Mot. at 12–13. The distinction between possessing something and having something come into one's possession is a temporal distinction—not a distinction between obtaining records from an outside source and through self-generation. Other statutes follow a similar construction. For example, Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization is declaration of intention is

15

lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event if Director Matthew's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Director's office generated the requested record and, under the Director's view, therefore did not "come into … possession" of it, any other "officer of election" within the same agency that acquires the record has "come into … possession" of the record and was obligated to "retain and preserve" it.  52 U.S.C. § 20701. Director Matthews now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying" *id.* § 20703, in an unredacted form.

The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304, 52 U.S.C. § 20704 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet Defendants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress

16

rejected the position that they advance by its broad reference to "all records and papers…" 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses. Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Illinois's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Defendants that non-public records are excluded fails as a matter of law.

The data the United States has requested under the CRA is the same that twenty-five states (including Illinois) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[12] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

Intervenors argue that privacy risks require redaction here. Dkt. 68 at 17-20. Not so. The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy

---

[12] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Feb. 17, 2026).

17

laws, such as the Privacy Act, E-Government at and Driver's License Protection Act. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[13] *Lynd*, 306 F.2d at 230.

### E. Illinois' SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added).

Illinois's SVRL is perhaps the archetypical example of a "record" that "relat[es] to" voter "registration." 52 U.S.C. § 20701. "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). And "[t]he ordinary meaning of" the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 566 n.1 (2011) (the term "related" is "expansive"). The SVRL is the

---

[13] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* Neff Decl. ¶ 16. As of April 6, 2026, fourteen states have provided their SVRLs without any MOU. *Id.* Two states have agreed to provide their SVRL under the terms of the MOU. *Id.* Oklahoma has provided their SVRL pursuant to a settlement agreement. *Id.*

method by which Illinois records who has registered to vote, and one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-96 (2017) (quoting *Morales*, 504 U.S. at 383-84)—namely, voter "registrations," 52 U.S.C. § 20701.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not exclude production of electronic or non-public records nor does it exclude records created by the custodian. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and papers," as the statute provides, *id.* and cannot be circumvented in the manner that Defendant suggest nor can he artificially narrow the scope of the request or qualify his production in any manner not specified in Title III. *See Kennedy v. Lewis*, 325 F.2d 210 (5th Cir. 1963).

Today many – and likely even most – voter registration applications are only in electronic form in a SVRL.[14] Director Matthew's understanding of what constitutes a "record" follows the

---

[14] According to the data that Illinois reported to the U.S. Election Assistance Commission, it is doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, and online. *See* U.S. Election Assistance Comm'n, EAVS Data Interactive 2024, *available at* https://www.eac.gov/research-and-data/studies-and-reports/eavs-data-interactive (last visited March. 4, 2026).

decision of the *Benson* court. However, such a reading would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226. Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic…" 2026 WL 362789, *10. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress*…" *Id.* (emphasis in original).

Nothing in Section 20701 restricts "all records and papers" to only those records and papers submitted by voters; even assuming that the examples of documents in the statute each "refers to something that the voter submits or does," 2026 WL 362789, at *9, that does not mean that every record or paper "relating to" those examples, 52 U.S.C. § 20701, likewise comes from a voter. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (Section 301 "encompasses, among other things, voting registration records, poll lists, applications for absentee ballots, ballot envelopes, tally sheets, computer programs used to tabulate votes, as well as the ballots themselves.").

Limiting Section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. Interpreting Section 301 to exclude materials that state election officers have created themselves—including statewide voter registration lists— would subvert that purpose by frustrating the United States's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers." *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson v. United States*, 400 U.S. 517, 533 (1971)); *accord*

20

*N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court rejected that contention. It explained that the plaintiff was entitled to the registered voter list because "a voter list is simply a partial compilation of voter registrations" encompassed by the Act. *Id*. at 442. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 20701, 20703. According to the *Benson* court, "'*come* into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. 2026 WL 362789, at *9 (first emphasis added). That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he

21

"get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession. And Defendant acquired the relevant records in the course of carrying out her duties as an officer of election.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of:  acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election.

Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible to carry out the duties assigned by Congress.

**F.  Use of Title III of the CRA does not create constitutional concerns.**

The United States' demand for an SVRL under Title III does not create as constitutional issue as Defendant suggests.  Dkt 65 at 18-20. The United States exercises investigatory power under Title III, which is an express grant of authority from Congress to the Attorney General.  *See* 52 U.S.C. §§ 20701-20706.  As explained above in the introduction, this use of the CRA to enforce list maintenance provisions of HAVA and the NVRA is not new.  Moreover, the United States is not claiming any new authority to revise or maintain Illinois' voter rolls.  The United States wants to verify that Illinois is complying with specific federal law requirements like the requirement for HAVA identifiers to be filled in on a voter registration application. *See* 52 U.S.C. § 21083(a)(5)(A).

## IV.    CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss (Docs. 41, and 49) be denied and the court summarily compel Director Matthews to produce the demanded records.

Dated: April 6, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

/s/ Christopher J. Gardner
CHRISTOPHER J. GARDNER
BRITTANY E. BENNETT
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8.141
Washington, D.C. 20002
Christopher.Gardner@usdoj.gov
Brittany.Bennett@usdoj.gov
Tel. (202) 704-5430
Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2026, a true and correct copy of the foregoing document was served via the email to all counsel of record.

/s/ Christopher J. Gardner
CHRISTOPHER J. GARDNER
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430